## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, **IOWA CITIZENS FOR COMMUNITY IMPROVEMENT**, **BAILING OUT BENJI**, **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**, and **CENTER FOR FOOD SAFETY**<br><br>Plaintiffs,<br><br>v.<br><br>**KIMBERLY K. REYNOLDS**, in her official capacity as Governor of Iowa, **TOM MILLER**, in his official capacity as Attorney General of Iowa, and **DREW SWANSON**, in his official capacity as Montgomery County, Iowa County Attorney,<br><br>Defendants. | **CASE NO.  4:19-cv-124**<br><br><br>**CIVIL RIGHTS COMPLAINT** |

Plaintiffs Animal Legal Defense Fund (ALDF), Iowa Citizens for Community Improvement (CCI), Bailing Out Benji, People for the Ethical Treatment of Animals, Inc. (PETA), and Center for Food Safety (CFS), by and through their attorneys, Rita Bettis Austen of the American Civil Liberties Union of Iowa; Matthew Liebman, Cristina Stella, and Kelsey Eberly of ALDF; Professors Justin Marceau and Alan Chen of the University of Denver Sturm College of Law, who are of counsel to ALDF; Matthew Strugar of the Law Office of Matthew Strugar; George Kimbrell of the CFS; and David S. Muraskin of Public Justice, P.C., respectfully allege as follows:

### INTRODUCTION

1.  In 2012, Iowa enacted its original "Ag-Gag" law, Iowa Code § 717A.3A, which criminalized undercover investigations at factory farms and slaughterhouses.

2.   In 2017, Plaintiffs brought suit challenging the constitutionality of that law.

3.   Earlier this year, this Court granted summary judgment to Plaintiffs, finding that the law was facially unconstitutional under the First Amendment, and enjoined the state from enforcing it. *See Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019) (granting summary judgment); ECF No. 86 (Feb. 14, 2019) (granting declaratory and injunctive relief).

4.   Less than three weeks after the Court enjoined enforcement of the first Ag-Gag law, the legislature introduced a new one. And on March 14, 2019, Defendant Governor Reynolds signed into law Senate File 519, now codified at Iowa Code § 717A.3B.

5.   As with the old Ag-Gag law, the new Ag-Gag law criminalizes undercover investigations at factory farms and slaughterhouses, the only difference being the law targets a slightly different form of speech that is integral to those investigations.

6.   Undercover investigations of factory farms and slaughterhouses regularly reveal criminal cruelty to animals, unsafe food safety practices, environmental hazards, and inhumane working conditions.

7.   In the last decade alone, journalists and animal protection advocates have conducted more than eighty undercover investigations at factory farms in the United States, virtually all of which would be criminalized by the new Ag-Gag law. Without exception, each investigation has exposed horrific animal suffering and many have led to food safety recalls, citations for environmental and labor violations, evidence of health code violations, plant closures, criminal animal cruelty convictions, and civil litigation. These investigations have resulted in thousands of news stories and have made invaluable contributions to national conversations on matters of significant public concern.

8.   In 2011, an undercover investigation at Iowa Select Farms exposed workers hurling small

piglets onto a concrete floor.[1] That same year, undercover investigators at Iowa's Sparboe Farms documented hens with gaping, untreated wounds laying eggs in cramped conditions among decaying corpses.[2] Using undercover investigators employed at a Hormel Foods supplier in Iowa, Plaintiff PETA documented and exposed workers who beat pigs with metal rods, stuck clothespins into pigs' eyes and faces, and kicked a young pig in the face, abdomen, and genitals to make her move while telling one investigator, "You gotta beat on the bitch. Make her cry." Another PETA investigation revealed horrific treatment of cows at an Iowa kosher slaughterhouse, some of whom remained conscious for as long as two minutes after their throats had been slit.

9.   Undercover investigations at agricultural production facilities also document unsafe working conditions, improper food safety practices, sexual misconduct, violations of labor laws, and violations of environmental laws.

10. In passing each of Iowa's Ag-Gag laws, the legislature intended to prevent such investigations with the force of criminal penalties. And it has succeeded. In the years leading up to the passage of the first Ag-Gag law in 2012, there were at least ten undercover investigations in Iowa. There have been none since.

11. Efforts to conduct undercover investigations, labor organizing, and advocacy regarding agriculture production facilities are often employment-based. Investigators or labor organizers obtain a job through the usual channels, then document activities in the facility through a hidden

---

[1] Anne-Marie Dorning, *Iowa Pig Farm Filmed, Accused of Animal Abuse*, ABC NEWS (June 29, 2011), https://abcnews.go.com/Business/iowa-pig-farm- filmed-accused-animal-abuse/story?id=13956009.
[2] Tiffany Hsu, *McDonald's Cuts Egg Supplier After Undercover Animal Cruelty Video*, L.A. TIMES (Nov. 18, 2011, 2:24 PM), http://latimesblogs.latimes.com/money_co/2011/11/mcdonalds- cuts-egg-supplier-after-undercover-animal-cruelty-video.html.

camera or work to organize coworkers, while performing the tasks required of them as employees. When obtaining employment, investigators actively or passively conceal their underlying motive, as well as their affiliations with journalistic or advocacy groups.

12. In other cases, such as investigations into puppy mills, groups or their agents may pose as customers, or buyers, to gain access to facilities so they can observe and document conditions for puppies and dogs.

13. Like the first Ag-Gag law, the new law gags critics of unsafe, abusive, or illegal practices within industrial agriculture by creating a content- and viewpoint-based crime that targets undercover investigators and other critics of industrialized agricultural production.

14. The new Ag-Gag law criminalizes using "deception," which is defined to include affirmative statements *or* omissions, to gain access to or employment at an agricultural production facility "with the intent to cause physical or economic harm or other injury to the agricultural production facility's operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer." Iowa Code § 717A.3B(1)(a), (b).

15. By targeting the intent to create "economic harm" or some undefined "other injury" to an "agricultural production facility," the statute makes clear it is not simply regulating access, but the speech generated as a result of undercover investigations and the subsequent release of information to the public, consumers, and advocacy groups.

16. Exposure of truthful information obtained by critics of industrial agricultural practices from undercover investigations has had and will continue to have the natural result of creating publication or reputational injuries to agricultural production facilities. Such exposure generates boycotts, food safety recalls, citations for environmental, labor, and health code violations, and criminal convictions. Because these reputational harms are "economic harms" or, potentially

"other injur[ies]," the new Ag-Gag law criminalizes undercover investigations at these facilities.

17. The Ag-Gag law creates a free speech paradox. When Plaintiffs' undercover investigators come across extreme animal cruelty or serious violations of food safety, labor, or environmental laws, they are more likely to receive more media attention, and will be more likely to be prosecuted under Iowa Code § 717A.3B. The more significant the public's interest in the exposé, the more likely the economic harm or "other injury," and thus the more likely a prosecution. Thus, the objective, and reality, of the law is to impede not just the gathering, but particularly the release of information of public concern.

18. Plaintiffs—the same entities that successfully brought suit to enjoin Iowa's first Ag-Gag law—now bring this action asking the Court to strike down the criminalization of investigations undertaken with an intent to cause "economic harm or other injury" from both substantive subsections of Iowa's new Ag-Gag law, Iowa Code § 717A.3B(1)(a) and (b).

