## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, **IOWA CITIZENS FOR COMMUNITY IMPROVEMENT**, **BAILING OUT BENJI**, **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**, and **CENTER FOR FOOD SAFETY** | **Case No. 4:19-cv-124** |
| Plaintiffs, | |
| v. | **Brief in Support of Plaintiffs' Cross-Motion for a Preliminary Injunction** |
| **KIMBERLY K. REYNOLDS**, in her official capacity as Governor of Iowa, **TOM MILLER**, in his official capacity as Attorney General of Iowa, and **DREW SWANSON**, in his official capacity as Montgomery County, Iowa County Attorney, | |
| Defendants. | |

COME NOW Plaintiffs Animal Legal Defense Fund ("ALDF"), Iowa Citizens for Community Improvement ("ICCI"), Bailing Out Benji, People for the Ethical Treatment of Animals ("PETA"), and Center for Food Safety ("CFS"), and submit the following brief supporting Plaintiffs' Cross-Motion for a Preliminary Injunction. In support, Plaintiffs state as follows:

**Table of Contents**

**Factual Background** ........................................................................................................... 1

**Argument** ........................................................................................................................... 4

   **I.**   **As Demonstrated in Their Resistance to the State's Motion to Dismiss, the First Amendment Applies** .......................................................................................... 5

   **II.**  **Plaintiffs Are Likely to Succeed on the Merits of Their Content- and Viewpoint Discrimination Claim** ............................................................................................ 5

       A.   The New Ag-Gag Law Is Content-Based on Its Face and in Its Purpose. ................. 7

       B.   The New Ag-Gag Law is Viewpoint-Based Because It Singles Out Speech Critical of a Single Industry for Special, Disfavored Treatment. ............................. 9

       C.   Plaintiffs Are Likely to Prevail in Demonstrating That the New Ag-Gag Law Is Subject to Strict Scrutiny. ....................................................................................... 10

       D.   Plaintiffs Are Likely to Prevail in Demonstrating the New Ag-Gag Law Is Unlikely to Survive Strict Scrutiny. ......................................................................... 11

           1.   The Ag-Gag Law Does Not Advance Compelling State Interests. ............. 11

           2.   The Ag-Gag Law is Neither Narrowly Tailored nor the Least Restrictive Means Available. ......................................................................................... 13

       E.   Plaintiffs Are Likely to Prevail in Demonstrating the New Ag-Gag Law Does Not Survive Intermediate Scrutiny. ......................................................................... 16

  **III.** **The Remaining Preliminary Injunction Factors All Weigh in Favor of Granting Preliminary Injunctive Relief.** ................................................................................. 17

       A.   The State's Violations of Plaintiffs' First Amendment Rights Constitute Irreparable Harm. ...................................................................................................... 18

       B.   The Balance of Hardships Weighs in Favor of Granting a Preliminary Injunction. ................................................................................................................. 18

       C.   The Public Interest Weighs in Favor of Granting a Preliminary Injunction. ........... 19

**Conclusion** ....................................................................................................................... 19

# Table of Authorities

## Cases

*281 Care Comm. v. Arneson*,
 638 F.3d 621 (8th Cir. 2011) ............................................. 10

*281 Care Comm. v. Arneson*,
 766 F.3d 774 (8th Cir. 2014) ............................................. 10

*Adarand Constructors v. Pena*,
 515 U.S. 200 (1995) ......................................................... 11

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
 271 F. Supp. 2d 230 (D.D.C. 2003) .................................... 5

*Animal Legal Def. Fund v. Herbert*,
 263 F. Supp. 3d 1193 (D. Utah 2017) .............................. 2, 7

*Animal Legal Def. Fund v. Otter*,
 118 F. Supp. 3d 1195 (D. Idaho 2014) ................................ 2

*Animal Legal Def. Fund v. Reynolds*,
 297 F. Supp. 3d 901, 918 (S.D. Iowa 2018) ................... 2, 7, 9

*Animal Legal Def. Fund v. Reynolds*,
 353 F. Supp. 3d 812 (S.D. Iowa 2019) ........................ passim

*Animal Legal Def. Fund v. Wasden*,
 878 F.3d 1184 (9th Cir. 2018) ........................................... 11

*Brown v. Enter. Merchs. Ass'n*,
 564 U.S. 786 (2011) ......................................................... 14

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*,
 690 F.3d 996 (8th Cir. 2012) .............................................. 4

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
 473 U.S. 788 (1985) ........................................................ 7, 9

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
 640 F.2d 109 (8th Cir. 1981) (en banc) .............................. 4

*Elrod v. Burns*,
 427 U.S. 347 (1976) ......................................................... 18

*FCC v. League of Women Voters of Cal.*,
  468 U.S. 364 (1984).................................................................................. 2

*Johnson v. Governor*,
  405 F.3d 1214 (11th Cir. 2005) (en banc) ............................................. 10

*Matal v. Tam*,
  137 S. Ct. 1744 (2017)............................................................................. 7

*McCullen v. Coakley*,
  573 U.S. 464 (2014).................................................................................. 2

