IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND; BAILING OUT BENJI; IOWA CITIZENS FOR COMMUNITY IMPROVEMENT; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; and CENTER FOR FOOD SAFETY, <br><br>     Plaintiffs, <br><br> vs. <br><br> KIMBERLY REYNOLDS, in her official capacity as Governor of Iowa; THOMAS MILLER, in his official capacity as Attorney General of Iowa; and DREW B. SWANSON, in his official capacity as Montgomery County, Iowa County Attorney, <br><br>     Defendants. | **No. 4:19-cv-00124–JEG-HCA** <br><br> **O R D E R** |

    This matter comes before this Court on a Motion to Dismiss for Failure to State a Claim, ECF No. 18, filed by Defendants Kimberly Reynolds, Tom Miller, and Drew Swanson (collectively, Defendants), and a Motion for a Preliminary Injunction, ECF No. 25,[1] filed by Plaintiffs Animal Legal Defense Fund (ALDF), Iowa Citizens for Community Improvement, Bailing Out Benji, People for the Ethical Treatment of Animals, Inc., and Center for Food Safety (collectively, Plaintiffs).   No party requested a hearing, and this Court finds a hearing is unnecessary. The motions are fully submitted and ready for disposition.

## I.    BACKGROUND

    The core issues in this case once again come before the Court as a result of amendment to the underlying statutory framework, which necessarily requires some discussion of both the prior

---

    [1] Plaintiffs have captioned their motion a "Cross" Motion for Preliminary Injunction. There is no other motion for preliminary injunction before the Court, so it will be referred to simply as Plaintiffs' Motion for Preliminary Injunction.

and new statutes.   On March 2, 2012, former Iowa Governor Terry Branstad signed into law the

Agricultural Production Facility Fraud law, Iowa Code § 717A.3A.   The statute stated a person

commits agricultural production facility fraud if the person willfully:

    a.   Obtains access to an agricultural production facility by false pretenses[, or]
    b.   Makes a false statement or representation as part of an application or agreement
         to be employed at an agricultural production facility, if the person knows the
         statement to be false, and makes the statement with an intent to commit an act not
         authorized by the owner of the agricultural production facility, knowing that the
         act is not authorized.

§ 717A.3A (2012).   "The first conviction for violation of § 717A.3A is a serious misdemeanor,

and a second or subsequent conviction is an aggravated misdemeanor."   § 717A.3A(2).

    On October 10, 2017, Plaintiffs filed a lawsuit against Defendants,[2] alleging that

§ 717A.3A was unconstitutional on its face because it violated the First and Fourteenth Amend-

ments to the U.S. Constitution.   <u>Animal Legal Def. Fund v. Reynolds</u> (<u>Reynolds I</u>), 297 F. Supp.

3d 901, 911 (S.D. Iowa 2018), <u>appeal filed</u>, (8th Cir. Feb. 22, 2019) (No. 19-1364).   On

February 27, 2018, this Court granted in part and denied in part Defendants' Motion to Dismiss,

dismissing the Equal Protection Clause claim but declining to dismiss the remaining claims.   <u>Id.</u>

at 928-29.   This Court found that Plaintiffs had standing to challenge the statute, <u>id.</u> at 912-17,

and that Plaintiffs had stated valid claims relating to the First Amendment because the statute

was a content-based regulation of constitutionally protected speech, <u>id.</u> at 917-25.   This Court

also held that Plaintiffs' claim that the statute was a viewpoint-based restriction was sufficient to

survive a motion to dismiss.   <u>Id.</u> at 926.

    On January 9, 2019, this Court granted Plaintiffs' Motion for Summary Judgment and

denied Defendants' Cross Motion for Summary Judgment, finding § 717A.3A violated the First

---

    [2] The parties were the same as those in the present case with the exception that the
Montgomery County, Iowa County Attorney was Bruce Swanson and is now Drew Swanson.

Amendment as a content-based restriction on free speech.   Animal Legal Def. Fund v. Reynolds (Reynolds II), 353 F. Supp. 3d 812, 827 (S.D. Iowa 2019), appeal filed, (8th Cir. Feb. 22, 2019) (No. 19-1364).   This Court reasoned that the statute implicated protected speech because "false statements will be protected by the First Amendment only if they do not cause a 'legally cognizable harm' or provide 'material gain' to the speaker," and the statute covered speech associated with neither.   Id. at 821-22 (quoting United States v. Alvarez, 567 U.S. 709, 718, 723 (2012)).   This Court then found that the statute's restriction on protected speech was contentbased because authorities would need to know "the content of the speech" and "the content's veracity" to enforce the statute.   Id. at 822.   Finally, this Court found that the statute could survive neither strict nor intermediate scrutiny because it did not serve compelling government interests, was not narrowly tailored to serve the proffered interests, and was "so broad in its scope" that it would "discourag[e] the telling of a lie in contexts where harm is unlikely and the need for prohibition is small."   Id. at 824-27.   This Court dismissed Plaintiffs' Fourteenth Amendment Due Process claim as moot based on this Court's ruling on the First Amendment claim.   Id. at 827.   Defendants filed a notice of appeal on February 20, 2019.   The appeal is pending.   With the prior matter on appeal, the Iowa Legislature again addressed this subject matter.

On March 14, 2019, Governor Reynolds signed into law the Agricultural Production Facility Trespass law, Iowa Code § 717A.3B (effective Mar. 14, 2019).   A person violates § 717A.3B if the person:

> a.   Uses deception . . . on a matter that would reasonably result in a denial of access to an agricultural production facility that is not open to the public, and, through such deception, gains access to the agricultural production facility, with the intent to cause physical or economic harm or other injury to the agricultural production facility's operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer[, or]
> b.   Uses deception . . . on a matter that would reasonably result in a denial of an opportunity to be employed at an agricultural production facility that is not open to the public, and, through such deception, is so employed, with the intent to cause

> physical or economic harm or other injury to the agricultural production facility's
> operations, agricultural animals, crop, owner, personnel, equipment, building,
> premises, business interest, or customer.

Iowa Code § 717A.3B.   Deception consists of, among other things, "[c]reating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true" *or* "[f]ailing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed."   Iowa Code § 702.9.   The first conviction for violation of § 717A.3B is a serious misdemeanor, and a second or subsequent conviction is an aggravated misdemeanor. Iowa Code § 717A.3B(2).

As this Court explained in the prior litigation challenging § 717A.3A, that statute arose "on the heels of several industrial farm investigations that brought critical national attention to Iowa's agricultural industry."   Reynolds II, 353 F. Supp. 3d at 816.   "Lawmakers described the bill as being responsive to two primary concerns of the agricultural industry: facility security (both in terms of biosecurity and security of private property) and harms that accompany investigative reporting."   Id. at 817.   Likewise, lawmakers described the bill that would become § 717A.3B, which is now at issue, in similar terms.   As Plaintiffs note, Iowa State Representative Jarad Klein defended § 717A.3B by saying he would "not stand by and allow [Iowa farmers] to be disparaged in the way they have been," and Iowa State Senator Ken Rozenboom said the bill would protect agriculture from "those who would intentionally use deceptive practices to distort public perception of best practices to safely and responsibly produce food." Compl. ¶¶ 59, 61, ECF No. 1 (alteration in original).   Defendants clarify, however, that Representative Klein also said the bill would protect farmers "from people who lie to get a job whose intent is to cause harm not just in social media but in biosecurity and life and health of their livestock," and Senator Rozenboom also said "managing strict biosecurity practices is a critical

component of this bill."[3]   Defs.' Resist. 11 n.3, ECF No. 34.   The matter now before this Court is not about the good faith intentions of legislators, but rather what the law requires.

On April 22, 2019, Plaintiffs filed a Complaint alleging § 717A.3B is unconstitutional on its face.   Plaintiffs' first and second causes of action allege that § 717A.3B violates the First Amendment as an overbroad restriction on speech and as a content- and viewpoint-based restriction on speech.   Plaintiffs' third cause of action alleges that § 717A.3B is void under the First and Fourteenth Amendments because it is vague.   Plaintiffs' fourth cause of action alleges that § 717A.3B substantially burdens Plaintiffs' exercise of a fundamental right in violation of the Fourteenth Amendment's Due Process Clause.[4]

On June 21, 2019, Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim against all causes of action identified in the Complaint, which Plaintiffs resist.   On July 19, 2019, Plaintiffs filed a Motion for Preliminary Injunction accompanied by four affidavits from the leaders of Plaintiffs' organizations, which Defendants resist.

## II.   DISCUSSION

### A.  Motion to Dismiss

Defendants move to dismiss Plaintiffs' complaint for failure to state a claim under Rule 12(b)(6).   To survive a Rule 12(b)(6)motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   Ashcroft

---

[3] As this Court previously noted, statements by lawmakers can be used for "illustrating the background for the current legal dispute."   Reynolds II, 353 F. Supp. 3d at 817 n.4.

[4] For purposes of the motion to dismiss, Plaintiffs' due process cause of action is subsumed by their First Amendment causes of action and will not be analyzed separately.   See Reynolds I, 297 F. Supp. 3d at 926 ("The above discussion concerning First Amendment protection for the speech prohibited by § 717A.3A addresses [Plaintiffs' due process] theory, as the First Amendment only applies to Defendants via the Fourteenth Amendment.").

v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).   "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   Id. at 679.   Defendants argue that none of Plaintiffs' four causes of action state valid claims.   Thus, the matter now before the Court is not an analysis of whether Plaintiffs have asserted sufficient factual support to make out plausible claims,[5] but rather whether the law provides a remedy for the asserted claims.   The manner in which the current motion is presented requires a more detailed analysis of the underlying legal principles than would be typical on a motion to dismiss pursuant to Rule 12(b)(6).