## JURISDICTION AND VENUE

19. This action arises under the U.S. Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

20. This Court has authority to grant the declaratory and injunctive relief herein requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

21. Venue is proper in the U.S. District Court for the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### Plaintiffs

22. Plaintiff ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit animal protection organization founded in 1979 that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food. ALDF's work is supported by more than 200,000 members and supporters across the country, including in Iowa. ALDF promotes the humane treatment of farmed animals. ALDF and its agents have conducted undercover investigations at animal facilities around the country, including facilities that would meet the definition of an "agricultural production facility" under Iowa Code § 717A.1(5)(a). ALDF would like to retain an investigator to conduct an investigation at an agricultural production facility in Iowa, has conducted animal welfare investigations in Iowa before, and has a professional working relationship with a licensed private investigator in Iowa. Moreover, ALDF's core mission of improving the lives of animals is fundamentally impaired by the Ag-Gag law. ALDF uses investigations to support its litigation and outreach, and this law directly impedes these efforts by diminishing the supply of such investigations. ALDF also spends significant resources to prevent the spread of unconstitutional Ag-Gag laws, including the ones enacted in Iowa. These expenditures to counteract these unconstitutional civil rights violations constitute a harmful diversion of ALDF's resources and a loss to the organization because those resources could otherwise be spent to further ALDF's core mission of protecting the lives and advancing the interests of animals through the legal system, including, for example, efforts to gain new legal protections for animals. ALDF, however, is obligated to divert its resources in order to prevent the harm Ag-Gag laws, like and including the one most recently enacted in Iowa, pose to ALDF's core mission because such laws prevent the creation and dissemination of information that protects the lives and advances the interests of animals, and because such laws directly impede the improvement of animals' status in the law.

23. Plaintiff IOWA CITIZENS FOR COMMUNITY IMPROVEMENT (CCI) is a statewide Iowa non-profit organization that works to enable Iowans from all walks of life—urban and rural, young and old, immigrants and lifelong Iowans—to make change in their communities by raising their voices and doing grassroots advocacy. They have approximately 5,100 dues paying members around the state, in addition to another 17,000 supporters and activists who sign up to receive CCI emails, take action online, attend meetings, sign petitions, and engage in other forms of activism with and for CCI. Many of their members are workers in agricultural facilities, through which CCI would be able to engage in undercover investigations and engage in evidence collection through false pretenses in order to support its advocacy mission, were it not for the Ag-Gag law. Their motto is "People Before Politics. People Before Profits. People Before Polluters." Their organizational priorities include fighting factory farms and protecting Iowa's clean water and environment, as well as advancing worker justice, racial justice, and immigrants' rights. They work to organize workers, and have specifically worked in the past to organize in hog facilities. In 2015, they worked with Latino workers in an egg and poultry facility who had been forced to pay for their own protective gear. CCI did not engage in undercover investigations as part of that advocacy, and did not collect footage of conditions for workers inside that facility, out of fear of criminal liability imposed by Iowa's first Ag-Gag law. Prior to the first Ag-Gag law, CCI's members—who were workers in targeted facilities— would collect photographic evidence of poor or unsafe working conditions. Those photos were key components of the complaint that CCI members, who were Latino farmworkers, filed with the Occupational Safety and Health Administration (OSHA) in 2012 against Anogla Pork LLC—which resulted in the agency issuing citations and notifications of penalty to Anogla Pork later that year. In that case, the ability of CCI, through its members, to obtain photographic evidence under the pretense of

simply being workers showing up for duty, was critical to the citations, which included serious

violations for failing to furnish facilities that were "free from recognized hazards that were

causing or likely to cause death or serious physical harm" to employees. In addition, CCI has

utilized and would utilize video and images gathered from such investigations in its online and

in-person activism, including online petitions and other forms of advocacy. But, now, when they

believe illegal dumping into Iowa waterways or other violations of the Clean Water Act are

occurring, they have been chilled from obtaining video evidence of those violations. Because of

the fear of criminal prosecution imposed by the new Ag-Gag law, CCI and its members do not

collect those images or video by gaining access to agricultural facilities, and are limited to what

documentation and images are viewable from public property. This necessarily severely limits

what documentation and images are used in CCI's advocacy. At a time when the Iowa

Department of Natural Resources has been underfunded by the legislature and is understaffed to

investigate and respond to citizen complaints of spills or dumping, CCI views the availability of

those tools as never more important to its mission.

24. Further, as a result of the new Ag-Gag law, CCI's new Worker Justice and Immigrants'

Rights Organizer will be unable to effectively engage with workers in agricultural facilities,

because the organizing tools CCI employs—including unionizing workers, putting pressure on

the employer to reform through public confrontation with evidence of unsafe, abusive, or illegal

practices, or filing complaints with state and/or federal regulatory agencies—begin with

encouraging workers to document the practices. CCI has found that documentation is essential to

protect workers from retaliation and provide workers with a remedy if retaliation does occur.

These concerns are particularly prevalent with undocumented immigrant workers, whose

immigration status makes them vulnerable to exploitation by their employers. As a result, CCI's

Worker Justice and Immigrants' Rights Organizer will be redirected to other industries, including construction trades and the service industry, while the agricultural industry, where worker protections are sorely needed, remains essentially off-limits. CCI is also chilled from organizing workers in the with the intent of exposing employer bad practices to the employer's customers, so that the customers of the employer in turn pressure the employer for reform. This is a tactic that CCI has successfully used in the past to end wage-theft practices at a Des Moines employer but which now it will be unable to employ in agricultural facilities.

25. Finally, CCI has diverted money and other organizational resources away from its core educational and outreach programs to focus on the social harms of the Iowa Ag-Gag laws and laws like them. The existence of Iowa Code § 717A.3B forces CCI to do public outreach and education about Ag-Gag laws generally, including Iowa's; CCI diverted resources to engage in lobbying against the bill that became the new Ag-Gag law. As such, CCI has less money and time to devote to outreach on topics that are central to its mission, such as educating the public about the harms of industrial farming.

26. Plaintiff BAILING OUT BENJI is a small Iowa non-profit organization that works to protect companion animals and raise the public's awareness about various animal welfare issues impacting dogs. It is specifically concerned about puppy mills. In 2011, the organization's founder, Mindi Callison, first learned about Iowa's problem puppy mills and the conditions some dogs and puppies face in large animal breeding facilities, including lack of human interaction, unsafe and unsanitary conditions, lack of veterinary care, and exposure to rain, snow, extreme heat, and extreme cold. Outraged and motivated to change things in Iowa, she founded Bailing Out Benji. Prior to the passage of the first Ag-Gag law, the organization conducted its own investigations into puppy mills, including on an undercover basis by using false pretenses or

"deception" to gain access to facilities, and used images and video obtained by these and others'
investigations in the organization's public presentations. For example, Bailing Out Benji
volunteers have used false pretenses to gain access to dog auctions, either by stating overtly or
by letting the assumption go uncorrected that they were breeders or brokers, when in fact, their
intent was not to purchase dogs, but to document and expose practices that they view as abusive,
and then rescue the dogs. This exposure specifically aims to name and shame puppy mills and
pet stores that buy from them. Since the Ag-Gag laws were enacted, however, Bailing Out Benji
no longer engages in undercover activities for fear of prosecution. Similarly, prior to the first Ag-
Gag law, Bailing Out Benji would use images and video obtained through undercover
investigations conducted in Iowa by another animal welfare organization, Companion Animal
Protection Society (CAPS), in their public education activities. Now, because of the chilling
effect of the Ag-Gag laws, CAPS no longer produces undercover materials of puppy mills in
Iowa, and as a result Bailing Out Benji can no longer use these materials in its advocacy. Finally,
one of the ways in which Bailing Out Benji accomplishes its mission is by exposing which
puppy mills pet stores in Iowa are purchasing puppies from as well as the conditions of those
puppy mills. For example, prior to the first Ag-Gag law, Ms. Callison engaged in deception to
gain access to a puppy mill that sold dogs to a pet store in Ames—by posing as a college-bound
student buying a puppy to keep her company—so that she could observe and document
conditions for dogs inside, and used that information to pressure the pet store to stop buying
puppies from that puppy mill—directly targeting the business interests of the puppy mill. When
that effort failed, Bailing Out Benji's volunteers protested the Ames pet store every weekend for
seven years before the pet store went out of business in June 2018. On March 28, 2019, a puppy
mill south of Ames, Iowa posted a "help wanted" ad on a Facebook group of approximately

22,000 people, "Ames People."  The puppy mill is one that Bailing Out Benji has been concerned about for some time. Because of the second Ag-Gag law, however, Bailing Out Benji was unable to send its volunteers to apply for jobs at the puppy mill in order to gain access to the puppy mill to observe the conditions for dogs and puppies, and, if warranted, expose abusive or unsafe conditions to regulatory agencies and the public.