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
  59 F.3d 80 (8th Cir. 1995) ....................................................................... 4

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
  692 F.3d 864 (8th Cir. 2011) (en banc) .................................................. 4

*Myers v. Thompson*,
  192 F. Supp. 3d 1129 (D. Mont. 2016) .................................................. 11

*N. Carolina State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ................................................................. 10

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361, 2375 (2018).................................................................. 17

*O'Neill v. Crawford*, 970 N.E.2d 973 (Ohio 2012) .................................... 11

*Phelps–Roper v. Nixon*,
  545 F.3d 685 (8th Cir. 2008) ................................................................... 4

*Powell v. Noble*,
  798 F.3d 690 (8th Cir. 2015) ................................................................. 18

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)................................................................................ 14

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015)..................................................................... 6, 7, 9

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
  826 F.3d 1030 (8th Cir. 2016) ................................................................. 5

*Richmond v. J. A. Croson Co.*,
  488 U.S. 469 (1989)................................................................................ 11

*Rickert v. Pub. Disclosure Comm'n*,
  168 P.3d 826 (Wash. 2007) ........................................................................ 11

*Rosemond v. Markham*,
  135 F. Supp. 3d 574 (E.D. Ky. 2015) ....................................................... 11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ..................................................................................... 7

*S & M Constructors, Inc. v. Foley Co.*,
  959 F.2d 97 (8th Cir. 1992) ......................................................................... 4

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ................................................................................... 12

*Survivors Network of Those Abused by Priests, Inc. v. Joyce*,
  779 F.3d 785 (8th Cir. 2015) ....................................................................... 3

*Susan B. Anthony List v. Driehaus*,
  814 F.3d 466 (6th Cir. 2016) ..................................................................... 11

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) ..................................................................................... 9

*United States v. Alvarez*,
  567 U.S. 709 (2012) ................................................................................. 2, 5

*United States v. O'Brien*,
  391 U.S. 367 (1968) ................................................................................... 17

*United States v. Virginia*,
  518 U.S. 515 (1996) ................................................................................... 17

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) ................................................................................. 7, 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ................................................................................... 12

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ................................................................................... 15

*Whitton v. City of Gladstone*,
  54 F.3d 1400 (8th Cir. 1995) ....................................................................... 9

*Winter v. Wolnitzek,*
    186 F. Supp. 3d 673 (E.D. Ky. 2016) ....................................................................... 11

**Statutes**

Iowa Code § 716.7 ...................................................................................................... 12

Iowa Code § 717A.2 ................................................................................................... 12

Iowa Code § 717A.3A ......................................................................................... 1, 2, 8

Iowa Code § 717A.3B ....................................................................................... 3, 4, 7, 8

Iowa Code § 717A.4 ................................................................................................... 13

**Other Authorities**

Rita-Marie Cain Reid & Amber L. Kingery, *Putting A Gag on Farm Whistleblowers: The
    Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism*, 11
    J. Food L. & Pol'y 31, 36 (2015) .............................................................................. 1

**Factual Background**

Plaintiffs provide a detailed factual background in their Resistance to the Motion to Dismiss filed by Defendants Kimberly Reynolds, in her official capacity as Governor of Iowa, Tom Miller, in his official capacity as Attorney General of Iowa, and Drew Swanson, in his official capacity as Montgomery County, Iowa County Attorney (collectively, "the State"). Plaintiffs incorporate that detailed factual background by reference here and recite only a brief summary. *See* Plaintiffs' Resistance to Defendants' Motion to Dismiss ("Plaintiffs' Resistance"), Factual Background, Sections I–IV.

This case arises out of Iowa's second attempt to criminalize undercover investigations at agricultural facilities. These statutes are commonly known as "Ag-Gag" laws because they gag speech that is critical of industrial agriculture. *See* Rita-Marie Cain Reid & Amber L. Kingery, *Putting A Gag on Farm Whistleblowers: The Right to Lie and the Right to Remain Silent Confront State Agricultural Protectionism*, 11 J. FOOD L. & POL'Y 31, 36 (2015).

Investigations of industrial animal agriculture facilities have revealed systematic and horrific animal abuse and led to food safety recalls, citations for environmental and labor violations, plant closures, and criminal convictions. Such investigations and the public conversation they ignite are an integral part of the discussion surrounding animal rights and welfare and the nature, safety and integrity of American food production.

Last year, this Court struck down the State's first attempt to criminalize undercover investigations, codified Iowa Code § 717A.3A, as facially unconstitutional. *See Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019) ("*Reynolds II*"). The Court first ruled that the law implicated free speech, rejecting the State's argument that it regulated only conduct: "Speech is necessarily implicated by § 717A.3A because 'one cannot violate

1

§ 717A.3A *without* engaging in speech.' The speech implicated is false statements and misrepresentations." *Reynolds II*, 353 F. Supp. 3d at 821 (quoting *Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 918 (S.D. Iowa 2018) ("*Reynolds I*") (emphasis in original). Because "false statements will be protected by the First Amendment only if they *do not* cause a 'legally cognizable harm' or provide 'material gain' to the speaker," *id*. at 821–22 (quoting *United States v. Alvarez*, 567 U.S. 709, 718, 723 (2012)), and "the false statements implicated by § 717A.3A . . . d[id] not cause either," the statute implicated protected speech. *Id*. at 822 (citing *Reynolds I*, 297 F. Supp. 3d at 920–24).