### 1.  First Amendment

Plaintiffs allege that § 717A.3B, like § 717A.3A before it, violates the First Amendment because it imposes content- and viewpoint-based restrictions on protected speech that cannot withstand constitutional scrutiny, and it is overbroad.   Defendants argue that § 717A.3B does not cover protected speech because it only prohibits conduct that causes legally cognizable harms or is made for the purpose of material gain.   Defendants further argue that the statute is not overbroad because, even if it prohibits some protected speech, it does not prohibit a substantial amount of protected speech.   Finally, Defendants argue that the statute does not impose viewpoint-based discrimination on its face.

---

[5] On consideration of the Motion, the Court assumes the facts alleged in the Complaint to be true.   See United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012).

### a. Regulation of Speech

The First Amendment only protects speech and "conduct that is inherently expressive." Rumsfeld v. Forum for Acad. & Institutional Rights, 547 U.S. 47, 66 (2006). Conduct merely accompanied by speech is not protected simply because the speech is protected, id., nor does conduct generate First Amendment protection "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," id. at 62 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). A statute regulates conduct, not speech, when it affects what persons "must *do* . . . not what they may or may not *say*." Id. at 60.

Defendants argue that § 717A.3B "prohibits conduct facilitated by speech, rather than pure speech." Defs.' Br. Supp. Mot. Dismiss 19-20, ECF No. 22. Defendants similarly argued that § 717A.3A, which referenced "false pretenses" or "false statements," regulated conduct rather than speech. Reynolds I, 297 F. Supp. 3d at 917. Although § 717A.3B replaces "false pre-tenses" or "false statements" with "deception," both § 717A.3A and § 717A.3B appear to require something more than just speech to violate the statute—obtaining access or employment, or acting with a particular intent.

This Court found that although "§ 717A.3A regulates conduct to some extent, it also restricts speech" because "one cannot violate § 717A.3A *without* engaging in speech." Reynolds I, 297 F. Supp. 3d at 918. Regarding the new statute, because a person can only violate § 717A.3B by engaging in deception, which requires either speech or expressive con-duct—such as nodding one's head instead of saying "yes" in response to a question—§ 717A.3B also appears to regulate speech.

### b. Content-Based Restriction of Protected Speech

Defendants' primary argument in support of their Motion to Dismiss is that § 717A.3B does not restrict *protected* speech. Content-based restrictions are presumed invalid and "subject

to strict scrutiny *unless* the speech falls into one of a number of categories of speech traditionally subject to restriction, commonly referred to as 'unprotected speech.'" Reynolds I, 297 F. Supp. 3d at 919 (quoting United States v. Stevens, 559 U.S. 460, 469-70 (2010)).   Content-based regulations are "those that target speech based on its communicative content." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015).   By contrast, "a regulation that is content-neutral on its face is nevertheless content-based if it cannot be 'justified without reference to the content of the regulated speech.'" Reynolds I, 297 F. Supp. 3d at 919 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).   "[C]ontent-neutral regulations include (but are not limited to) regulations regarding the time, place, or manner of speech." Id. (citing Ward, 491 U.S. at 791).

This Court found that § 717A.3A was content-based on its face.   Id.   This Court said that to distinguish between a person who obtains access by false pretenses and a person who obtains access by some other means, and to distinguish between a person who makes a true statement in an employment application and a person who makes a false statement, "one must evaluate what the person has said." Id.   The need to evaluate what the person said made "§ 717A.3A a content-based restriction on speech." Id.   The analysis here is the same: enforcement authorities would have to evaluate the content of what a person said to determine whether they engaged in deception, so § 717A.3B indicates a content-based regulation.   See Alvarez, 567 U.S. at 717-18 (evaluating restriction on falsely claiming to have received a Medal of Honor as a content-based regulation).   Notably, in support of their Motion to Dismiss, Defendants do not address whether § 717A.3B is a content-based regulation.[6]   For purposes of the Motion to Dismiss, this Court assumes that § 717A.3B regulates speech based on its content.

---

[6] Defendants argue in Resistance to Plaintiffs' Motion for a Preliminary Injunction that § 717A.3B is not content-based, which will be addressed in the discussion of the preliminary injunction.

Defendants instead argue that § 717A.3B's prohibitions fall into an exception to First Amendment protection.   "Some content-based restrictions are permitted as a restriction on one of 'the few historic and traditional categories of expression long familiar to the bar.'"   Reynolds I, 297 F. Supp. 3d at 919 (cleaned up) (quoting Alvarez, 567 U.S. at 717).   "Those categories include advocacy intended and likely to incite imminent lawless action, obscenity, defamation, fraud, speech integral to criminal conduct, 'fighting words,' child pornography, true threats, and speech presenting a grave and imminent threat."   Id. at 919-20 (citing Alvarez, 567 U.S. at 718). Although "there is no general exception to First Amendment protection for false statements," some categories of false statements "do not receive First Amendment protection."   Id. at 920 (citing Alvarez, 567 U.S. at 718).   Most relevant for the pending motions is an exception for false statements that cause a "legally cognizable harm," or provide a "material gain" to the speaker.   Alvarez, 567 U.S. at 719, 723.   Defendants argue that any speech prohibited by § 717A.3B falls into that exception.

This Court found that the speech prohibited by § 717A.3A did not cause a legally cognizable harm or provide a material gain to the speaker and, therefore, received First Amendment protection.   Reynolds I, 297 F. Supp. 3d at 923-924.   This Court explained the trespass provision of § 717A.3A prohibited speech that might cause a "nominal harm," but such harm did not rise to the level of a legally cognizable harm sufficient to remove the speech from First Amendment protection.   Id. at 923.   Similarly, this Court found that the employment provision of § 717A.3A regulated speech that was associated with a legally cognizable harm or material gain to the speaker.   Id. at 924.   Contrasting § 717A.3A to the regulation at issue in Animal Legal Defense Fund v. Wasden, 878 F.3d 1184 (9th Cir. 2018)—which criminalized knowingly obtaining employment via misrepresentation with the intent to cause economic or other injury— this Court reasoned that § 717A.3A "sweeps much more broadly and on its face requires no

likelihood of actual, tangible injury on the part of the recipient of false speech."   Id. at 924

(contrasting Wasden, 878 F.3d 1184).

Defendants argue that § 717A.3B's revised intent element—"intent to cause physical or

economic harm or other injury"—exempts it from the First Amendment protection this Court

found covered the speech at issue in § 717A.3A.[7]   Plaintiffs respond that not all speech that

causes harm lies outside of First Amendment protection, only speech that causes legally cog-

nizable harms or a material gain to the speaker.   Section 717A.3B, Plaintiffs argue, goes beyond

criminalizing speech that causes legally cognizable harms or provides material gains and also

criminalizes speech associated with activities such as undercover investigations that cause no

legally cognizable harm to the agricultural production facility or material gain to the investigator.

In considering the constitutional challenges to § 717A.3A, this Court repeatedly

emphasized that not all false speech that causes *any* type of harm lies outside the protection of

the First Amendment.   For instance, this Court said that "false statements will be protected by

the First Amendment only if they *do not* cause a 'legally cognizable harm' or provide 'material

gain' to the speaker."   Reynolds II, 353 F. Supp. 3d at 821-22 (quoting Alvarez, 567 U.S. at

718, 723).   This Court further said, "First Amendment doctrine permits the regulation of some

categories of lies—those that cause a *legally cognizable* harm or material gain," id. at 827

(emphasis added), and "[t]he types of false statements historically unprotected by the First

Amendment are those that cause '*specific or tangible*' injuries, Reynolds I, 297 F. Supp. 3d at

921 (emphasis added) (quoting Wasden, 878 F.3d at 1194).   In discussing harms from trespass,

for instance, this Court distinguished "nominal damage[s]" which are "damage[s] in name only"

---

[7] Section 717A.3A has an intent element that only applies to the employment section and
reads: "an intent to commit an act not authorized by the owner of the agricultural production
facility, knowing that the act is not authorized."   Iowa Code § 717A.3A(1)(b).   Section
717A.3B's intent element, by contrast, applies to both of its sections.

from "*actual or material* injuries." <u>Reynolds I</u>, 297 F. Supp. 3d at 922 (emphasis added).   And this Court cautioned that to "categorically deny protection for false speech that may cause the *nominal* invasion of a legal right but that does not result in *actual, material* harm would result in overbroad restrictions on speech, creating undue chilling of valued First Amendment expression." <u>Id.</u> at 923 (emphasis added).

The Supreme Court in <u>Alvarez</u> also recognized this important distinction between speech that causes harm and speech that causes legally cognizable harm.   The four-Justice plurality acknowledged that someone lying about having received a Medal of Honor "might harm the Government by demeaning the high purpose of the award" and "may offend the true holders of the Medal." <u>Alvarez</u>, 567 U.S. at 726.   But that potential harm did not remove the false speech at issue in <u>Alvarez</u> from First Amendment protections.   The plurality analyzed the restriction on speech with "most exacting scrutiny" *despite* the potential harm associated with the speech. <u>Id.</u> at 724 (quoting <u>Turner Broad. Sys. v. FCC</u>, 512 U.S. 622, 642 (1994)).   In distinguishing the constitutionally-protected false speech in <u>Alvarez</u> from other cases in which false speech did not receive First Amendment protection, the plurality said that the other cases all involved "defamation, fraud, or *some other legally cognizable harm* associated with a false statement." <u>Id.</u> at 719 (emphasis added); <u>see also</u> <u>281 Care Comm. v. Arneson</u>, 766 F.3d 774, 783 (8th Cir. 2014) (applying <u>Alvarez</u> to conclude that a law that "targets falsity, as opposed to the legally cognizable harms associated with a false statement" receives "no free pass around the First Amendment" (citing <u>Alvarez</u>, 567 U.S. at 719)).