27. Bailing Out Benji has also diverted volunteer time and other organizational resources away from its core educational and outreach programs to focus on the social harms of the Ag-Gag laws and laws like them. The existence of Iowa Code § 717A.3B forces Bailing Out Benji to do public outreach and education about Ag-Gag laws generally, including Iowa's; the organization diverted its resources to educate its membership about its opposition to the bill that became Iowa Code § 717A.3B. As such, Bailing Out Benji has less money and time to devote to outreach on topics that are central to its mission, such as educating the public about the harms of puppy mills, and other forms of abuse, neglect, and cruelty to dogs and puppies.

28. Plaintiff PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. (PETA) is a Virginia non-stock corporation and animal protection charity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals. A central tenet of PETA's mission is to expose cruelty to farmed animals, educate the public about such cruelty, and encourage people to choose a lifestyle that does not involve or support abuse, neglect, or exploitation of animals. PETA has conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of investigations

over to appropriate law enforcement and/or regulatory authorities. It continues to conduct these investigations to expose further illegal conduct on the part of workers and management personnel. PETA is also interested and willing to conduct an investigation in Iowa but for the threat of criminal prosecution under Iowa Code § 717A.3B. Specifically, PETA has conducted such employment-based investigations in Iowa before the passage of the first Ag-Gag law and is interested in conducting an employment-based undercover investigation in Montgomery County following receipt of a whistleblower report of animal mistreatment at a Montgomery-based egg farm. PETA would attempt to conduct an employment-based undercover investigation at the Montgomery County facility but for the new Ag-Gag statute. Moreover, PETA uses investigations to support its litigation and outreach, and this law directly impedes these efforts by diminishing the supply of such investigations. The new Ag-Gag law impairs PETA's ability to carry out its core mission and has forced PETA to divert resources toward educating the public regarding and otherwise opposing Ag-Gag laws, like those enacted in Iowa. PETA has diverted and will continue to divert resources to engage in educational outreach about Iowa's Ag-Gag laws, and the money spent opposing and doing outreach regarding Ag-Gag laws diminishes the money available for these more traditional, core educational goals of PETA.

29. Plaintiff CENTER FOR FOOD SAFETY (CFS) is a 501(c)(3) non-profit environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impact of industrial agriculture. Through legal, scientific, and grassroots action, CFS protects and promotes the public's right to safe food and the environment. CFS has over 900,000 members nationwide, including 5,211 members in Iowa. CFS's industrial animal agriculture program uses regulatory action, citizen engagement, litigation, and legislation to promote transparency and accountability in the animal agriculture industry. Through this work,

the program aims to reduce the harmful impacts of industrial animal facilities on animal welfare, the environment, and human health and to increase consumer awareness, availability, and accessibility of suitable alternatives by highlighting humane, organic, and pasture-based animal raising practices and producers. Since 2009, CFS's industrial animal agriculture program has developed expertise and multi-faceted strategies on addressing the known impacts of intensive animal confinement on food safety and public health. Unconstitutional Ag-Gag laws frustrate CFS's mission to protect the earth from the harmful impact of industrial agriculture because they prevent CFS from obtaining and disseminating information about the conditions at animal production facilities to their members, impede the transparency in agriculture that CFS promotes, and encourage the continuation of the harmful, inhumane, industrial animal agricultural model. CFS disseminates to government agencies, members of Congress, and the general public a wide array of informational materials addressing the harmful effects of industrial agriculture. These materials include news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work. The new Iowa Ag-Gag law impedes CFS's ability to carry out its work because it cannot obtain and disseminate information concerning the animal agricultural industry in Iowa that would be produced by undercover investigations. CFS has also spent significant resources to stop unconstitutional Ag-Gag laws and promote transparency in animal agriculture. But for these unconstitutional Ag-Gag laws, CFS would utilize its limited resources promoting alternatives to the industrial animal raising system.

**Defendants**

30. Defendant KIMBERLY KAY REYNOLDS is the Governor of Iowa and as such, is the

Chief Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes. The Governor is sued in her official capacity.

31. Defendant TOM MILLER is the Attorney General of Iowa and as such, oversees the enforcement of the State's criminal statutes by the Iowa Attorney General's Office, including yearly coordination of training with Iowa county attorneys who prosecute the state's criminal statutes in all of Iowa's 99 counties. The Attorney General is sued in his official capacity.

32. Defendant DREW B. SWANSON is the County Attorney of Montgomery County, Iowa, the site of an egg farm where PETA would conduct an undercover investigation in response to a 2017 whistleblower complaint, but for the new Ag-Gag law. As county attorney, Mr. Swanson is primarily responsible for the enforcement of criminal laws in Montgomery County, Iowa by acting as prosecuting attorney on behalf of the State of Iowa. Mr. Swanson is sued in his official capacity.

## FACTUAL BACKGROUND

### Plaintiffs Challenge Iowa's First Ag-Gag Law, Which This Court Declares Unconstitutional and Enjoins

33. Iowa enacted its original Ag-Gag law, codified at Iowa Code § 717A.3A, in 2012. That law criminalized "obtain[ing] access to an agricultural production facility by false pretenses," Iowa Code § 717A.3A(1)(a), as well as "mak[ing] a [knowingly] false statement or representation" on an employment application "with an intent to commit an act not authorized by the owner" of the facility. Iowa Code § 717A.3A(1)(b). Violations were punishable by up to a year in jail and up to $1,875 in fines for a first conviction, Iowa Code § 903.1(1)(b), or up to two years in jail and up to $6,250 for a second conviction. *Id.* §§ 903.1(2); 717A.3A(2).

34. Iowa passed its first Ag-Gag law in response to a series of industrial farm investigations that revealed appalling violence to animals at agricultural production facilities. These

investigations revealed workers hurling small piglets onto a concrete floor and kicking pigs on the face and genitals, among other horrors.

35. The law had the effect of criminalizing undercover investigative activities targeting agricultural operations. It required journalists and investigators to disclose that they sought to engage in an undercover investigation as part of the employment process, eliminating any possibility that they would be permitted access to these facilities.

36. In 2017, the same Plaintiffs that bring this case filed suit challenging Iowa Code § 717A.3A on its face and in full as violating of the First and Fourteenth Amendments. *See Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362-JEG-HCA (S.D. Iowa).