The Court next ruled that both substantive provisions "'contained within § 717A.3A [were] content-based on their face.'" *Id*. (quoting *Reynolds I*, 297 F. Supp. 3d at 919). Not only must a prosecutor "'necessarily examine the content' of an individual's statement to determine whether the individual violate[d] the statute," but he or she must also "know the content's veracity." *Id*. (citing *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

The Court then found that the statute failed both strict and intermediate scrutiny. The State's asserted interests of protecting private property and biosecurity were "not compelling in the First Amendment sense" because "the targeted harms 'were entirely speculative.'" *Id*. at 824 (quoting *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1198 (D. Utah 2017) and citing *Animal Legal Def. Fund v. Otter*, 118 F. Supp. 3d 1195, 1207–08 (D. Idaho 2014)). But even if the interests were compelling, "§ 717A.3A's prohibitions [were] not narrowly tailored to serve either interest." *Id*. The State failed to demonstrate how biosecurity or property rights were served by the Ag-Gag law, or "'that alternative measures that burden substantially less speech would fail to achieve the government's interest.'" *Id*. at 825 (quoting *McCullen v. Coakley*, 573 U.S. 464 (2014)). The State had numerous other laws at its disposal to protect private property

and biosecurity interests without impinging on free-speech rights. As the Court found, "'The existence of content neutral alternatives to' protect property rights and biosecurity, 'undercut[s] significantly' the defenses raised to the statutory content.'" *Reynolds II*, 353 F. Supp. 3d at 825 (quoting *Survivors Network of Those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785, 793–94 (8th Cir. 2015) (alteration in original)).

The Court entered judgment for the plaintiffs, declaring the statute unconstitutional and enjoining the state from enforcing it. *Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362-JEG-HCA, ECF Nos. 86 (Feb. 14, 2019) (granting declaratory and injunctive relief), 87 (Feb. 15, 2019) (judgment).

Less than three weeks later, the legislature introduced a substantially similar bill, which was swiftly enacted and is now codified at Iowa Code § 717A.3B. As with the old law, in its intent and operation, the new Ag-Gag law prohibits undercover investigations at agricultural facilities because the use of "deception" (i.e., false pretenses, misrepresentations, and material omissions) is essential to conducting undercover journalism, labor organizing, and public interest investigations. If investigators were required to disclose that they were engaging in an undercover investigation or affiliated with the press or public interest organizations, as the new Ag-Gag law requires, they would never be allowed to enter the facilities.

Iowa's new Ag-Gag law is unconstitutional for many of the same reasons its first Ag-Gag law was unconstitutional. It criminalizes speech that is protected by the First Amendment. It is content- and viewpoint-discriminatory. And it fails both intermediate and strict scrutiny.

Plaintiffs are suffering irreparable harm from the statute's deprivation of their First Amendment rights. Because they are likely to succeed on their claims, and because no harm

would befall the State if it were prevented from enforcing the unconstitutional Ag-Gag law, Plaintiffs urge this Court to preliminarily enjoin the State from enforcing Iowa Code § 717A.3B.

## Argument

Plaintiffs seek injunctive relief enjoining the State from enforcing the new Ag-Gag law. A preliminary injunction is necessary to halt the State's continuing violation of Plaintiffs' First Amendment rights.

A preliminary injunction should be issued where Plaintiffs can demonstrate (1) a likelihood of success on the merits; (2) a threat of irreparable harm absent the injunction; (3) that the threatened injury outweighs any harm that may result from an injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012).

Of these four factors, "likelihood of success on the merits is most significant." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (*quoting S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2011) (en banc) (internal quotation marks omitted). Accordingly, when Plaintiffs are "likely to win on the merits of [their] First Amendment claim, a preliminary injunction is proper." *Id.* at 877; *see also Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps–Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012) ("In a First Amendment case . . . the likelihood of

success on the merits is often the determining factor in whether a preliminary injunction should issue.")

Plaintiffs "'need only establish a likelihood of succeeding on the merits on any one of [their] claims.'" *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003)). Plaintiffs can establish a likelihood of success on their content-discrimination claim because the new Ag-Gag law is content-based in the same manner that the old Ag-Gag law was content-based.

## I.     As Demonstrated in Their Resistance to the State's Motion to Dismiss, the First Amendment Applies.

As Plaintiffs demonstrate in their Resistance to the State's Motion to Dismiss, filed concurrently with this brief, the Ag-Gag law is not outside the First Amendment's purview. Criminal liability under the new Ag-Gag law hinges on speech, not conduct. And the law criminalizes false speech far beyond the boundaries on false speech permitted by *United States v. Alvarez*, 567 U.S. 709 (2012). *See* Plaintiffs' Resistance, Argument, Section I.A. Plaintiffs incorporate those arguments here.