The two concurring Justices agreed that the false, potentially harmful speech at issue received First Amendment protection but instead analyzed the statute with intermediate scrutiny. <u>Alvarez</u>, 567 U.S. at 730-31 (Breyer, J., concurring).   The concurrence distinguished between the statute before the Court and "narrower" statutes that required "proof of specific harm to identifiable victims," noting that the latter operated "in contexts in which a tangible harm to

others is especially likely to occur," or only prohibited false speech that was "particularly likely

to produce harm."   Id. at 734.   In short, the concurring Justices agreed that not all false speech

merely associated with harm lies outside of First Amendment protection.

Section 717A.3B appears to place no meaningful limit on the harm that would satisfy its

intent element—that is, it does not require the harm to be legally cognizable, specific, tangible,

actual, or material.   On its face, an intent to cause *any* injury, no matter how trivial or subjective,

would suffice to establish the harm element of the statute.   As such, it would include a business

injury that arose from legitimate First Amendment activity, such as truthful reporting on animal

abuse or unsanitary conditions.   On the other hand, some applications of the statute certainly

relate to legally cognizable harms.   If an arsonist lied about their criminal history while

intending to commit arson and thereby received a job at an agricultural production facility, the

harm that the arsonist intended would be legally cognizable; if a competitor's agent lied about

intending to steal trade secrets, the intended harm would also be legally cognizable.   But that

does not imply that all intended harms are material or legally cognizable.

This Court gave an example of speech that would facilitate harm that was not material and

legally cognizable in the prior litigation:

> an animal rights organization member could violate [§ 717A.3A] by obtaining access
> to a puppy mill auction by stating or implying that he or she was a breeder or pet
> broker.   That individual might then surreptitiously take photographs or audio or
> video recordings, or perhaps simply take mental notes regarding what that person
> observed of the animals or their conditions.   Under this scenario, the property owner
> may not have suffered any more than nominal damage arising from the false state-
> ments (or misleading omissions) at this point.   That individual that made the false
> statements might subsequently make *true* statements, protected by the First Amend-
> ment, regarding what that individual saw or recorded, for example, in disclosure to
> the facility's customers, or in advocating legislation against puppy mills.

Reynolds I, 297 F. Supp. 3d at 923.   This Court explained that such a scenario demonstrates that

some false statements may "cause little harm" and "may 'serve useful human objectives' by

facilitating truthful discourse or by helping others realize the truth."   Id. (quoting Alvarez, 567

U.S. at 733, 736 (Breyer, J., concurring)).   "Put another way, 'the First Amendment requires that [courts] protect some falsehood in order to protect speech that matters.'"   Id. (alteration in original) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 341 (1974)).   Despite its new intent element, § 717A.3B appears to criminalize the exact puppy mill scenario described in the prior litigation: an investigator that used *deception* to obtain access to the puppy mill auction and subsequently made First Amendment-protected, truthful statements with the information gained would cause economic harm or other injury to the property owner's business interest.   See id.

Defendants acknowledge that not all harms are legally cognizable, asserting that the statute may not apply to covert labor organizers because "it is unlikely that an intent to engage in statu-torily authorized conduct will satisfy the intent to harm element under the statute."   Defs.' Br. Supp. Mot. Dismiss 25, ECF No. 22.   Defendants do not point to any language in the statute that excludes "statutorily authorized conduct" from § 717A.3B's intent element.   By acknowledging that harms to an employer arising from labor organizers' acts might not be legally cognizable under § 717A.3B, Defendants suggest a narrowing construction of the statute such that it would not apply to "conduct authorized by law."   Id.   But, the statute only needs a narrowing con-struction if, on its face, it *could* apply to such conduct.[8]   Further, the investigator in the above puppy mill hypothetical would have also intended to engage in conduct authorized by law (or at least protected by the First Amendment) by accurately reporting what they saw at the auction, but that scenario appears to be just what § 717A.3B criminalizes.

---

[8] The Supreme Court sets a high bar for federal courts issuing narrowing constructions of state statutes.   See Stenberg v. Carhart, 530 U.S. 914, 944 (2000) (stating federal courts are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." (quoting Boos v. Barry, 485 U.S. 312, 330 (1988))).   More-over, whether a narrowing construction would be appropriate is not properly before the Court at this time.

Significantly, § 717A.3B does not state that the deception must have occurred during the job application process; therefore, an omission by an existing employee (such as failing to inform management of an intent to whistleblow) would constitute deception under the statute. Plaintiffs argue that the statute covers existing employees because it "refers to 'the opportunity to *be* employed', which connotes both *remaining* employed and *obtaining* employment."[9]   Pls.' Reply 2 n.1, ECF No. 37 (emphasis in original) (quoting § 717A.3B(1)(b)).   Defendants argue that the statute would not apply to existing employees who engage in whistleblowing because "the intent of the statute is to punish those with nefarious motives—not those who engage in legitimate whistle-blowing."   Defs.' Resist. 17, ECF No. 34.   Defendants further argue that a floor debate in the legislature suggests "good-faith employees who observe wrongdoing would not be subject to the law."   Id.   Defendants never explain what statutory language supports this interpretation or why the floor debate could not, inversely, suggest the statute *does* apply to whistleblowers.   Defendants' unsupported position that § 717A.3B does not apply to whistle-blowing and might not apply to labor organizing activities does not change the fact that either type of activity could cause an "economic harm or other injury" to an agricultural production facility's "business interest."   A disgruntled whistleblower might very well intend to harm an agricultural production facility by truthfully reporting misconduct.   Indeed, the fact that other Iowa statutes affirmatively provide whistleblower protections, see, e.g., Iowa Code § 88.9(3) (whistleblower protection relating to occupational health and safety), and the absence of such a provision in § 717A.3B, suggests it would not provide such protection.   Labor organizing,

---

[9] Plaintiffs at one point state that § 717A.3B would *not* apply to "employees who do not apply for employment with an intent to video-record and publish their findings, but who subse-quently do record some wrongdoing."   Pls.' Br. Supp. Mot. Prelim. Inj. 14, ECF No. 25-1. Plaintiffs twice advance the opposite argument in other briefing.   See Pls.' Br. Resist. Mot. Dismiss 10, ECF No. 27; Pls.' Reply Mot. Prelim. Inj. 2 n.1, ECF No. 37.

whistleblowing, and the puppy mill scenario demonstrate that "physical or economic harm or other injury" is not synonymous with "legally cognizable harm."

This point also distinguishes <u>Wasden</u>, in which the Ninth Circuit only upheld the sections of a comparable statute that "protect[ed] against a 'legally cognizable harm associated with a false statement.'"   <u>Wasden</u>, 878 F.3d at 1199 (quoting <u>Alvarez</u>, 567 U.S. at 719).   That court found a trespass-by-misrepresentation section of the statute unconstitutional because "some lies quite simply do not inflict any *material or legal* harm on the deceived party." <u>Id.</u> at 1196 (emphasis added) (citing <u>Alvarez</u>, 567 U.S. at 718-19).   But the court upheld a section that prohibited misrepresentations used to obtain records because "[o]btaining an agricultural production facility's records by misrepresentation inflicts a 'legally cognizable harm' by impairing an agricultural production facility owner's ability to control who can assert dominion over, and take possession of, his property" and risks "exposing proprietary formulas, trade secrets, or other confidential business information to unwanted parties." <u>Id.</u> at 1199.   The court's analysis of both sections focused on determining whether the false speech at issue was associated with a legally cognizable harm.

The employment section of that statute included an "intent to cause economic or other injury" element, which the court similarly analyzed by determining whether the speech caused a legally cognizable harm or provided a material gain.   The <u>Wasden</u> court's analysis included interpreting Idaho state law as providing that "an employee hired with an intent to harm the employer" commits "a breach of the covenant of good faith and fair dealing that is implied in all employment agreements in Idaho." <u>Id.</u> at 1201 (citing <u>Jenkins v. Boise Cascade Corp.</u>, 108 P.3d 380, 389-90 (Idaho 2005)).   The court reasoned that *any* intent by an employee to harm one's employer is legally cognizable under Idaho law because it violates the implied convent of good faith and fair dealing.   But Idaho law is an outlier on this point.   See <u>Metcalf v. Intermountain Gas Co.</u>, 116 Idaho 622, 626, 778 P.2d 744, 748 (1989) (recognizing that by applying implied

duty of good faith and fair dealing to employment agreements, the court was "joining the minority view in this country").   In Iowa, unlike in Idaho, "[t]he general duty of good faith and fair dealing has been limited by the Iowa Supreme Court, which has 'consistently rejected th[e] theory in employment contract cases.'"   Stoberl v. CybrCollect, Inc., No. 4:08-cv-00360-JEG-CFB, 2011 WL 13168823, at *13 (S.D. Iowa Nov. 28, 2011) (second alteration in original) (quoting Porter v. Pioneer Hi-Bred Int'l, 497 N.W.2d 870, 871 (Iowa 1993)); see also Fogel v. Trs. of Iowa Coll., 446 N.W.2d 451, 457 (Iowa 1989) (noting that four of five states that had adopted the implied covenant at the time only recognized it as a contract-based action rather than as a tort).   Iowa law does *not* recognize the implied duty of good faith and fair dealing in the employment context; therefore, unlike Idaho, the duty does not demonstrate that *any* harm an employee might cause an employer is legally cognizable.