37. In January of this year, the Court granted summary judgment to Plaintiffs. *Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019). Analyzing the law under both strict and intermediate scrutiny, the Court found that the entire statute was unconstitutional under the First Amendment. *Id*. at 826-27. In February, the Court entered judgment, declaring the statute unconstitutional and enjoining the state from enforcing it. *Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362-JEG-HCA, ECF Nos. 86 (Feb. 14, 2019) (granting declaratory and injunctive relief), 87 (Feb. 15, 2019) (judgment).

**In Response to the First Ag-Gag Law Being Struck Down, Iowa Passes Another**

38. In reaction to the judgment, the Iowa legislature wasted little time. Less than three weeks after the Court enjoined enforcement of Iowa Code § 717A.3A, the legislature introduced new Ag-Gag legislation. The new legislation sped through subcommittees, committees, and both chambers in eleven days.

39. On March 14, 2019—one month after being enjoined from enforcing Iowa Code § 717A.3A and one day after the legislature sent the bill to her desk—Defendant Governor

Reynolds signed into law Senate File 519, now codified at Iowa Code § 717A.3B. The bill, "deemed of immediate importance," took effect upon the Governor's signature.

## Statutory Overview

40. As the old Ag-Gag law, Iowa Code § 717A.3A, created the new crime of "agricultural production facility fraud," Iowa Code § 717A.3B creates a new crime of "agricultural production facility trespass."

41. As with Iowa Code § 717A.3A, § 717A.3B defines "agricultural production" as "any activity related to maintaining an agricultural animal at an animal facility or a crop on crop operation property." Iowa Code § 717A.1(2).

42. The old law created two forms of agricultural production facility fraud: (1) "Obtain[ing] access to an agricultural production facility through false pretenses," Iowa Code § 717A.3A(1)(a); and (2) "Mak[ing] a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized," Iowa Code § 717A.3A(1)(b).

43. The new law follows the same structure but provides a slightly different gloss. It, too, contains an access prohibition, criminalizing "Us[ing] deception . . . on a matter that would reasonably result in a denial of access to an agricultural production facility that is not open to the public, and, through such deception, gain[ing] access to the agricultural production facility, with the intent to cause physical or economic harm or other injury to the agricultural production facility's operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer." Iowa Code § 717A.3B(1)(a).

16

44. The new law also contains an employment prohibition. A person violates the statute when he or she "[u]ses deception . . . on a matter that would reasonably result in a denial of an opportunity to be employed at an agricultural production facility that is not open to the public, and, through such deception, is so employed, with the intent to cause physical or economic harm or other injury to the agricultural production facility's operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer." Iowa Code § 717A.3B(1)(b).

45. The statute defines deception to include not only affirmative misstatements ("Creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true," Iowa Code § 702.9(1)), but also omissions ("Failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed," Iowa Code § 702.9(2)).

46. As with Iowa Code § 717A.3A, persons violating Iowa Code § 717A.3B(1)(a) or (b) face up to a year in jail and up to $1,875 in fines for a first conviction, or up to two years in jail and up to $6,250 for a second conviction. Iowa Code §§ 717A.3B(2); 903.1(1)(b), (2).

47. And as with Iowa Code § 717A.3A, in its intent and operation, § 717A.3B prohibits undercover investigations at agricultural facilities because the use of "deception" (i.e., false pretenses, misrepresentations, and material omissions) is an essential tool for conducting undercover journalism, organizing, and public interest investigations. If investigators were required to disclose that they were engaging in an undercover investigation or affiliated with the press or public interest organizations, as the new Ag-Gag law requires, they would never be allowed to enter the facilities.

48. Moreover, the statute defines "agricultural production facility" so broadly that it applies not only to factory farms and slaughterhouses, but also to any "crop operation property" or any location "agricultural animals" are maintained, including exhibitions, markets, and even vehicles. Iowa Code § 717A.1(2)-(4), (5)(a).

49. Like the old Ag-Gag law, the new Ag-Gag law even applies to "puppy mills," facilities that breed large numbers of dogs in inhumane conditions for the pet trade. The law defines "agricultural animal" to include "[a]n animal that is maintained for its parts or products having commercial value," as are dogs bred for the commercial pet trade. Iowa Code § 717A.1(1)(a); *see also id.* § 162.8 (vesting regulatory authority over commercial dog breeders in Iowa with the Iowa Department of Agriculture and Land Stewardship).

50. Advocacy groups estimate that Iowa currently has approximately 250 puppy mills. While the conditions at many of these facilities are unknown, at least 15 have been cited for causing extreme animal suffering, such as forcing the animals to live in filthy conditions, providing no protection from extreme heat and cold, and having severely injured or sick dogs without adequate veterinary care.

51. Undercover investigations are the only reliable way to expose the conditions at Iowa's abusive puppy mills.

52. Under the plain terms of Iowa Code § 717A.3B, no new investigations of the type contemplated by some of the Plaintiffs and relied on by all Plaintiffs may be conducted in Iowa.

**Statutory Purpose**

53. By criminalizing obtaining access to or employment at an agricultural production facility through "deception" and with the "intent to cause . . . economic harm or other injury to the agriculture production facility's operations, agricultural animals, crop, owner, personnel,

equipment, building, premises, business interest, or customer," Iowa Code § 717A.3B(1)(a), (b), the law ensures that no investigations will ever take place if they seek to expose illegal or abusive behavior and cause resulting harm to investigated facilities, such as through boycotts, food safety recalls, citations for environmental and labor violations, evidence of health code violations, or criminal convictions.

54. Because the law criminalizes "deception" made with "intent to cause . . . economic harm . . . to the agriculture production facility's . . . business interest," Iowa Code § 717A.3B(1)(a), (b), the statute prohibits speech that will portray the agricultural industry in a negative light. The purpose and effect of the statute is to prioritize and privilege speech that is favorable to the agricultural industry and to prevent speech that is unfavorable to the agricultural industry.

55. Because the law criminalizes "deception" made with "intent to cause . . . other injury," separate and apart from "physical or economic harm," the statute also fails to define the criminal offense with sufficient definiteness that ordinary people can understand what speech or conduct is prohibited.

56.  The statute's legislative history demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations.

57.  Although the Ag-Gag law primarily targets animal protection organizations, it is written so broadly that it also impedes the speech of other entities, including parties not before the Court in this case. For example, the law's prohibition on "deception" made with "intent to cause . . . economic harm or other injury" also criminalizes protected labor organizing, including prospective employees who apply for a job with the intent to promote unionization (a practice known as salting and protected by federal labor law) or to document unsafe working conditions as part of an effort to make a complaint to state or federal regulators. These actions also involve

no physical or material harm to the employer but are criminalized by the Ag-Gag statute because the prospective employee's intent is to organize workers or document unsafe working conditions, each of which would cause "economic harm or other injury" as the statute defines it.

58. In introducing the bills that became Iowa Code § 717A.3B, sponsors in both the House (Rep. Klein) and the Senate (Sen. Rozenboom) were clear that the new bills were a response to the U.S. District Court for the Southern District of Iowa striking down Iowa Code § 717A.3A.

59. Representative Klein, speaking in support of the bill he introduced, said he "will not stand by and allow [Iowa farmers] to be disparaged in the way they have been."

60. Representative Bearinger, speaking in support of the law, stated that the law was necessary due to "extremism" and that it was "an important bill to protect our agricultural entities across the state of Iowa."

61. Senator Rozenboom noted that agriculture contributes $38 million in economic output in Iowa and that "agriculture in Iowa deserves protection from those who would intentionally use deceptive practices to distort public perception of best practices to safely and responsibly produce food."