Having established that the First Amendment applies, the new Ag-Gag law fails for the same reasons that its predecessor did—it is a content- and viewpoint-based restriction on speech that fails constitutional scrutiny.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Content- and Viewpoint Discrimination Claim.

This Court declared the original Ag-Gag law content-based and found that it failed both strict and intermediate scrutiny. *Reynolds II*, 353 F. Supp. 3d at 824–27. The new law operates in

the same content- and viewpoint-based manner as the original law. The government interests are the same. And the tailoring is virtually identical.

At least for the purposes of its Motion to Dismiss, the State has not argued otherwise. Instead, the State relies exclusively on the argument that the new law is outside of the First Amendment on account of its revised intent requirement. State's Brief in Support of Motion to Dismiss, ECF No. 22, at 6–23 ("MTD Br."). Thus, provided the Court finds that the law implicates the First Amendment, *see* Plaintiffs' Resistance, Argument, Section I.A, the Court should find the new law fails for the same reasons the original one did. Accordingly, Plaintiffs have a high likelihood of success on the merits.

Each subsection of the new Ag-Gag law is both facially content-based and content-based by reference to the justification and purpose of the law.

In assessing whether a law is content-based, the Supreme Court recently reiterated a two-tiered approach: "strict scrutiny applies either when a law is content based on its face *or* when the purpose and justification for the law are content based." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2222 (2015) (emphasis added). The "crucial first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face." *Id*. at 2228. The second step, if necessary, requires a court to examine the legislative justifications for the law. *Id*. ("[W]e have repeatedly considered whether a law is content neutral on its face before turning to the law's justification or purpose."). Here, the law is plainly content-based on its face, and the legislative history also confirms a content-based purpose.

Iowa's new Ag-Gag law is also viewpoint-based. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content

6

discrimination.'" *Id.* at 2230 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). A statute discriminates based on viewpoint when the State "has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017). Viewpoint discrimination also looks to whether government enacts a law with the purpose of suppressing a particular viewpoint. *Reed*, 135 S. Ct. at 2227; *Vieth v. Jubelirer*, 541 U.S. 267, 314–15 (2004) (Kennedy, J., concurring in the judgment)); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985)). The text and history of Iowa Code § 717A.3B also demonstrate the government's purpose in silencing animal rights perspectives.

### A.      The New Ag-Gag Law Is Content-Based on Its Face and in Its Purpose.

As this Court found with the first Ag-Gag law, "[b]oth regulations contained within" the new Ag-Gag law "are content-based on their face" because a court must review the nature of the speech to determine whether the law is violated. *Reynolds I*, 297 F. Supp. 3d at 919. As with the first law, "[s]ubsection (a) explicitly distinguishes between a person who obtains access to an agricultural production facility by false pretenses and a person who obtains access by other means." *Id.* And as with the first law, "[s]ubsection (b) distinguishes between a person who makes a true statement as part of an application for employment at an agricultural facility yet possesses an intent to commit an unauthorized act, and a person with the same intent who makes a false statement." *Id.* "To determine if a person has violated either of these provisions, one must evaluate what the person has said." *Id.* This makes the new Ag-Gag law a content-based restriction on speech. *See Herbert*, 263 F. Supp. 3d at 1210 (determining that the Utah Ag-Gag law's misrepresentation prohibition was content-based because "whether someone violates the Act depends on what they say").

The new Ag-Gag law is also content-based because it is limited to the subject matter of commercial agricultural industry practices. The text of the law itself makes clear that it seeks to prohibit undercover investigations of agricultural facilities and only agricultural facilities. *See* Iowa Code §§ 717A.3B(1)(a)–(b). The law does not apply to any other industries that traditionally have been or might be subject to undercover investigations, including medical facilities, elder care facilities, day care centers, automotive shops, or prepared food service businesses. It is uniquely drafted to protect only the animal agriculture industry from scrutiny.

Consistent with the plain text of the statute, the history of the law further evinces this intent. This Court previously recognized that the original Ag-Gag law appeared to be passed with the intent to criminalize undercover investigations at animal agricultural facilities. *Reynolds II*, 353 F. Supp. 3d at 817 (noting legislature considered first Ag-Gag bill while news of Iowa undercover investigations of animal agricultural facilities were "were being circulated by news media"); *id*. at 824 (detailing statements "illustrat[ing] that § 717A.3A serves the interest of protecting Iowa's agricultural industry from perceived harms flowing from undercover investigations of its facilities"). As noted above, the circumstances and timing of the new Ag-Gag law lead to the inescapable conclusion that the State was seeking to replace the old law to advance the same interest: to criminalize undercover investigations of animal agriculture facilities.