Assuming, arguendo, Iowa law did recognize the implied duty of good faith and fair dealing in the employment context, the Supreme Court in Alvarez said that the First Amendment covers all content-based restrictions on speech that do not fall into one of "the few 'historic and traditional categories [of expression] long familiar to the bar.'"   Alvarez, 567 U.S. at 717 (alteration in original) (quoting Stevens, 559 U.S. at 468).   "Before exempting a category of speech from the normal prohibition on content-based restrictions . . . the Court must be presented with 'persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription.'"   Id. at 722 (quoting Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 792 (2011)).   Defendants do not identify a long tradition, recognized or not, of exempting from First Amendment protection false speech associated with an intent to violate the duty of good faith and fair dealing or any other duties an employee might owe an employer.

Defendants instead argue that § 717A.3B codifies Iowa's duty of loyalty.   It does not. This Court rejected that argument in the prior litigation because the "Iowa Supreme Court has cautioned that even a *civil* cause of action based on the breach of the duty of loyalty must be

limited in scope." Reynolds II, 353 F. Supp. 3d at 826 (citing Condon Auto Sales & Servs. v. Crick, 604 N.W.2d 587, 600 (Iowa 1999)).   The Iowa Supreme Court in Condon reasoned that even in the civil context, "[a] broad cause of action would give employers more protection than needed and could create an unfair advantage."   Condon, 604 N.W.2d at 600.   The court instead explained that "the duty of loyalty is generally confined to instances of direct competition, mis-appropriation of profits, property, or business opportunities, trade secrets and other confidences, and deliberately performing acts for the benefit of one employer which are adverse to another employer."   Id. (citing Food Lion, Inc. v. Capital Cities/ABC, 194 F.3d 505, 516 (4th Cir. 1999)).   That is, stealing trade secrets to pass to a competitor would breach the duty of loyalty but reporting animal abuse may not.   Defendants cite no contrary authority.

There are other reasons why § 717A.3B would not codify the Iowa duty of loyalty.   Under Iowa law, actions based on a breach of the duty of loyalty include a materiality requirement. See id. ("Inconsequential or indirect assistance or competition that is indirect or minimal is actionable only if the employee renders substantial assistance to the competitor." (citing Cameco, Inc. v. Gedicke, 157 N.J. 504, 516, 724 A.2d 783, 789 (1999))).   Section 717A.3B requires only that the *deception* be material; it does not require an intent to cause material harm.   As this Court clarified in the prior litigation, nominal harm flowing from a breach of loyalty would also not suffice to eliminate First Amendment protections from false speech.   Reynolds I, 297 F. Supp. 3d at 924-25 ("Defendants suggest that a 'false friend' employee would breach their duty of loyalty to the employer, but that also does not necessarily establish the existence of *any more than a nominal harm* to the employer." (emphasis added) (citing Food Lion, 194 F.3d at 517-18)).

In addition, "the scope of the duty of loyalty will vary with the nature of the relationship." Condon, 604 N.W.2d at 600 (citing Cameco, 724 A.2d at 789).   "A higher duty of loyalty exists for employees who occupy a position of trust and confidence than those who occupy a low level

task." Id. (citing Cameco, 724 A.2d at 789).   Plaintiffs' investigators could be such low-level employees, and therefore would not be subject to the same duty of loyalty as higher-level employees, as low-level employees indeed often do not owe fiduciary duties to their employers. See id. ("[The] heightened responsibility of an agent justifies the imposition of a fiduciary relationship. . . . Depending on the particular facts, some employees may be fiduciaries, while some may not.") (internal citations omitted).   A corporate officer may be bound by a fiduciary duty "to act in all things wholly for the benefit of the corporation," Midwest Janitorial Supply v. Greenwood, 629 N.W.2d 371, 375 (Iowa 2001) (citing Midwest Management Corp. v. Stephens, 353 N.W.2d 76, 80 (Iowa 1984)), but no similar blanket obligation exists for employees.   Section 717A.3B, however, does not distinguish between disloyal actions by management as compared to low-level employees.

The parties vigorously dispute whether the narrowing construction applied by the Wasden court relating to excluding "reputational and publication damages," Wasden, 878 F.3d at 1202, only applies in determining economic loss for purposes of the statute's restitution clause, or if it also limits the substantive criminal prohibition to not apply to an intent to cause reputational and publication damages.   The U.S. District Court for Idaho has already interpreted the Ninth Circuit's narrowing construction to only apply to the restitution clause.   Animal Legal Def. Fund v. Wasden, 312 F. Supp. 3d 939, 942 (D. Idaho 2018).   The plain language of the Ninth Circuit's opinion supports such a reading, as it states "[i]n the absence of Idaho case law to the contrary, we read the statute's *restitution clause* as excluding reputational and publication damages." Wasden, 878 F.3d at 1202 (emphasis added).   By way of a footnote, that court noted that "[o]n a more basic level, we cannot see how the restitution provision is inevitably viewpoint based. Restitution is pegged to economic loss, not to the view expressed, which could be a positive puff piece or a negative critique.   The issue is documented loss, not viewpoint."   Id. at 1202 n.14. However, the Ninth Circuit went on to parenthetically indicate that a narrowing construction is

18

necessary to "eliminate" "an unconstitutionally broad statute['s]" "constitutional deficiencies." Wasden, 878 F.3d at 1202 (quoting Berger v. City of Seattle, 569 F.3d 1029, 1046 (9th Cir. 2009) (en banc)).   As Plaintiffs point out, if *civil* restitution for reputational and publication damages is unconstitutionally broad, it follows that a *criminal* prohibition based on intent to cause reputational or publication harm would be so as well.   The Wasden court provided minimal analysis as to why reputational or publication harm from truthful reporting constitutes material, legally cognizable harm, despite its conclusion regarding the statute's trespass-by-misrepresentation section that "some lies quite simply do not inflict any *material* or *legal* harm on the deceived party."   Wasden, 878 F.3d at 1196 (emphasis added) (citing Alvarez, 567 U.S. at 718-19).   This Court need not resolve this dispute because Wasden is persuasive, not binding, authority.   Suffice it to say, the Ninth Circuit was concerned with imposing liability for reputational and publication harm rather than harm that is more tangible and legally cognizable.   That focus on the type of harm associated with false speech is persuasive and consistent with Alvarez and this Court's prior decision in Reynolds I.

Next, Defendants argue, as they similarly argued before, that § 717A.3B's employment section does not cover protected speech because the plurality in Alvarez stated that the First Amendment does not protect false statements used to obtain "offers of employment."   See Alvarez, 567 U.S. at 723.   The Wasden court also put significant emphasis on the plurality's language in Alvarez regarding "offers of employment."   Wasden, 878 F.3d at 1201 ("Almost as though the Idaho legislature drafted this provision with Alvarez by its side, [the Idaho statute's employment] subsection follows the Supreme Court's guidance as to what constitutes a lie made for material gain.").   However, when read in context, the Alvarez plurality uses "an offer of employment" as *an example* of a material gain in stating that a fraudulent false statement, such as overstating qualifications, would not receive First Amendment protection if it were meant to procure a material gain, *such as* an offer of employment.   Alvarez, 567 U.S. at 723.   The

19

plurality did not say that any false statement associated with an offer of employment falls outside the protection of the First Amendment.   In fact, on this point the plurality cited <u>Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council</u>, 425 U.S. 748 (1976), which dealt with *commercial* speech regarding a statute that restricted drug pricing advertisement and did not relate to offers of employment, further suggesting that the <u>Alverez</u> Court did not intend its "offer of employment" example to create a blanket First Amendment exception relating to offers of employment.   As this Court previously noted, the lies Plaintiffs' "undercover investigators tell relate to their affiliation with animal protection organizations" but not "about their job qualifications and relevant experience."   <u>Reynolds I</u>, 297 F. Supp. 3d at 924; <u>cf.</u> <u>Food Lion</u>, 194 F.3d at 514 (finding that undercover investigators did not commit fraud because they did not receive paychecks due to "resume misrepresentations" but rather because they "showed up for work and performed their assigned tasks").   This Court previously declined to read <u>Alvarez</u> to say that "the First Amendment allows for government prosecution of all misrepresentations made to secure employment, whether material or not, and irrespective of any *actual damage* suffered by the employer." <u>Reynolds I</u>, 297 F. Supp. 3d at 925 (emphasis added).   There is no reason to read <u>Alvarez</u> differently now.

Defendants also reassert that undercover investigations do not receive First Amendment protection against tort claims.   As this Court explained in the prior litigation, the cases cited by Defendants "stand for the point that *generally applicable laws* apply with full force to individuals who wish to engage in speech or expressive activity."   <u>Reynolds I</u>, 297 F. Supp. 3d at 920.   But "[c]ontent-based restrictions on *speech* may be invalid under the First Amendment even if the government may also prohibit conduct that accompanies that speech."   <u>Id.</u>   Here, as before, the key inquiry is whether the statute only prohibits the "types of false statements historically unprotected by the First Amendment."   <u>Id.</u>   As explained above, § 717A.3B appears to sweep broadly and covers false speech that is not associated with a legally cognizable harm.

Defendants also argue that § 717A.3B's prohibitions protect private property rights, which should reduce First Amendment protection.   This Court also addressed § 717A.3A's application to private property, noting that, although trespass-type harms may cause nominal damages, "nominal damage is just that—damage in name only."   Reynolds I, 297 F. Supp. 3d at 922. "To categorically deny protection for false speech that may cause the nominal invasion of a legal right but that does not result in actual, material harm would result in overbroad restrictions on speech, creating undue chilling of valued First Amendment expression."   Id. at 923. "[N]ominal damage a property owner sustains from an unconsented entry to property, without more, does not generate the type of 'material gain' required under Alvarez for the false statements that § 717A.3A prohibits to qualify for an exception from the 'normal prohibition on content-based restrictions.'"   Id. (quoting Alvarez, 567 U.S. at 722-23).   Such nominal damages similarly do not remove the speech prohibited by § 717A.3B from First Amendment protection.