62. On information and belief, there are no other statutes in Iowa that target a specific category of whistleblowing, investigations, or investigative journalism in a particular industry. Undercover investigations of, for example, financial institutions or medical providers are still permitted.

63. Moreover, laws prohibiting fraud, trespass, adulteration of food products, and theft of trade secrets already exist in Iowa. *See, e.g.*, Iowa Code §§ 714.8-714.13 (criminal fraud); 189A.10 (fraudulent practices in meat and poultry inspection); 716.7-716.8 (trespass); 190.3-190.9, 190.15 (adulteration of food); 550.3-550.4 (theft of trade secrets).

**Investigations Generally**

64. Plaintiff ALDF has engaged in, and intends to continue to engage in, undercover investigations of agricultural facilities in the United States. ALDF conducts investigations because they are useful to the organization's legal advocacy, as well as its educational and outreach missions.

65. Plaintiff PETA regularly conducts investigations into industrial factory farming facilities and slaughtering operations in the United States, including previous investigations in Iowa. These investigations are central to the organization's mission and related public interest campaigns.

66. PETA's employment-based investigations at Postville, Iowa's Agriprocessors cow slaughter facility in 2004 and 2008 revealed painful and grossly inadequate slaughter techniques that left cows conscious for as long as two minutes after their throats were slit. The investigations resulted in a six-month investigation by the Department of Agriculture and changes to the facility's slaughter practices.[3]

67. Another 2008 PETA employment-based investigation at a farm outside of Bayard, Iowa, that supplied pigs to Hormel showed multiple beatings of pigs with metal rods and workers sticking clothespins into pigs' eyes and faces. PETA's investigator recorded a supervisor kicking a young pig in the face, abdomen, and genitals to make her move; the supervisor told one investigator that when he gets angry or a sow won't move, "I grab one of these rods and jam it in her [anus]." The investigation resulted in 22 charges of livestock neglect and abuse filed against

---

[3] *See* Alan Cooperman, *USDA Investigating Kosher Meat Plant*, WASH. POST (Dec. 31, 2004), https://www.washingtonpost.com/archive/politics/2004/12/31/usda-investigating-kosher-meat-plant/26e6ae03-7040-4b76-8a2e-52a359e2d531/?utm_term=.4ec716b083a8; Julia Preston, *Kosher Plant Is Accused of Inhumane Slaughter*, N.Y. TIMES (Sept. 4, 2008), http://www.nytimes.com/2008/09/05/us/05immig.html.

six of the facility's former employees, all of whom admitted guilt.

68. Under Iowa's new Ag-Gag law, gaining employment or access through misrepresentation or omission to an agricultural production facility in Iowa, with the intent to expose truthful but critical information—the natural result of which is economic harm in the form of boycotts and related reputational harm—would be a serious misdemeanor. Thus, ALDF and PETA are impeded from gaining access to the facilities. ALDF is a legal organization with a Criminal Justice Program that provides free legal assistance and training to law and enforcement prosecutors, while PETA has often worked with law enforcement to ensure the prosecution of animal cruelty on factory farms and elsewhere. Neither organization would intentionally violate a criminal law.

69. During their investigations, investigators use recording equipment to document violations of applicable laws and regulations, including unsanitary practices, cruelty to animals, pollution, sexual misconduct, labor law violations, and other matters of public importance.

70. Plaintiffs ALDF and PETA have used the videos and photos of illegal conduct obtained through undercover employment-based investigations to seek enforcement of civil and criminal laws and regulations, to encourage legislative and industry reform, to educate the public about factory farms, and to effectuate changes in corporate policies and supply chains.

71. Because the new Ag-Gag law effectively prohibits ALDF and PETA from conducting undercover investigations in Iowa, gathering these videos and photos is impossible.

72.  Multiple examples from other states show the type of investigations that are impeded by the Ag-Gag law here. PETA's 1998 investigation of Belcross Farm, a pig-breeding factory farm in North Carolina, resulted in felony indictments of workers after PETA released hours of video footage that revealed shocking, systematic cruelty, from daily beatings of pregnant sows with a

wrench and an iron pole, to skinning pigs alive and sawing off a conscious animal's legs.

73. A 2001 PETA investigation of Seaboard Farms, an Oklahoma pig farm, resulted in the first conviction for felony animal cruelty to farmed animals after PETA's investigation showed employees routinely throwing, beating, kicking, and slamming animals against concrete floors and bludgeoning them with metal gate rods and hammers.

74. PETA's 2008 investigation of the factory farms of Aviagen Turkeys resulted in the first-ever felony indictments for cruelty to farmed poultry, and the first convictions of factory farmers for abusing turkeys.

75. ALDF's 2016 investigation of a Nebraska pig breeding operation owned by The Maschhoffs, the nation's third largest pig producer and a Hormel Foods supplier, revealed long-term neglect and lack of appropriate veterinary care, with pigs suffering for days or weeks with grossly prolapsed rectums, intestinal ruptures, large open wounds, and bloody baseball-sized ruptured cysts. Pigs were denied food for long periods of time, and a botched "euthanasia" resulted in a mother pig slowly dying after being shot in the head multiple times over the course of several minutes. Hormel suspended the supplier after ALDF's release of the investigation.

76. Another ALDF investigation in 2015, of a Carthage, Texas-based Tyson Foods chicken slaughterhouse, showed birds treated like trash, left to suffocate by the hundreds on overcrowded conveyor belts and discarded, still alive, in heaps of dead and dying chickens, feathers, and filth. That investigation resulted in the filing of complaints—concerning the treatment of chickens, food safety, worker protection, and false corporate statements—with several federal and state agencies.

77. Undercover investigations have resulted and will continue to result in positive legal outcomes, provide insights into modern factory farming, and contribute immensely to public

discourse about the political and ethical dimensions of our food choices.

78. These exposés are an important part of the marketplace of ideas because they influence public opinion and consumer demand. A 2012 consumer survey conducted by Purdue University's Department of Agricultural Economics and Department of Animal Sciences found that the public relies on the information gathered and presented by animal protection groups and investigative journalists more than they rely on industry groups and the government combined.

79. With the exception of material generated by or done on behalf of the animal agricultural industry, or pro-agriculture speech produced by the State, investigations by journalists or activists and their subsequent coverage in the media provide the primary avenue through which the workings of agricultural operations may be gleaned.

80. Existing employees in the agricultural industry almost never become whistleblowers due to a lack of legal protections for whistleblowers in the industry, employees' often-precarious socioeconomic and immigration status, and the likelihood of retaliation from co-workers or management. As a result, undercover employment-based investigations by advocacy organizations or journalists are the only available means of exposing the truth about what happens inside factory farms and slaughterhouses. Plaintiffs are aware of no exposés by non-investigatory or "bona fide" employees in Iowa before or since the passage of the Ag-Gag laws.

81. Reporters and authors sometimes seek access to factory farms and slaughterhouses by asking owners for tours in order to better understand modern industrial agriculture. Owners and managers of these facilities virtually never give such consent. The acclaimed author Jonathan Safran Foer, who spent three years researching agriculture for his book Eating Animals, wrote, "As it turns out, locked doors are the least of it. I never heard back from . . . any of the companies I wrote to. . . . Even research organizations with paid staffs find themselves

consistently thwarted by industry secrecy. . . . The power brokers of factory farming know that their business model depends on consumers not being able to see (or hear about) what they do."

### Investigative Injuries (ALDF, CCI, BAILING OUT BENJI, and PETA)

82. Plaintiffs ALDF, CCI, BAILING OUT BENJI, PETA, and CFS, have the goal and organizational purpose of producing speech that shows the hidden side of industrial animal agriculture.