The contemporaneous statements by legislators further evince this intent. Representative Klein, who introduced the bill that became § 717A.3B, said he "will not stand by and allow [Iowa farmers] to be disparaged in the way they have been." Complaint ¶ 56. Representative Bearinger stated that the law was necessary due to "extremism" and that it was "an important bill to protect our agricultural entities across the state of Iowa." *Id*. ¶ 60. And Senator Rozenboom

noted that agriculture contributes $38 million in economic output in Iowa and that "agriculture in Iowa deserves protection from those who would intentionally use deceptive practices to distort public perception of best practices to safely and responsibly produce food." *Id.* ¶ 61. These comments reveal the true purpose of the law: to protect an entire industry from a specific type of critical speech on an issue of public importance.

### B. The New Ag-Gag Law is Viewpoint-Based Because It Singles Out Speech Critical of a Single Industry for Special, Disfavored Treatment.

The new Ag-Gag law is also viewpoint-based because it singles out speech critical of a single industry for special, disfavored treatment. "Where the government enacts a law with the purpose of suppressing a particular viewpoint, it is a viewpoint-based restriction on speech." *Reynolds I*, 297 F. Supp. 3d at 926 (citing *Reed*, 135 S. Ct. at 2238 (Kagan, J., concurring in the judgment); *Vieth*, 541 U.S. at 314–15 (Kennedy, J., concurring in the judgment); *Cornelius*, 473 U.S. at 811). The new Ag-Gag law is a viewpoint-based restriction on speech because it was animated by disagreement with, and a desire to suppress, exposés and other speech that would demonstrate agricultural facilities' illegal or unethical conduct without regulating pro-animal agriculture speech.

"[E]ven a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 645 (1994); *see also Reed*, 135 S. Ct. at 2222 ("[S]trict scrutiny applies either when a law is content based on its face *or* when the purpose and justification for the law are content based" (emphasis added)). "[E]ven when a government supplies a content-neutral justification for the regulation, that justification is not given controlling weight without further inquiry." *Whitton v. City of Gladstone*, 54 F.3d 1400, 1406 (8th Cir. 1995). Iowa legislators were candid with the media regarding the viewpoint-based legislative purpose underlying the first Ag-Gag law.

Among other statements, Iowa legislators admitted that that the law was aimed at "stopping these groups that go out and gin up campaigns that they use to raise money by trying to give the agriculture industry a bad name." *Reynolds II*, 353 F. Supp. 3d at 817. The State's scramble to re-enact a new Ag-Gag law after this Court struck down the first one demonstrates that the State was motivated by the same purposes. *See*, *e.g.*, *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016) (where law was originally "motivated by an impermissible discriminatory intent" and a later amendment effectuates the same end, courts should subject the later statute to strict scrutiny); *Johnson v. Governor*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc) (where temporal "proximity" exists between "intentional discrimination" and seemingly neutral legislative actions, courts should have a "healthy skepticism" of amendments). And the statements of the legislators who passed the new law evidence this renewed intent.

### C.     Plaintiffs Are Likely to Prevail in Demonstrating That the New Ag-Gag Law Is Subject to Strict Scrutiny.

Strict scrutiny is warranted here because, as demonstrated above, the statute discriminates based on content and viewpoint, triggering strict scrutiny. *Turner*, 512 U.S. at 642.

Consistent with this, strict scrutiny is also the correct standard to apply to statutes that regulate false statements of fact, which by definition are content-based because the court needs to examine the speech to determine whether the law applies. The *Alvarez* plurality applied strict scrutiny to prohibitions on lies. 567 U.S. at 715. And the Eighth Circuit has applied strict scrutiny to lies that are political in nature both before *Alvarez*, *281 Care Comm. v. Arneson*, 638 F.3d 621, 636 (8th Cir. 2011); and since, *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) ("target[ing] falsity, as opposed to the legally cognizable harms associated with a false statement, . . . is no free pass around the First Amendment"). *See also Animal Legal Def. Fund v.*

*Wasden*, 878 F.3d 1184, 1196 (9th Cir. 2018) (subjecting Idaho Ag-Gag law's prohibition on

gaining access to an animal agriculture facility by misrepresentation to strict scrutiny); *Herbert*,

263 F. Supp. 3d at 1210 (analyzing post-*Alvarez* precedent on level of scrutiny to apply to false

statements and determining strict scrutiny applied to Utah Ag-Gag law).[1]

### D.   Plaintiffs Are Likely to Prevail in Demonstrating the New Ag-Gag Law Is Unlikely to Survive Strict Scrutiny.

#### 1.   The Ag-Gag Law Does Not Advance Compelling State Interests.

Strict scrutiny is never satisfied when the interest served by the law is anything less than

the most "pressing public necessity." *Turner*, 512 U.S. at 680. It is not enough that the law would

serve "legitimate, or reasonable, or even praiseworthy" ends. *Id.*

When assessing whether a law is justified by a compelling government interest, a court

must look at the actual motive or purpose behind the law. "Indeed, the purpose of strict scrutiny

is to 'smoke out'" illegitimate governmental classifications. *Adarand Constructors v. Pena*, 515

U.S. 200, 226 (1995) (quoting *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989)).