In sum, § 717A.3B's intent element does not remove the speech it prohibits from First Amendment protection.   This Court, applying Alvarez, was clear in the prior litigation that false speech associated with legally cognizable harms or material gains to the speaker fall outside of the First Amendment, but false speech associated with nominal harms or harms that flow from legal conduct receive First Amendment protection.   Section 717A.3B covers many types of speech that may not cause legally cognizable harms, including the above examples relating to union organizing, whistleblowing, and puppy mill investigations.   Although the value of false speech itself may be low, § 717A.3B, like § 717A.3A before it, "criminalizes the telling of lies that, by themselves, not only cause merely nominal harm but that also facilitate core First-Amendment speech regarding issues of public import."   Reynolds I, 297 F. Supp. 3d at 923 (citing Bernbeck v. Moore, 126 F.3d 1114, 1116 (8th Cir. 1997)).   "[T]he Supreme Court's jurisprudence cautions against the assumption of any such 'freewheeling authority to declare new categories of speech outside the scope of the First Amendment.'"   Reynolds I, 297 F. Supp. 3d

21

at 925 (quoting <u>Alverez</u>, 567 U.S. at 722).   As such, on the current motion this Court cannot find

that speech prohibited by § 717A.3B falls outside the scope of the First Amendment.

Defendants do not move to dismiss Plaintiffs' challenge that § 717A.3B fails the appro-

priate level of constitutional scrutiny for content-based restrictions.   Therefore, at this pro-

cedural stage, this Court does not address the appropriate level of scrutiny to be applied to

that challenge.

Defendants' motion must be denied with respect to Plaintiffs' claim that § 717A.3B is a

content-based restriction on protected speech.

### c. Viewpoint-Based Restriction

Plaintiffs also assert that § 717A.3B singles out the agricultural industry for protection

against harmful speech, making it a viewpoint-based restriction.   Defendants argue that

§ 717A.3B does not on its face restrict speech based on viewpoint but rather prohibits deception

without regard to the ideology of speaker.   "Restrictions on speech are viewpoint-based where

they distinguish between speech based on 'the specific motivating ideology or the opinion or

perspective of the speaker,'" <u>Reynolds I</u>, 297 F. Supp. 3d at 925-26 (quoting <u>Reed</u>, 135 S. Ct.

at 2230), or "'proscribed views on particular disfavored subjects and suppressed distinctive

ideas conveyed by a distinctive message,'" <u>id.</u> (quoting <u>National Endowment for the Arts v.</u>

<u>Finley</u>, 524 U.S. 569, 582 (1998)).   "Where the government enacts a law with the purpose of

suppressing a particular viewpoint, it is a viewpoint-based restriction on speech."   <u>Id.</u> at 926

(citing <u>Reed</u>, 135 S. Ct. at 2238 (Kagan, J., concurring in the judgment)).

In ruling on Defendants' motion to dismiss Plaintiffs' constitutional challenge of

§ 717A.3A, this Court found Plaintiffs had plausibly alleged a viewpoint discrimination claim

because the complaint contained "examples of statements from legislators disparaging animal

activists in connection with the proposed legislation" and the statute only applied "to false state-

ments made at agricultural facilities, and not to other private property in any other industry that

22

might be targeted by undercover investigators who are not animal activists." Id. Here, Plaintiffs' Complaint challenging § 717A.3B likewise provides examples of legislators' statements made in support of the bill that became § 717A.3B that suggest the law was motivated by, among other things, an intent to prevent disparaging remarks about agricultural facilities. Like § 717A.3A, § 717A.3B only targets the agricultural industry. Plaintiffs have stated a plausible claim of viewpoint discrimination to survive a motion to dismiss. Defendants' motion must be denied with respect to Plaintiffs' viewpoint discrimination claim.

### d. Overbreadth

Plaintiffs also claim that § 717A.3B is unconstitutionally overbroad because it violates the free speech rights of parties not before this Court, such as labor organizers, and prohibits substantially more speech than the First Amendment permits, even if the statute also has legitimate applications. In particular, Plaintiffs allege that the phrase "other injury" renders the law overbroad. Defendants argue that, even if § 717A.3B burdens protected speech, it does not burden substantially more speech than it permits, and the phrase "other injury" does not render the statute overbroad.

"The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 767 (1982) (citing Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)). "What has come to be known as the First Amendment overbreadth doctrine is one of the few exceptions to this principle and must be justified by 'weighty countervailing policies.'" Id. at 768 (quoting United States v. Raines, 362 U.S. 17, 22-23 (1960)). "[T]he overbreadth doctrine is 'strong medicine' and [the Court has] employed it with hesitation, and then 'only as a last resort.'" Id. at 769 (quoting Broadrick, 413 U.S. at 613). In order for a statute that involves conduct rather than only speech to be declared facially overbroad, "the overbreadth of a statute must not only be real, but substantial as well,

23

judged in relation to the statute's plainly legitimate sweep."   Id. at 770 (quoting Broadrick, 413 U.S. at 615).

In Ferber, the Supreme Court held that an anti-child-pornography statute was not substantially overbroad even though the statute may have applied to depictions of children in medical textbooks or "pictorials in the National Geographic."   Id. at 773.   The Court reasoned "these arguably impermissible applications" do not "amount to more than a tiny fraction of the materials within the statute's reach."   Id.   By contrast, in United States v. Stevens, the Supreme Court found that a statute that prohibited depictions of animal cruelty was overly broad when it would have applied to so-called "crush videos" and depictions of animal fighting but also may have applied to all other depictions of animals being wounded or killed, such as in hunting magazines and videos.   Stevens, 559 U.S. at 474-83.   The Court reasoned that the narrow markets for crush videos and depictions of animal fighting were "dwarfed" by the market for hunting depictions, to which the statute could not legitimately apply.   Id. at 481-82.

Plaintiffs allege that § 717A.3B would not only apply to undercover investigations focused on animal abuse but also to covert labor organizing activities and undercover investigations focused on worker health and safety.   Defendants counter that Plaintiffs' examples are merely different types of undercover investigations rather than different types of protected speech. Defendants also point to several legitimate applications of the statute, including attempts to steal trade secrets or confidential information, interfere with biosecurity, or remove animals from a facility.   Plaintiffs respond that such examples are just "imagined, post-hoc attempts to defend the law," while the conduct truly targeted by the law is undercover investigations.

As discussed above, this Court has determined that a plausible claim is asserted that § 717A.3B implicates protected speech.   The examples Plaintiffs list as evidence of the statute's overly broad prohibition are plausible examples of such protected speech, which Plaintiffs allege to be the primary conduct targeted by the statute.   At the motion to dismiss stage, this Court

24

need not determine whether these examples of allegedly illegitimate applications substantially outweigh the legitimate applications of the statute.   Plaintiffs have alleged a meaningful number of illegitimate applications sufficient to state a plausible claim to survive Defendants' Motion to Dismiss.   Further, because the overbreadth doctrine should only be used as a "last resort," Ferber, 458 U.S. at 769 (quoting Broadrick, 413 U.S. at 613),[10] this Court need not continue the overbreadth analysis beyond what is necessary to resolve the Motion to Dismiss.   Defendants' motion must be denied with respect to Plaintiffs' overbreadth claim.

### 2.   Void-for-Vagueness

Plaintiffs also allege that § 717A.3B's use of the term "other injury" renders the statute unconstitutionally vague.   Defendants contend the term "other injury" as used in the statute refers "to a person's intent to cause some 'damage' or 'violat[e] another's rights' apart from a specific intent to cause 'physical or economic harm'" and that it must relate to "the agricultural production facility's 'operations, agricultural animals, crop, owner, personnel, equipment, building, premises, business interest, or customer.'"   Defs.' Br. Supp. Mot. Dismiss 30, ECF No. 22 (quoting § 717A.3B(1)(a), (b)).   Defendants assert that any problem posed by the term "other injury" "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt."   Id. (quoting United States v. Williams, 553 U.S. 285, 306 (2008)).   Defendants argue, therefore, because the statute does not provide government officials "virtually unfettered discretion" in the enforcement of § 717A.3B, the term "other injury" does not render the statute unconstitutionally vague.   Id. at 31 (quoting Williams, 553 U.S. at 307).

---

[10] In the prior litigation, Defendants did not challenge Plaintiffs' overbreadth claim at the motion to dismiss stage.   See Reynolds I, 297 F. Supp. 3d at 925.   On summary judgment, the Court found § 717A.3A invalid as a content-based restriction on protected speech, which made it unnecessary to resolve Plaintiffs' overbreadth challenge.   See Reynolds II, 353 F. Supp. 3d at 827 n.18.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983) (citing Vill. of Hoffman Estates v. Flipside, 455 U.S. 489 (1982)). "Close cases can be imagined under virtually any statute," but close cases are not enough to demonstrate a statute is overly vague. Williams, 553 U.S. at 306 (citing In re Winship, 397 U.S. 358, 363 (1970)).

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

Id. (citing Coates v. Cincinnati, 402 U.S. 611, 614 (1971); Reno v. ACLU, 521 U.S. 844, 870-71, n.35 (1997)).