83. ALDF and PETA have a specific interest in agricultural investigations in Iowa, which leads the nation in industrial animal agriculture. Iowa is by far the country's biggest producer of pigs raised for meat. More than 20 million pigs are raised on Iowa farms each year, more than twice as many as the country's number two producer, North Carolina (which also has an Ag-Gag law). A majority of these pigs are born into the industry by breeder sows who are confined in "gestation crates," a form of intensive confinement that causes immense animal suffering and has been banned in several states.

84. Iowa is also the country's biggest egg producer, with more than 45 million hens raised on Iowa farms each year. The vast majority of these hens are kept in "battery cages," a form of intensive confinement that causes immense animal suffering and has been banned in several states.

85. In addition to its prominent role in pig and egg production, Iowa farms also raise millions of other animals for meat or other animal products, including cows, turkeys, and sheep.

86. There are more than 250 slaughterhouses and processing plants in Iowa.

87. Given Iowa's prominent role in animal agriculture, ALDF and PETA have a strong desire to conduct undercover investigations at facilities in the state.

88. Plaintiffs ALDF and PETA's missions are best served by demonstrating that meat, dairy,

eggs, and related products are produced in a similar manner industry-wide, across the United States, which requires the ability to access a diverse array of states and not just a select few. This requires seeking investigative opportunities in different states.

89. The inability to conduct undercover investigations in Iowa allows agricultural enterprises in Iowa to claim that they are treating their animals in a way that is different than what is shown in the videos obtained by Plaintiffs from other states. Food safety, labor, and animal welfare issues are uniquely hidden from public scrutiny because of the Iowa Ag-Gag law.

90. ALDF has identified agricultural production facilities in Iowa where it would like to conduct undercover, employment-based investigations, but it has not pursued such investigations due to its reasonable fear of prosecution under the new Ag-Gag law. After Iowa's first Ag-Gag law was struck down, ALDF took steps towards retaining a licensed investigator to conduct an undercover investigation at an agricultural production facility in Iowa, but immediately put those plans on hold when Iowa passed its new Ag-Gag statute, due to its reasonable fear of prosecution under that law.

91. Since Iowa passed the first Ag-Gag law in 2012, at least 15 whistle-blowers have contacted PETA alleging cruel or inhumane treatment of animals at Iowa agricultural facilities, including pig farms, chicken farms, egg farms, dairy farms, fur farms, and cow slaughterhouses. Because of the threat of criminal liability under the old Ag-Gag law, PETA was unable to conduct an employment-based investigation at any of these facilities. PETA is similarly unable to conduct an employment-based investigation at any Iowa-based agricultural production facility today because of the threat of criminal liability under the new Ag-Gag law.

92. On information and belief, agricultural employers in Iowa inquire about whether a potential employee has any connections to an animal protection organization.

93. Industry documents for the agricultural field routinely instruct agricultural employers to inquire about affiliations with animal protection organizations.

94. These industry practices make it even more likely that an undercover investigator will have to misrepresent his intentions to conduct an investigation because such information would "reasonably result in a denial of access to" or the failure to "be employed at" "an agricultural production facility that is not open to the public." Iowa Code § 717A.3B(1)(a), (b).

95. The investigations desired by ALDF and PETA would use "deception" as defined in the new Ag-Gag statute. Whereas a typical applicant seeks employment in order to earn wages, an ALDF-retained or PETA-directed applicant seeks the job without revealing that his motive is investigatory, not to earn wages, thus using the "deception" of being a typical applicant, and "failing to correct [that] false belief or impression." Iowa Code § 702.9(2). The investigator would thus use "deception" under both subsections of the new Ag-Gag statute, even without making an affirmative misrepresentation.

96. Applicants pursuing an undercover investigation for ALDF would likely use "deception" to gain access and employment by "creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition," Iowa Code § 702.9(1), during the employment process. Those "deceptions" could include omitting investigators' affiliations with animal protection organizations, omitting their status as licensed private investigators (where applicable), downplaying their educational background, and telling innocuous white lies to ingratiate themselves to their interviewers, such as "I like your tie (or local sports team or company philosophy)."

97. PETA applicants would also be considered to use "deception" to gain access and employment by "creating or confirming another's belief or impression as to the existence or

nonexistence of a fact or condition," Iowa Code § 702.9(1), during the employment process by omitting their animal protection affiliations and by video recording what is believed to be illegal conduct at the facility, even where the facility does not authorize such recording or has the impression that an employee will not video record.

98. PETA and ALDF instruct their investigators to adhere to all applicable federal, state, and local laws, statutes, rules, and regulations, and to generally accepted professional practices and standards, which means that they direct investigators not to exaggerate their qualifications, such as by purporting to have skills, licenses, or clearances that they do not in fact have.

99. Instead, the "deception" in which ALDF and PETA direct or give their investigators license and expect them to engage, to gain employment or access, are "downward" lies to misdirect attention from, for example, a journalism degree or animal rights background, rather than "upward" lies to exaggerate qualifications, such as claiming to have experience with a particular piece of machinery or a certification to drive a forklift.

100. The investigations desired by ALDF would also be understood to be conducted "with the intent to cause . . . economic harm or other injury to the agriculture production facility's operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer." Iowa Code § 717A.3B(1)(a), (b). ALDF's investigations seek to document and expose illegal, cruel, and inhumane practices endemic to animal agriculture, the natural and foreseeable results of which include boycotts, food safety recalls, citations for environmental, labor, or health code violations, or criminal convictions. Exposing illegal, cruel, and inhumane practices or activities often results in economic harm or other injury to an agricultural production facility's operation, owner, and business interest.

101. Investigations that expose illegal, cruel, and inhumane practices or activities also

frequently result in economic harm or other injury to an agricultural production facility's

customers.[4] For example, if an industrial dairy production facility is a primary supplier to a

popular national cheese brand or yogurt brand, an investigation that exposes cruelty by a supplier

is frequently felt "downstream" by the dairy's customers. The public typically does not purchase

directly from an individual agricultural production facility, but from that facility's downstream

customers. For that reason, public pressure in the form of boycotts is an "economic harm or other

injury" brought to the facility's customer, and not always to the facility itself. Similarly, a food

safety recall results in harm to the facility's customer if the food being recalled has already

passed downstream from the facility to its customers.

102.    The investigations desired by PETA would also be understood to be undertaken

with the intent to cause economic harm, as the statute defines it, or other injury, as left undefined

by the statute. PETA publishes truthful information uncovered in its investigations in the hope

and with the intention that, where appropriate, such exposés will result in corrective action being

taken by the subject facility. Any boycotts of the facility's products because of its cruel practices,

and any harm to the facility's reputation, result solely from the independent judgments of

consumers and the public generally based upon the truthful published materials detailing the

investigation and its findings.

103.    Where applicable, PETA also publishes this information in the hope and with the

intention that such exposés will result in appropriate governmental action, including food safety

recalls, citations for environmental, labor, and/or health code violations, plant closures, and/or

criminal convictions, any of which might result in economic harm to an agricultural production

---

[4] By customers, Plaintiffs refer not to individual consumers, but to other businesses that
purchases supplies from agricultural production facilities and then produce products that are later
sold to individual consumers, or which purchase products from agricultural production facilities
and distribute them to consumers in a retail setting.

facility's business interest.