As explained above, the State's actual legislative interests in passing both the original

Ag-Gag law and the new law were clear. *See supra*, Section II.A. Sponsors and supporters of

both the old and new law repeatedly expressed a concern for protecting the agriculture industry

---

[1] Accord *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 472 (6th Cir. 2016) (applying strict scrutiny to state law criminalizing false statements about political candidates); *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1139–41 (D. Mont. 2016) (applying strict scrutiny to professional rules of conduct prohibiting false statements in judicial elections); *Winter v. Wolnitzek*, 186 F. Supp. 3d 673, 696–97 (E.D. Ky. 2016) (applying strict scrutiny to false speech provision of judicial canons), *aff'd in part, vacated and rev'd in part on other grounds*, 834 F.3d 681 (6th Cir. 2018); *Rosemond v. Markham*, 135 F. Supp. 3d 574, 586 (E.D. Ky. 2015) (applying strict scrutiny to regulatory board regulation prohibiting, in part, false representations); *O'Neill v. Crawford*, 970 N.E.2d 973, 973 (Ohio 2012) ("The *Alvarez* court . . . recognized that not only must the restriction meet the 'compelling interest test,' but the restriction must be 'actually necessary' to achieve its interest."); *Rickert v. Pub. Disclosure Comm'n*, 168 P.3d 826, 828 (Wash. 2007) (applying strict scrutiny to Washington false-statement law).

from the sunlight of undercover investigations. These statements reveal that the desire to protect the agricultural industry from critical speech was a "motivating factor" of the law. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Because the new Ag-Gag law was motivated, at least in substantial part, by illegitimate motives, it cannot survive the compelling-interest test. *Id.*

The interests the State asserts as its real motives were incidental to the speech-suppressing motives. As it did with the original law, the State appears to invoke motives involving protecting private property and ensuring biosecurity. MTD Br. at 20–21, 27. This is another smokescreen. Finding additional bases on which to justify the law does not mean the State's asserted interests were therefore the actual government motives. It simply means that at some point, the State created another putative justification. Strict scrutiny demands the actual purposes behind legislation. *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996).

But even accepting the State's purported interests, they were not compelling in support of the original law and they are not compelling here. As with the last law, other statutory provisions that do not criminalize protected speech already advance those interests. First, Iowa already has a generally applicable prohibition against trespass that does not implicate speech in any way. *See* Iowa Code § 716.7 (defining trespass). And as this Court noted in connection with the first challenge:

> an already existing section of ... the Iowa Code provides that persons "shall not, without the consent of the owner" do various acts, including entering the facility to disrupt or otherwise harm the operation. Iowa Code § 717A.2. With similar interests in mind, the state could also rely upon Iowa's existing trespass law, Iowa Code § 716.7(2), to protect its proffered interests without chilling speech.

*Reynolds II*, 353 F. Supp. 3d at 825. Thus the State's repeated reliance on cases rejecting a First Amendment defense to both civil and criminal trespass claims only highlights that the State did

not have any pressing need for a new law, especially not one aimed squarely at critics of animal agriculture. *See* MTD Br. at 7–8, 21–22. The existence of other laws accomplishing the State's purported interest further suggests that the statute was intended to quash investigative reporting on agricultural production facilities.

So too with biosecurity. "Biosecurity is effectively and appropriately protected by the last section of Chapter 717A, which prohibits the willful possession, transportation, or transfer of 'a pathogen with an intent to threaten the health of an animal or crop.'" *Reynolds II*, 353 F. Supp. 3d at 825–26 (citing Iowa Code § 717A.4).

Since strict scrutiny exists to uncover disguised, illegitimate governmental motives, accepting the State at its word that the law was passed to protect broad private property and biosecurity interests would water down strict scrutiny into rational-basis review, requiring the Court to ignore evidence of improper purpose simply because the State is also able to manufacture a different, arguably proper motive. That is not the law.

> **2.** **The Ag-Gag Law is Neither Narrowly Tailored nor the Least Restrictive Means Available.**

Even if the State's interests underlying the new Ag-Gag law could somehow be characterized as "compelling," the law fails strict scrutiny because it is not narrowly tailored to serve those interests, nor is it the least restrictive means available to meet them.

As was true for the original statute, numerous other laws already exist that protect private property and biosecurity interests without impinging on free-speech rights or singling out a single industry for protection (or its critics for prosecution). "[T]he only interest distinctively served by [a] content limitation," if another law "would have precisely the same beneficial effect," is to display "hostility" towards those views, which is "precisely what the First Amendment forbids," and makes the law "plainly" not tailored. *R.A.V. v. City of St. Paul*, 505

U.S. 377, 396 (1992). "'The existence of content neutral alternatives to' protect property rights and biosecurity, 'undercut[s] significantly' the defenses raised to the statutory content.'" *Reynolds II*, 353 F. Supp. 3d at 825 (quoting *Survivors Network*, 779 F.3d at 793–94 (alteration in original)).