Plaintiffs' vagueness argument rests on the statute's inclusion of the phrase "other injury." Because "a word is given more precise content by the neighboring words with which it is associated," id. at 294 (citing Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)), the phrase "other injury" must be read in conjunction with "physical or economic harm." When read along with its neighboring words, "other injury" would cover any type of harm not already covered by "physical or economic harm." See, e.g., United States v. Yielding, 657 F.3d 688, 715 (8th Cir. 2011) (reasoning a vagueness challenge cannot be maintained when the text of the statute provides fair notice that the particular conduct fell within the statute's scope). Most injuries would certainly be physical or economic, but legislatures often include catch-all language to clarify that a statute is meant to sweep broadly. See, e.g., Verdugo-Morales v. Sessions, 719 F. App'x 507, 515 (6th Cir. 2018) (unpublished) (upholding "broad" "catchall language" against vagueness challenge when surrounding language clarified its meaning). Plaintiffs' argument that it is not

clear what "other injury" adds that is not already covered by "physical or economic harm" indi-
cates that "other injury" might be redundant, not that it is vague.   The phrase is further narrowed
because the injury must be to an agricultural production facility's "operations, agricultural
animals, crop, owner, personnel, equipment, building, premises, business interest, or customer."
§ 717A.3B.   The phrase "other injury," then, is unlike the subjective phrases such as "annoying"
and "indecent" that the Supreme Court has found vague and instead more closely relates to the
issues of "belief and intent" that "courts and juries every day pass upon."   Williams, 553 U.S.
at 306.

Plaintiffs question whether the phrase "other injury" is so vague that it is unclear if the
statute would apply to "harm to a facility's reputation caused by a damning exposé," among
other scenarios.   Pls.' Br. Resist. Defs.' Mot. Dismiss 39, ECF No. 27.   Potentially, reputational
harm would be either "economic harm" or "other injury" to an agricultural production facility's
"business interest."   Plaintiffs repeatedly argue that the exact purpose of the law is to punish
such conduct.   Just because the statutory language is broad does not mean that it is vague.   See
United States v. Cook, 782 F.3d 983, 988 (8th Cir. 2015) (upholding an "extremely broad"
phrase against vagueness challenge, reasoning "when a statute is later interpreted to cover [a
defendant's] conduct in a way that does not do violence to the ordinary understanding of the
English language, the [Fifth] Amendment is not offended" (second alteration in original)).   In
any event, the difficulty this scenario "poses is addressed, not by the doctrine of vagueness, but
by the requirement of proof beyond a reasonable doubt."   Williams, 553 U.S. at 306 (citing In re
Winship, 397 U.S. at 363).

Plaintiffs have not stated a valid claim that § 717A.3B is void for vagueness.   Although the
statutory language is broad, its meaning is sufficiently precise to allow ordinary people to under-
stand what is and is not prohibited.   Defendants' motion to dismiss therefore must be granted
with respect to Plaintiffs' vagueness claim.

**B.  Plaintiffs' Motion for a Preliminary Injunction**

While Defendants' Motion to Dismiss was pending, Plaintiffs filed a Motion for Preliminary Injunction, arguing that a preliminary injunction is justified based on their claims of content- and viewpoint-based discrimination in violation of the First Amendment.[11]   Plaintiffs also provided four affidavits from leaders of some plaintiff organizations stating, among other things, that § 717A.3B has deterred their organizations from engaging in undercover investigations, which they would otherwise conduct.

> To determine whether to issue a preliminary injunction, the district court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest.

Powell v. Noble, 798 F.3d 690, 697 (8th Cir. 2015) (quoting Dataphase Sys. v. C L Sys., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).   "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."   Minn. Citizens Concerned for Life v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (quoting Phelps-Roper v. Troutman, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam), vacated on reh'g on other grounds, 705 F.3d 845 (8th Cir. 2012) (mem.)).[12]

---

[11]  Plaintiffs do not raise their other claims—overbreadth and void-for-vagueness—as bases for a preliminary injunction.

[12]  See Rodgers v. Bryant, 942 F.3d 451, 455-56 (8th Cir. 2019), regarding the need for a substantial probability of success on the merits when a state statute is in question:

> Under the third Dataphase factor, parties seeking to preliminarily enjoin the "implementation of a state statute" must demonstrate that they are "likely to prevail on the merits."   Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc) (citation omitted).   This is in contrast to the "fair chance" of success that is typically required.   Id. at 732.   The higher bar "reflects the idea

### 1.  Likely to Prevail on the Merits

As discussed above in relation to Defendants' Motion to Dismiss, § 717A.3B regulates speech based on its content that does not fall into a traditional exception to First Amendment protection.   Defendants argue in their Resistance to Plaintiffs' Motion for a Preliminary Injunction that § 717A.3B is not content-based.   Defendants quote Ward v. Rock Against Racism, 491 U.S. at 791, in arguing that "if the statute serves purposes unrelated to the content of the speech it is deemed content neutral, 'even if it has an incidental effect on some speakers or messages but not others.'"   Defs.' Resist. 9, ECF No. 34.   Defendants read Ward too creatively.

The Supreme Court in Ward found that a "sound-amplification" guideline's purpose was "to control noise levels," not regulate the content of speech.   491 U.S. at 792.   The Court concluded the sound-amplification guideline was a content-neutral "time, place, or manner" regulation.   Id.   That is unlike the present statute, which is content-based on its face because it requires enforcement authorities to evaluate the content of speech to determine if it violates the statute.   The Supreme Court has previously rejected the interpretation of Ward posited by Defendants.   See Reed v. Town of Gilbert, 135 S. Ct. at 2228 ("Ward had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban on the use, in a city-owned music venue, of sound amplification systems not provided by the city.   In that context, we looked to governmental motive, including whether . . . the regulation was justified without reference to the content of the speech. . . .   Innocent motives do not eliminate the

---

that governmental policies implemented through legislation . . . [and] developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."   Id. (citation omitted).   Generally, if a party shows a "likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied."   Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted).

danger of censorship presented by a facially content-based statute." (citations and internal quotation marks omitted)).   Unlike the noise-control regulation in <u>Ward</u>, § 717A.3B specifically regulates the content of speech and, quite simply, is not a content-neutral "time, place, or manner" regulation.

Plaintiffs' likelihood of prevailing depends on whether they can demonstrate that § 717A.3B's content-based restriction on constitutionally protected speech fails to pass scrutiny. As in the prior litigation, the parties dispute whether strict or intermediate scrutiny should apply. As this Court explained in the prior litigation, the Supreme Court's fractured decision in <u>Alvarez</u> has led to some confusion regarding the appropriate level of scrutiny for false statements.

> The Court's decision [in <u>Alvarez</u>] was fragmented, which has led to the somewhat uncertain legal framework for analyzing regulations that proscribe false speech. Justice Kennedy wrote on behalf of a four-Justice plurality, which found the Act was not narrowly tailored as strict scrutiny required. [567 U.S.] at 729-30.   Justice Breyer, who was joined by Justice Kagan, concurred in the judgment, but rejected the plurality's "strict categorical analysis," and instead applied a form of intermediate scrutiny.   <u>Id.</u> at 730 (Breyer, J., concurring).   Justice Breyer determined the Act could not survive intermediate scrutiny because "the statute work[ed] First Amendment harm, while the Government [could] achieve its legitimate objectives in less restrictive ways."   <u>Id.</u>   Justice Breyer recognized that strict scrutiny was necessary in some cases, <u>id.</u> at 731-32, but he found intermediate scrutiny more appropriate where "dangers of suppressing valuable ideas are lower," such as when "the regulations concern false statements about easily verifiable facts that do not concern" more complex subject matter.   <u>Id.</u> at 732.

<u>Reynolds II</u>, 353 F. Supp. 3d at 823 (cleaned up).   This Court reasoned it was not necessary to resolve the dispute because it would reach same conclusion under either strict or intermediate scrutiny.   <u>Id.</u> at 824.   Similarly, here Plaintiffs are likely to prevail under either degree of scrutiny.

### a.  Strict Scrutiny

Under strict scrutiny, a content-based regulation is "presumptively unconstitutional and will be justified only if the state proves that the law is narrowly tailored to serve a compelling

state interest."   Reynolds II, 353 F. Supp. 3d at 824 (citing United States v. Playboy Entm't

Grp., 529 U.S. 803, 818 (2000)).   Defendants argue that § 717A.3B advances the State's

interests in protecting the private property, proprietary information, and biosecurity measures of

agricultural production facilities.   Defendants emphasize that the State's interests are not just in

private property, proprietary information, or biosecurity, but specifically in protecting those

interests "where the perpetrators have obtained access or employment by deception."   Defs.'

Resist. 16, ECF No. 34.   Defendants argue that these interests are particularly important because

of "agriculture's significance in Iowa."   Id.   Defendants never argue that the statute serves the

interest of preventing undercover investigation and instead argue that "[t]here is no clear,

discriminatory legislative purpose against undercover investigations."   Defs.' Resist. 10, ECF

No. 34.   By contrast, Plaintiffs argue that the true purpose of § 717A.3B is preventing under-

cover investigations.

In the prior litigation, this Court said that, even if it assumed that protecting the property

and biosecurity of agricultural facilities from third parties were the true interests served by

§ 717A.3A, they were not "compelling in the First Amendment sense."   Reynolds II, 353 F.