104.     ALDF's and PETA's intentions in conducting employment-based undercover investigations of agricultural production facilities are to expose illegal, unethical and inhumane conduct, and the conditions and the treatment of animals at agricultural production facilities, so that the public is made aware of the source of their food. Any impact to the facilities investigated resulting from the investigations is attributable solely to the reaction from law enforcement, regulatory agencies, or the public to the truthful information PETA and ALDF publish.

105.     Neither ALDF, PETA, nor their investigators obtain any unjustified material gain from the investigators' employment at agricultural production facilities. Investigators perform their lawful tasks as any other employees while investigating a facility. Any wages the investigator receives from the facility are a result of the work the investigator performs for the facility.

106.     ALDF and PETA instruct their investigators to undergo the same training and perform the same lawful tasks as any other employee, including respecting all biosecurity protocols.

107.     The camera worn by an investigator is minute and hidden on the clothing, and does not interfere with the investigator's ability to perform the tasks required of the position.

108.     In terms of efficiency and productivity, the investigator is no different from any other employee.

109.     Plaintiffs reasonably believe that prosecutors in Iowa intend to enforce Iowa Code § 717A.3B.

110.     ALDF and PETA would like to investigate one or more facilities in Iowa, but their constitutionally protected speech is chilled because of the reasonable fear of prosecution

under Iowa Code § 717A.3B. They cannot engage in their investigative activities without fear of prosecution in Iowa. They have taken steps to find a suitable investigator but cannot take further actions to conduct an undercover investigation because of Iowa Code § 717A.3B.

111.    Plaintiff CCI has likewise been harmed by the Ag-Gag laws. For example, prior to the passage of first Ag-Gag law, CCI's members who were workers at the Anogla Pork, LLC facility collected photos of workplace safety violations that became key components of CCI's 2012 OSHA complaint that resulted in citations and notifications to the facility. But under the chill of both Ag-Gag laws, CCI's members are unable to obtain evidence undercover. In addition, CCI, which utilizes video and images in its online and in-person activism, including online petitions and other forms of advocacy, is unable to obtain or utilize documentary evidence of illegal dumping into Iowa waterways or other violations of the Clean Water Act—and is limited to what documentation and images are viewable from public property.

112.    Plaintiff Bailing Out Benji is similarly harmed. Since the Ag-Gag laws were enacted, it has been unable to gain access to puppy mills or dog auctions on agricultural facilities by posing as job applicants, purchasers, breeders, or brokers, either by stating so overtly or by letting the assumption go uncorrected, in order to investigate, document, and advocate against unsafe or inhumane practices in its work to protect dogs and puppies. Such unsafe or inhumane practices would, if exposed, likely cause economic harm to puppy mills or dog auctions.

**Organizational Injuries (ALDF, PETA, CFS, CCI, and Bailing Out Benji)**

113.    ALDF, PETA, CFS, CCI, and Bailing Out Benji are each forced to divert money or organizational resources away from their core organizational programs to focus on the social harms of Ag-Gag laws. The existence of Iowa Code § 717A.3B forces each organization to do public outreach and education about Ag-Gag laws generally, including Iowa's, and as such they

have less money and time to devote to other organizational activities that are central to their missions, such as animal rescues, educating the public about the harms of industrial farming, and other forms of abuse, neglect, and cruelty to animals, and advocating for greater legal protections for animals.

114.     ALDF, PETA, CFS, CCI, and Bailing Out Benji are also each harmed because the law hinders their outreach, educational, and advocacy programs.

115.     ALDF and PETA use their own investigations and those of other groups to file lawsuits and promote legislation to further their missions of protecting animals. They also use investigations to document the problems with the legal system's treatment of animals, such as the absence of federal laws that protect animals on farms or the under-enforcement of state anti-cruelty laws. Iowa Code § 717A.3B all but forecloses investigative accounts of the agricultural industry, creating an information vacuum that directly undermines the Plaintiffs' litigation, legislation, outreach, and educational programs.

116.     CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work. For example, CFS was involved in litigation in Texas to enforce the state's Health and Safety Code at egg production facilities with the goal of protecting the public from contracting foodborne illnesses. The lawsuit stemmed in part from an undercover investigation that revealed unsanitary and inhumane conditions at a Texas facility. CFS is a uniquely situated recipient of the undercover recordings as it is a listener; without access to undercover recordings CFS has difficulty fulfilling its mission and providing information to the public about food production at agricultural operations.

117.     CFS has imminent plans to rely on undercover investigations to pursue legal and

policy work as part of its campaign against concentrated animal feeding operations. The reasonable fear of foodborne illnesses from certain agricultural facilities, the difficulty in obtaining information, and the inability to protect the public from environmental and public health threats of certain agricultural operations are themselves actual injuries.

118.    Plaintiff Bailing Out Benji is unable to utilize information, images, and video obtained through undercover investigations of puppy mills in Iowa in their public education activities and advocacy. Specifically, they are unable to send volunteers to pose as customers or as job applicants to gain access to puppy mills.

119.    Plaintiff CCI also suffers a direct injury because it is hindered in its mission to educate the public about the harms of factory farming to workers and the environment. As was the case under the old Ag-Gag law, under the new Ag-Gag law, CCI is unable to acquire and use in its advocacy efforts information or documentary evidence which was obtained in an undercover manner due to the chill of the new law.

## CLAIMS FOR RELIEF

### First Cause of Action

### (First Amendment: Overbreadth)

120.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

121.    Even a speaker or listener whose rights are not violated by the statute in question can raise an overbreadth challenge. Overbreadth doctrine permits the vindication of First Amendment rights for parties not before the Court. The law in question is overbroad in this sense because it is drafted so broadly that it violates the free speech rights of third parties not before the court, such as labor union organizers.

122.     The Iowa Ag-Gag statute is also unconstitutionally overbroad because it prohibits substantially more speech than the First Amendment permits, even though some of its provisions have legitimate applications. The Iowa Ag-Gag statute is overbroad in this sense because while it regulates some conduct not protected by the First Amendment, such as using deception to gain access to an agricultural production facility with the intent to cause physical harm, it also reaches a substantial amount of constitutionally protected speech, such as the undercover investigations the Plaintiffs conduct and/or rely upon as well as similar types of speech-producing conduct by labor organizers, journalists, and others engaged in such investigations.

123.     Another reason the Ag-Gag law is overbroad is because of its criminalization of deception used to gain access to an agricultural production facility with the intent to cause some unspecified category of "other injury," which could lead to prosecution of a seemingly endless scope of conduct. In this way, the "other injury" provision creates both overbreadth and vagueness problems, the latter of which are described in the Third Cause of Action.

124.     Both listeners and speakers can challenge a law as constitutionally overbroad. When a law impairs protected speech, both the would-be speakers and those who would benefit from hearing or seeing the speech are harmed. One need not be fearing prosecution under Iowa Code § 717A.3B in order to have a cognizable injury.

125.     The new Ag-Gag law, although designed to target and chill animal protection activists, also criminalizes all sorts of protected speech. Intentionally or not, the law chills and criminalizes a plethora of protected speech that is not even related to animal welfare, including that concerning worker safety, food safety, labor laws, and other types of agricultural industry misconduct.

126.     The new Ag-Gag law criminalizes not just the protected speech of Plaintiffs, but

of any person or group that would seek to investigate an "agricultural production facility" in a similar manner, including journalists, union workers seeking to organize a workforce, or any person merely concerned about the conditions under which food is processed.

127.     A statute that is unconstitutionally overbroad is facially invalid and must be declared unconstitutional in its entirety.