The new law enjoys no close fit between the actions criminalized and the State's asserted interests in protecting private property or biosecurity. For instance, the law does not apply to employees who do not apply for employment with an intent to video-record and publish their findings, but who subsequently do record some wrongdoing. Such employees would presumably have the same (negligible) effect on private property as the employee who had such an intent at the time of application, exposing the lack of fit between the supposed means and ends. And if the State's "real concern is trespass," then the existing laws already address that concern. *Wasden*, 878 F.3d at 1196.

As with the original law, the new law is not only "unnecessary to protect the state's interests, it is also an under-inclusive means by which to address them." *Reynolds II*, 353 F. Supp. 3d at 826. "[A]n underinclusive prohibition should raise 'serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Id*. (quoting *Brown v. Enter. Merchs. Ass'n,* 564 U.S. 786, 802 (2011)). The new Ag-Gag law "does nothing to deter the exact same alleged harms—trespass and biosecurity breaches—from individuals who proceed to access or enter a facility without false pretense or misrepresentation." *Id*.

The State also will not be able to meet the narrow tailoring required of "demonstrat[ing] that alternative measures that burden substantially less speech would fail to achieve the

government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 467.[2]

In *McCullen*, the Supreme Court applied intermediate scrutiny to a Massachusetts law that

prohibited standing within 35 feet of the entrance to or driveway of an abortion clinic. *Id*. at 469,

486. The Court held that the law was not narrowly tailored to the state's asserted interest in

protecting public safety from the risk created by protestors outside of abortion clinics because

"generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the

like" already satisfied that interest. *Id*. at 492. The Court also held that the law was not tailored to

the state's "interest in preventing congestion in front of abortion clinics." *Id*. at 493.

Massachusetts could have enacted a law that "that require[s] crowds blocking a clinic entrance to

disperse when ordered to do so by the police, and that forbid the individuals to reassemble within

a certain distance of the clinic for a certain period." *Id*. Such alternatives would have been more

tailored to the problem than the blunt prohibition the state enacted. *Id*. Finally, the Court rejected

the state's contention that existing, generally-applicable laws or alternative tools had failed. *Id*. at

494. The state could not identify "a single prosecution brought under [existing, generally-

applicable] laws within at least the last 17 years." *Id*. And while the state claimed they "tried

injunctions," "the last injunctions they cite date to the 1990s." *Id*. "In short, the Commonwealth

ha[d] not shown that it seriously undertook to address the problem with less intrusive tools

readily available to it." *Id*.

     As in *McCullen*, "a substantial portion of the burden on speech" imposed by the Ag-Gag

law "does not serve to advance [the State's] goals." *Id*. at 486 (quoting *Ward v. Rock Against

Racism*, 491 U.S. 781, 799 (1989)). The State will not be able to provide evidence of attempted

---

[2] While *McCullen* involved intermediate, not strict, scrutiny, 537 U.S. at 477, both tests share the narrow tailoring requirement. *See, e.g.*, *Reynolds II*, 353 F. Supp 3d at 826–27 (addressing *McCullen*'s narrow tailoring analysis in applying strict scrutiny).

or failed prosecutions under these already-existing laws against trespass or protecting biosecurity, or evidence of any attempt to employ any narrower restrictions before resorting to the blunt force of either Ag-Gag law. This Court found that the State failed to use these alternatives before enacting the original Ag-Gag law, *Reynolds II*, 353 F. Supp. 3d at 825, and the State's rush to enact the new law after the original was struck down emphasized the State's disinterest in using alternative measures.

As in *McCullen*, the State will not be able to demonstrate "that it seriously undertook to address the problem with less intrusive tools readily available to it." 573 U.S. at 494. As with the Idaho statute, the Iowa law fails narrow tailoring because "it is 'possible substantially to achieve the Government's objective in less burdensome ways' with 'a more finely tailored statute.'" *Wasden*, 878 F.3d at 1198 (quoting *Alvarez*, 567 U.S. at 737).

The State does not have a compelling interest in silencing whistleblowers in animal agriculture. Even if the State's true interest were protecting private property or biosecurity, the new Ag-Gag law is in no way tailored to that end, and certainly is not the least restrictive means of achieving it. Plaintiffs are likely to succeed in demonstrating that the law fails strict scrutiny.

> **E.      Plaintiffs Are Likely to Prevail in Demonstrating the New Ag-Gag Law Does Not Survive Intermediate Scrutiny.**

Even if this Court determines that intermediate scrutiny is the appropriate standard, the new Ag-Gag law also still fails that level of scrutiny, just like its predecessor. *Reynolds II*, 353 F. Supp. 3d at 826–27.

To meet intermediate scrutiny, the State must demonstrate that the law is "narrowly tailored to serve a significant government interest" and "leave[s] open ample alternative channels for communication of the information" to be upheld. *Ward*, 491 U.S. at 791. Like strict scrutiny, intermediate scrutiny requires that the proffered interest be the "actual state purposes, not

rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535–36 (1996).

As demonstrated above, the State's actual interests in passing the Ag-Gag law were not substantial because they were "[related] to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The law criminalizes speech directly and was motivated by a desire to prohibit speech that is critical of animal agriculture.