Supp. 3d at 824.   Citing Animal Legal Defense Fund v. Herbert, 263 F. Supp. 3d 1193, 1211-12

(D. Utah 2017), the Court reasoned that "entirely speculative" harms, though important, "are not

compelling in the First Amendment sense."   Reynolds II, 353 F. Supp. 3d at 824; see also

Holder v. Humanitarian Law Project, 561 U.S. 1, 55 (2010) ("Both First Amendment logic and

First Amendment case law prevent us from 'sacrific[ing] First Amendment protections for so

speculative a gain.'" (alteration in original) (quoting Columbia Broad. Sys. v. Democratic Nat'l

Comm., 412 U.S. 94, 127 (1973)), and (citing Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n

of N.Y., 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling

state interest.")))   Now, as before, Defendants' proffered interests are entirely speculative, and

the minimal record Defendants have so far created on the issue is unpersuasive.   Defendants cite

a U.S. Department of Justice press release detailing the federal conviction for theft of trade secrets from companies' facilities in Iowa.   In support of their Motion to Dismiss, Defendants argued that the existing federal theft of trade secret prohibition might not cover entirely *intra*state conduct; however, Defendants failed to provide any record that such thefts occur in the industry that § 717A.3B aims to protect.

Similarly, Defendants cite cases to show the importance of § 717A.3B's biosecurity rationale.   Not a single cited case, however, involves individuals who *used deception* to gain access to or employment at an agricultural production facility while intending to harm the facility.   United States v. DeCoster, 828 F.3d 626 (8th Cir. 2016), involved the federal conviction of the *owners* of agricultural production facilities who introduced salmonella-contaminated eggs into interstate commerce after flagrantly ignoring biosecurity hazards.   In DeCoster, employees did not breach biosecurity protocols via deception; instead, the owners "created a work environment where employees not only felt comfortable disregarding regulations . . . but may have even felt pressure to do so." Id. at 631.   The wrongs committed in DeCoster would not have been avoided, nor the convictions secured, based on a law preventing outside parties from obtaining access to or employment at agricultural production facilities via deception.[13] Defendants also cite Rembrandt Enterprises v. Illinois Union Insurance, No. CV 15-2913 (RHK/HB), 2017 WL 129998 (D. Minn. Jan. 12, 2017), and Rembrandt Enterprises v. Illinois

_____

   [13] DeCoster stands in contrast to Defendants' argument as it demonstrates Plaintiffs' undercover investigations are a matter of public import.   In that case, the defendants' agricultural production facility had "live and dead rodents and frogs in the laying areas, feed areas, [and] conveyor belts" and "manure was found piled to the rafters," all the result of the owners ignoring warnings regarding biosecurity.   DeCoster, 828 F.3d at 630.   The owners' attempt to cut costs by sacrificing biosecurity protocols resulted in 56,000 Americans becoming ill from contaminated eggs.   Id.   Thus, instead of addressing biosecurity breaches of the kind in DeCoster, § 717A.3B prevents such owner-initiated breaches from being exposed and subject to public scrutiny unless and until the breaches result in disease outbreak.

Union Insurance, 129 F. Supp. 3d 782, 783 (D. Minn. 2015), which reference the spread of avian flu between agricultural facilities, but the cases suggest that bird flu may have spread between facilities through the air and do not suggest any biosecurity breaches caused its spread.   More-over, neither case relates to third parties using deception to obtain access to or employment at agricultural production facilities.   Defendants' final case citation on this point, Farris v. Department of Employment Security, 8 N.E.3d 49, 50 (Ill. Ct. App. 2014), is an unemployment benefits dispute involving an employee who was fired for violating his agricultural production facility's biosecurity policy, with no suggestion that the employee used deception to obtain access to or employment at the facility with an intent to cause harm.   Indeed, the employee in Farris violated his facility's biosecurity policies by failing to remove his dirty farm clothes before taking a nap in a bathroom stall, which is not of the nature of the problem Defendants suggest § 717A.3B addresses.   Id. at 51.   Defendants' reliance on these cited cases is mis-placed.   While they demonstrate that biosecurity breaches occur, they do not provide any record that such breaches are the result of outsiders using deception to gain access to or employment at an agricultural production facility with the intention of harming the facility.   Defendants have not made any meaningful record that the proffered interest in protecting agricultural facilities from those who would use deception to gain access with the intention of harming the facilities is anything more than speculative.

Assuming without deciding that Defendants' proffered interests are the actual interests § 717A.3B serves and that those interests are compelling, on the record currently before the Court, Defendants have not demonstrated that § 717A.3B is narrowly tailored to serve those interests.   "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."   McCullen v. Coakley, 573 U.S. 464, 495 (2014).   In the prior litigation, this Court concluded that § 717A.3A was not narrowly tailored to

serve the proffered interests in part because existing statutes already address the interests.

Reynolds II, 353 F. Supp. 3d at 825-26.   The interests presented here are the same, and the

existing statutes this Court previously identified are still in effect.   Defendants argue that the

existing biosecurity law, Iowa Code § 717A.4, prohibits the "intentional introduction of a

pathogen" but not "the intentional interference with bio-security protocol by a 'false-friend'

employee or others with nefarious motives that could allow for the spread of disease or interfere

with the production or processing of livestock."   Defs.' Resist. 16-17, ECF No. 34.   This Court

addressed that argument in the prior litigation and concluded:

> Defendants have produced no evidence that the prohibitions of § 717A.3A are
> actually necessary to protect perceived harms to property and biosecurity.   Defen-
> dants have made no record as to how biosecurity is threatened by a person making a
> false statement to get access to, or employment in, an agricultural production facility.
> Nor, in the absence of any record to the contrary, will the Court assume that biological
> harm turns on a human vector making a false statement unrelated to such harm in
> order to gain access to the facility.

Reynolds II, 353 F. Supp. 3d at 825 (citations omitted).

On the record before the Court, Defendants have failed to show that § 717A.3B is narrowly

tailored to preventing interference with biosecurity protocols because alternative measures that

burden substantially less speech are available.   A prohibition against intentional, material inter-

ference with biosecurity protocols, without the requirement that the interference be preceded by

deception, would not burden speech.   Conversely, the deception element of § 717A.3B could

remain with a specification that a violator would have to have deceived with "an intent to

materially interfere with biosecurity protocols," directly associating the deception with a

material, legally cognizable harm, which would likely remove the false statement from First

Amendment protection, while at the same time directly addressing Defendants' proffered interest

without prohibiting protected speech.   Similarly, alternatives exist to advance Defendants'

proffered interest in preventing theft of trade secrets.   Iowa law already prohibits the theft of

trade secrets, although it does not contain a deception requirement.   See generally Iowa Code § 550.   That existing law could be amended to explicitly prohibit the use of deception with an intent to steal trade secrets.

This Court previously explained that § 717A.3A could not pass strict scrutiny because it was underinclusive, and an underinclusive prohibition should raise "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."   Reynolds II, 353 F. Supp. 3d at 826 (quoting Brown, 564 U.S. at 799).   This Court concluded that "§ 717A.3A does nothing to deter the exact same alleged harms—trespass and biosecurity breaches—from individuals who proceed to access or enter a facility without false pretense or misrepresentation."   Id.   Section 717A.3B, similarly, does nothing to deter trespass or biosecurity breaches from individuals who proceed to access or enter a facility without deception.   As explained above, none of the cases Defendants cite as support for the need for § 717A.3B involve outsiders using deception.

Based on the current record, § 717A.3B is also overinclusive.   Like § 717A.3A, § 717A.3B "goes far beyond what is necessary to protect the state's interests and allows for expansive prosecution."   Id.   Although § 717A.3B includes some limiting features—the new intent element and the requirement that misrepresentations be material—that § 717A.3A lacked, § 717A.3B is still overinclusive compared to Defendants' proffered interests because it applies to deception coupled with an intent to cause *any* type of harm, rather than merely an intent to cause the types of harm Defendants claim the statute is meant to address.   The potential application of § 717A.3B to Plaintiffs' activities, which do not fall under the umbrella of Defendants' proffered interests, demonstrates that the prohibition is overinclusive.

The scant record supporting Defendants' proffered interests, the ready availability of alternatives that burden substantially less speech, and the disconnect between § 717A.3B's

means and Defendants' ends, suggest that the law's true purpose is to prohibit undercover investigations.   Section 717A.3B's focus on deception is much more tailored to prohibiting undercover investigations, for which deception is vital, than for prohibiting biosecurity violations, for which deception seems peripheral.   As this Court noted in the prior litigation, even if § 717A.3A was in part aimed at protecting the State's interest in private property and biosecurity, "statements in the record illustrate that § 717A.3A serves the interest of protecting Iowa's agricultural industry from perceived harms flowing from undercover investigations of its facilities."   Reynolds II, 353 F. Supp. 3d at 824.   The result is the same in the present case: the existing record indicates that at least one purpose of the law is to prevent critical coverage of the agricultural industry that comes from undercover investigations, although legislators also mentioned other interests, such as biosecurity.   The Supreme Court has said that statutes can only survive scrutiny based on the actual purpose the statute advances, not based on a rationalization. See United States v. Virginia, 518 U.S. 515, 535-36 (1996) (in applying scrutiny, "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded" (citing Weinberger v. Wiesenfeld, 420 U.S. 636, 648 & n.16 (1975); Califano v. Goldfarb, 430 U.S. 199, 212-13 (1977))).   At the preliminary injunction stage, this Court need not make a final determination regarding whether the law's true purpose is to deter undercover investigations.   It suffices to conclude that Plaintiffs are likely to succeed on the merits because, as explained above, the current record suggests that Defendants are unlikely to show that the proffered interests are compelling, and that the statute is narrowly tailored to advance the proffered interests.