128.     Plaintiffs are entitled to declaratory and prospective injunctive relief facially invalidating the Ag-Gag law and enjoining the Defendants from enforcing its provisions.

129.     Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

**Second Cause of Action**

**(First Amendment: Content & Viewpoint Based Discrimination)**

130.     Plaintiffs incorporate by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

131.     The new Ag-Gag law is a content-based restraint on constitutionally protected speech on a matter of significant public concern; it is not narrowly tailored to a compelling government interest.

132.     The new Ag-Gag law is content-based on its face because it prohibits "deception" as defined by the statute, but not true statements.

133.     The new Ag-Gag law is content-based because it applies only to speech involving

a single industry—agricultural production. The state has not provided other industries with equivalent protections from undercover investigations.

134.    By singling out the agricultural industry for protection against political speech that may be harmful to its profits, the new Ag-Gag law must be treated as a content- and viewpoint-based regulation. In practice, the law ensures that only one side of the debate about industrial agricultural facilities can be raised.

135.    The new Ag-Gag law is content-based because it was passed with the legislative motive of eliminating undercover, employment-based investigations by animal rights groups into factory farms and other agricultural production facilities.

136.    The improper, speech-suppressing purpose behind the law is also revealed by examining the impact of the law, the historical background for the enactment, and the legislative history.

137.    The new Ag-Gag law is not narrowly tailored because Iowa already has laws protecting the interests that purportedly motivated the legislature—laws protecting privacy, prohibiting trespass, and promoting biosecurity. The only "harm" not already accounted for by existing law is the embarrassment and political and economic fall-out suffered by the agriculture industry when otherwise-legal undercover investigations paint the industry in a negative light. Shielding an industry from criticism cannot be considered a legitimate, much less a "compelling," government interest.

138.    The new Ag-Gag statute, as a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, violates Plaintiffs' First Amendment rights.

139.    Plaintiffs are entitled to prospective relief from the Defendants to remedy the

deprivations suffered as a result of the violations of their First Amendment rights.

140.    Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the new Ag-Gag law's prohibitions on access and employment gained by "deception" made with the intent to cause economic harm or other injury are unconstitutional and unenforceable in any situation.

141.    Plaintiffs are also entitled to injunctive relief in the form of this Court enjoining Defendants from enforcing the new Ag-Gag law's prohibitions on access and employment gained by "deception" made with the intent to cause economic harm or other injury. Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

### Third Cause of Action

### (First & Fourteenth Amendments: Vagueness)

142.    Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

143.    The new Ag-Gag law's prohibition on using deception to gain access or employment with an intent to cause "other injury," as distinct from physical or economic harm, violates the First and Fourteenth Amendments on its face because "other injury" is so vague as to fail to provide adequate notice to individuals of what is speech or conduct is prohibited. Such language is so unclear that persons of common intelligence must necessarily guess as to its

meaning and differ as to its application even though laws prohibiting First Amendment-protected activities must have a particularly high level of clarity to protect citizens' rights. For the same reason, such vague language gives government officials unfettered discretion in its enforcement, and causes Plaintiffs and other to avoid First Amendment-protected activity in order to avoid prosecution.

144.     Plaintiffs are entitled to prospective relief from the Defendants to remedy the deprivations suffered as a result of the violations of their First and Fourteenth Amendment rights.

145.     Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the new Ag-Gag law's prohibitions on access and employment gained by deception made with the intent to cause "other injury" is unconstitutional and unenforceable in any situation.

146.     Plaintiffs are also entitled to injunctive relief in the form of this Court enjoining Defendants from enforcing the new Ag-Gag law's prohibitions on access and employment gained by deception made with the intent to cause "other injury." Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

**Fourth Cause of Action**

**(Fourteenth Amendment: Due Process)**

147.     Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

148.     Iowa Code § 717A.3B substantially burdens Plaintiffs' exercise of a fundamental right—namely, freedom of speech, in violation of the Due Process Clause of the Fourteenth Amendment.

149.     Plaintiffs are entitled to prospective relief from the Defendants to remedy the Due Process violation.

150.     Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the new Ag-Gag law's prohibitions on access and employment gained by "deception" made with the intent to cause economic harm or other injury to an agricultural production facility are unconstitutional under the Due Process Clause of the Fourteenth Amendment.

151.     Plaintiffs are also entitled to injunctive relief in the form of this Court enjoining Defendants from enforcing the new Ag-Gag law's prohibitions on access and employment gained by "deception" made with the intent to cause economic harm or other injury to an agricultural production facility. Defendants are acting and threatening to act under color of state law to deprive Plaintiffs of their constitutional rights. Plaintiffs will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute. Plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiffs are refraining from constitutionally protected activities solely for fear of prosecution under the statute.

### REQUEST FOR RELIEF

Plaintiffs respectfully request an order and judgment:

1.   Declaring Iowa Code § 717A.3B to be unconstitutionally overbroad and therefore invalid on its face.

2.   Declaring Iowa Code § 717A.3B to be an unconstitutional content-based and/or

viewpoint discriminatory law on its face.

3.   Declaring that "other injury," as used in Iowa Code § 717A.3B(1)(a) and (b), is unconstitutionally void for vagueness;

4.   In the alternative, declaring that Iowa Code § 717A.3B(1)(a) and (b)'s prohibitions on using "deception" to gain access to or employment at an agricultural production facility with the intent to cause "economic harm or other injury" violate the U.S. Constitution on their face and as applied to Plaintiffs;

5.   In the alternative, declaring that the follow provisions of Iowa Code § 717A.3B(1) violate the U.S. Constitution on their face and as applied to Plaintiffs:

   a.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's operations";

   b.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's operations";

   c.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . owner";

   d.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . owner";

   e.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to

the agricultural production facility's . . . business interest";

    f.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . business interest";

    g.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . customer";

    h.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . customer";

6.   Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing Iowa Code § 717A.3B.

7.   In the alternative, permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing Iowa Code § 717A.3B(1)(a) and (b) for violations "with the intent to cause . . . economic harm or other injury";

8.   In the alternative, permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the follow provisions of Iowa Code § 717A.3B(1):

    a.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's operations";

b.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's operations";

c.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . owner";

d.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . owner";

e.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . business interest";

f.   The prohibition on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . business interest";

g.   The prohibition on using "deception" to gain access to an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . customer";

h.   The prohibitions on using "deception" to gain employment at an agricultural production facility with the intent to cause "economic harm or other injury to the agricultural production facility's . . . customer";

9.   Awarding the Plaintiffs reasonable attorneys' fees and costs; and

10. Awarding any such relief as the Court may deem just and proper.

Dated this 22nd day of April, 2019.

Respectfully submitted:

/s/ *Rita Bettis Austen*
Rita Bettis Austen, AT0011558
ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 808
Des Moines, IA 50309–2317
Telephone:  515.243.3988
Fax: 515.243.8506
Email:  Rita.Bettis@aclu-ia.org

Matthew Liebman (*pro hac vice application
forthcoming*)
Cristina Stella (*pro hac vice application
forthcoming*)
Kelsey Eberly (*pro hac vice application
forthcoming*)
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org
cstella@aldf.org
keberly@aldf.org

Matthew Strugar (*pro hac vice application forthcoming*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com

Professor Alan Chen (*pro hac vice application
forthcoming*)
University of Denver
Sturm College of Law
2255 E. Evans Avenue Denver, CO
80208
(303) 871-6283
achen@law.du.edu

Professor Justin Marceau (*pro hac vice application
forthcoming*)

Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

David S. Muraskin (*pro hac vice application forthcoming*)
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net

*Attorneys for Plaintiffs*