Even under intermediate scrutiny, "the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799). *See also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (assuming the existence of a "substantial state interest" but holding that the law was "not sufficiently drawn to achieve it").

Like its predecessor, the new Ag-Gag law fails intermediate scrutiny first, because there is simply no fit between the State's alleged interests and the means by which the new Ag-Gag law supposedly goes about protecting them; and second, because there is ample evidence that Iowa's "actual state purpose[]," *Virginia*, 518 U.S. at 535, was not "unrelated to the suppression of free expression," *O'Brien*, 391 U.S. at 377. Even under intermediate scrutiny controls, the new Ag-Gag law must fall.

III. **The Remaining Preliminary Injunction Factors All Weigh in Favor of Granting Preliminary Injunctive Relief.**

To the extent they are relevant, all of the other factors for issuing a preliminary injunction weigh in favor of Plaintiffs. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life*, 692 F.3d at 870.

Here, Plaintiffs demonstrate a strong likelihood of succeeding on their content- and viewpoint-discrimination claim. While the Court need not go any further to find that a preliminary injunction is warranted, the remaining factors support issuing a preliminary injunction as well.

### A. The State's Violations of Plaintiffs' First Amendment Rights Constitute Irreparable Harm.

"'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Plaintiffs Animal Legal Defense Fund, People for the Ethical Treatment of Animals, ICCI, and Bailing Out Benji each independently investigated potential facilities and developed plans to investigate Iowa agricultural facilities in the wake of this Court's order enjoining enforcement of the original Ag-Gag law. *See* Affidavit of Mark Walden in Support of Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 12–15; Affidavit of Jeff Kerr in Support of Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 17–18; Affidavit of Mindi Callison in Support of Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 8, 10–12; Affidavit of Adam Mason in Support of Plaintiffs' Motion for a Preliminary Injunction, ¶¶ 12–13. Those organizations were forced to abandon those plans once the State enacted the new Ag-Gag law on the fear of prosecutions. Walden Aff. ¶ 14; Kerr Aff. ¶ 18; Callison Aff. ¶ 10; Mason Aff. ¶¶ 12–14. This fear of exercising First Amendment rights under the threat of prosecution is irreparable harm.

### B. The Balance of Hardships Weighs in Favor of Granting a Preliminary Injunction.

The ongoing irreparable injuries to Plaintiffs in the absence of an injunction considerably outweigh any threatened harms that State could possibly allege. There cannot be any injury in

enjoining the State from enforcing a facially unconstitutional statute that burdens Plaintiffs' and others' First Amendment rights. In contrast, the injuries to Plaintiffs' First Amendment rights are ongoing and irreparable. Even with the issuance of a preliminary injunction, the State will continue to have at its disposal criminal prohibitions against trespass, Iowa Code § 716.7, disrupting, destroying, or damaging property at an animal facility or exercising control over an animal at an animal facility, *id.* § 717A.2, using pathogens to threaten crops or animals, *id.* § 717A.4, and various other tools to meet its asserted interested in protecting Iowa agricultural facilities.

The State cannot claim any burden posed by compliance with the United States Constitution. By contrast, Plaintiffs will suffer irreparable injury if the State continues to criminalize their First Amendment protected speech. The balance of hardships weighs decidedly in Plaintiffs' favor.

### C.      The Public Interest Weighs in Favor of Granting a Preliminary Injunction.

Finally, a preliminary injunction would further the public interest, because "it is always in the public interest to protect constitutional rights." *Phelps-Roper*, 545 F.3d at 690. There is no public interest in continuing to chill Plaintiffs' First Amendment speech.

### Conclusion

Plaintiffs are likely to succeed on their claim that the new Ag-Gag law is a content-based and viewpoint-based restriction on protected speech that cannot survive review under any form of heightened scrutiny. The remaining factors all support the issuance of a preliminary injunction.

Therefore, this Court should grant Plaintiffs' Cross-Motion for a Preliminary Injunction.

Dated this 19th day of July, 2019

/s/ *Matthew Strugar*
Matthew Strugar (*Pro Hac Vice*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com

Rita Bettis Austen, AT0011558
ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 808
Des Moines, IA 50309–2317
Telephone: 515.243.3988
Fax: 515.243.8506
Email: Rita.Bettis@aclu-ia.org

Matthew Liebman (*Pro Hac Vice*)
Kelsey Eberly (*Pro Hac Vice*)
Cristina Stella (*Pro Hac Vice*)
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org
keberly@aldf.org
cstella@aldf.org

Professor Alan Chen (*Pro Hac Vice*)
University of Denver
Sturm College of Law
2255 E. Evans Avenue Denver, CO 80208
(303) 871-66283
achen@law.du.edu

Professor Justin Marceau, (*Pro Hac Vice*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

20

David S. Muraskin (*Pro Hac Vice)*
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in this case are registered CM/ECF users and will served by the CM/ECF system.

Date: July 19, 2019                              /s/  Matthew Strugar

                                                 Matthew Strugar

22