### b.  Intermediate Scrutiny

The result would be the same under intermediate scrutiny.   Under intermediate scrutiny, a regulation "will be sustained under the First Amendment if it advances important governmental

interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."   <u>Holder</u>, 561 U.S. at 26-27 (quoting <u>Turner Broad. Sys.</u>, 520 U.S. at 180, 189 (1997)).   Defendants' proffered interests cannot be considered "important" in the First Amendment context because they appear entirely speculative.   In addition, § 717A.3B burdens substantially more speech than necessary to advance the proffered interests; as explained above, it would potentially criminalize whistleblowing, labor organizing, and undercover investigating activities, even though none of those activities relate to the stated purposes of the statute.   Like its predecessor, § 717A.3B "criminalizes speech that inflicts no 'specific harm' on property owners, 'ranges very broadly,' and risks significantly chilling speech that is not covered under the statute."   <u>Reynolds II</u>, 353 F. Supp. 3d at 827 (quoting <u>Wasden</u>, 878 F.3d at 1198).   This Court concluded in the prior litigation that "investigative deceptions" are "protected by our country's guarantee of free speech and expression."   <u>Id.</u> (citing <u>Alvarez</u>, 567 U.S. at 729-30).   Defendants have not shown why a statute that considerably prohibits protected speech should stay in effect when the interests it purportedly advances are unsupported by the record and only tangentially associated with the statutory language.   Plaintiffs are therefore likely to prevail under either intermediate or strict scrutiny.

### 2.   Other Preliminary Injunction Factors

The remaining factors this Court must analyze in determining whether to grant a preliminary injunction are whether Plaintiffs will suffer an irreparable harm, the balance of interests between the parties, and the public interest.   <u>Swanson</u>, 692 F.3d at 870.   But Eighth Circuit law is clear that "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been

satisfied." Id. (quoting Troutman, 662 F.3d at 488).   Nonetheless, Plaintiffs here satisfy the other requirements, which the Court briefly addresses.

### a. Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Powell, 798 F.3d at 702 (quoting S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist., 696 F.3d 771, 778 (8th Cir. 2012)).   "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Id. (alteration in original) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).   Plaintiffs here are likely to succeed on their First Amendment claim and therefore would suffer an irreparable harm from the loss of their First Amendment freedoms in the absence of a preliminary injunction. Further support for this conclusion is found in the affidavits filed by four of the plaintiff organizations, which attest that they have held back on conducting undercover investigations because of the threat of criminal prosecution.   See Affs. of Walden, Kerr, Callison, and Mason, Affs. Supp. Pls.' Mot. Prelim. Inj., ECF Nos. 25-2 through 25-5.

Defendants argue that Plaintiffs would not suffer an irreparable injury because they have other investigatory methods available to them besides undercover investigations, but cite no authority for the proposition that irreparable injury does not occur when one First Amendment activity is prohibited because other First Amendment activities are available.   Plaintiffs persuasively argue that Defendants' rationale would result in rarely finding irreparable injury in First Amendment cases because some other form of expression is nearly always available.   In any event, it would seem axiomatic that undercover investigations are likely to produce information that is unavailable from interviews, public record requests, and whistleblowing.

Defendants also argue that because Plaintiffs waited approximately three months after filing the complaint in this case before seeking a preliminary injunction against § 717A.3B and they never sought a preliminary injunction against § 717A.3A, Plaintiffs must not believe they will suffer an irreparable injury.   Defendants cite cases in which courts declined to grant preliminary injunctions, in part, because of the movants' months-long delays in requesting the injunctions.   Of those cited cases, not one deals with a First Amendment challenge; rather, most involve intellectual property disputes.   Defendants acknowledge that in the context of intellectual property cases, the principle of denying preliminary injunctions due to the movant's delay in requesting the injunction arises when the circumstances of the case allow an inference that the timing of the motion for preliminary injunctive relief was strategic.   See, e.g., Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("A finding of inexcusable delay in trademark cases is most likely when the circumstances of the case permit an inference that the owner of the mark has timed the request for injunctive relief so as to inhibit competition."); see also, e.g. Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (reversing the district court's grant of a preliminary injunction in a trademark infringement action, concluding the plaintiff's delay in bringing the action and in seeking a preliminary injunction negated the presumption of irreparable harm arising from likelihood of confusion); CHS, Inc. v. PetroNet, LLC, No. CIV. 10-94 RHK/FLN, 2010 WL 4721073, at *4 (D. Minn. Nov. 15, 2010) (finding the plaintiff's lengthy delay in seeking injunctive relief in a copyright infringement action was sufficient to rebut any presumption that the plaintiff was likely to suffer imminent irreparable harm from the defendants' conduct); Gonannies, Inc. v. Goaupair.Com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (finding in a trademark infringement action the plaintiff's six-month delay in filing for temporary and preliminary injunctive relief only after settlement negotiations had soured was sufficient to rebut any possible presumption of

irreparable harm); Marcy Playground, Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277, 281-82

(S.D.N.Y. 1998) (finding a three-month delay in moving for injunctive relief in a copyright

infringement action combined with the fact that the plaintiffs did not seek injunctive relief during

the pendency of settlement discussions vitiated any presumption of irreparable injury); Poe v.

Michael Todd Co, 151 F. Supp. 801, 803 (S.D.N.Y. 1957) (finding the plaintiff's delaying in

filing for injunctive relief to prevent the release of a film, which was based on the defendant's

failure to include the plaintiff on the list of movie credits, militated against the granting of the

motion).[14]

       In Dow Jones & Co. v. Kaye, cited by Plaintiffs, the district court rejected the contention

that preliminary injunctive relief should be denied due to delay in a First Amendment suit.   Dow

Jones & Co. v. Kaye, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000), order vacated as moot, appeal

dismissed, 256 F.3d 1251 (11th Cir. 2001).   That court reasoned, "[t]his rationale [of denial due

to delay] is not applicable in the context of an alleged First Amendment violation where each

passing day may constitute a separate and cognizable infringement on the First Amendment."

(citation and internal quotation marks omitted)).   Plaintiffs explain that they delayed in filing a

motion for a preliminary injunction until after Defendants filed their Motion to Dismiss so

Plaintiffs could "see if the State proposed a materially different defense to this Ag-Gag law than

--------------------------------------------

       [14] The other two cases cited by Defendants, in which motions for preliminary injunction
were denied, did not involve intellectual property but are similarly distinguishable from the
present case.   See Sprint Commc'ns Co., L.P. v. Native Am. Telcom, LLC, No. CIV. 10-4110–
KES, 2011 WL 2160478, at *6 (D.S.D. May 31, 2011) (denying the defendant's motion for pre-
liminary injunction, reasoning even if the court could issue the equitable remedy sought, the
defendant had not sustained its burden of proving it would suffer irreparable harm because the
defendant sought monetary damages); Beidenkopf v. Des Moines Life Ins. Co., 142 N.W. 434,
441 (Iowa 1913) (affirming the denial of a temporary injunction on a contract that called for the
immediate delivery of the company's property and assets, reasoning the plaintiff delayed three
months before asking for injunctive relief, by which time there had been substantial compliance
with the terms of the agreement).

it did to the last one."   Pls.' Reply 4, ECF No. 37.   Given the Supreme Court's and the Eighth

Circuit's holdings that even a temporary violation of First Amendment rights "unquestionably

constitutes irreparable injury," <u>Powell</u>, 798 F.3d at 702 (quoting <u>Elrod</u>, 427 U.S. 347 at 373), this

Court finds that Plaintiffs would suffer irreparable injury despite their delay in requesting a

preliminary injunction.

### b.   Balance of Harms

The balance of harms also weighs in favor of granting a preliminary injunction.   The

deprivation of First Amendment rights is a serious harm, and Plaintiffs have shown that their

planned undercover investigations will not proceed due to the risk of prosecution.   By contrast,

Defendants have not made any persuasive record regarding the interests the statute is said to

serve.   Indeed, it appears that § 717A.3A was never enforced between when it came into law in

2012 and when this Court permanently enjoined its enforcement in 2019, suggesting that the

State is unlikely to miss out on prosecutions under § 717A.3B during the course of this litigation

if a preliminary injunction is granted.

### c.   Public Interest

The public interest also weighs in favor of granting a preliminary injunction.   Although

this Court seriously considers the public's interest in seeing the enforcement of criminal laws,

Defendants have done little to show that § 717A.3B responds to ongoing issues of public concern

unrelated to the suppression of free speech.   By contrast, the public benefits from people and

organizations exercising First Amendment rights and educating the public about important issues

relating to animal abuse and safety at agricultural production facilities.   The public interest

weighs in favor of granting a preliminary injunction.

All the relevant factors weigh in favor of granting Plaintiffs' Motion for a Preliminary

Injunction based on Plaintiffs' claim that § 717A.3B is an unconstitutional content-based restric-

tion on speech.   Although Plaintiffs argue this Court should enjoin enforcement of § 717A.3B as

a viewpoint-based restriction, because this Court finds Plaintiffs' content-based claim justifies a preliminary injunction, this Court need not determine whether Plaintiffs' other claims would support a preliminary injunction.   See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1040 (8th Cir. 2016) (affirming the grant of a preliminary injunction reasoning, "[t]he plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims.'" (second alteration in original) (quoting Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 250 (D.D.C. 2003))).   Plaintiffs' Motion for a Preliminary Injunction must be granted.

## III.   CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss for Failure to State a Claim, ECF No. 18, must be **granted** with respect to Plaintiffs' third cause of action (vagueness) but **denied** with respect to Plaintiffs' remaining causes of action, and Plaintiffs' Motion for a Preliminary Injunction, ECF No. 25, must be **granted**.   Defendants and their officers, agents, employees, attorneys, and all other persons who are in active concert or participation with them are hereby **enjoined** and prohibited from enforcing, through any action or omission or otherwise, Iowa Code § 717A.3B as currently drafted throughout the pendency of this litigation.

**IT IS SO ORDERED.**

Dated this 2nd day of December, 2019.

JAMES E. GRITZNER, Senior Judge
U.S. DISTRICT COURT

42