**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**, **IOWA CITIZENS FOR COMMUNITY IMPROVEMENT**, **BAILING OUT BENJI**, **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**, and **CENTER FOR FOOD SAFETY** | **Case No.  4:19-cv-124–JEG-HCA** |
| Plaintiffs, | |
| v. | **Brief in Support of Plaintiffs' Motion for Summary Judgment** |
| **KIMBERLY K. REYNOLDS**, in her official capacity as Governor of Iowa, **TOM MIL-LER**, in his official capacity as Attorney General of Iowa, and **DREW SWANSON**, in his official capacity as Montgomery County, Iowa County Attorney, | |
| Defendants. | |

## Table of Contents

Introduction ........................................................................................................................... 1

Statement of Facts ................................................................................................................ 2

   I.   Undercover Investigations of Animal Agriculture Expose Inhumane and Unsafe Practices That Are of Widespread Public Concern. ........................................................ 2

   II.   Iowa's First Attempt to Criminalize Undercover Investigation of Agricultural Facilities is Struck Down as Unconstitutional. .................................................................. 4

   III.  In Response to § 717A.3A Being Struck Down, Iowa Passes § 717A.3B. ................... 6

   IV.  This Court Denies the State's Motion to Dismiss and Preliminarily Enjoins the Law. .............................................................................................................................. 7

Legal Standard ..................................................................................................................... 8

Argument .............................................................................................................................. 8

   I.   Plaintiffs Have Standing to Challenge the Constitutionality of § 717A.3B. ............... 8

   II.   Section 717A.3B Violates the First Amendment. ...................................................... 11

     A.   Section 717A.3B Criminalizes Speech, Not Conduct. ................................................. 11

     B.   Section 717A.3B Targets Speech Protected by the First Amendment. ......................... 12

     C.   Section 717A.3B is Content- and Viewpoint-Based. .................................................... 15

        1.   Section 717A.3B Is Content-Based. ........................................................................ 15

        2.   Section 717A.3B Is Viewpoint-Based Because It Singles Out Speech Critical of a Single Industry for Special, Disfavored Treatment. ...................................... 17

   III.  Section 717A.3B Does Not Survive Heightened Scrutiny. ............................................. 19

     A.   The Ag-Gag Law Does Not Survive Strict Scrutiny. .................................................. 19

        1.   Prohibitions on False Statements Receive Strict Scrutiny. ............................... 19

        2.   Section 717A.3B Does Not Survive Strict Scrutiny. ........................................ 21

          i.   Section 717A.3B Does Not Advance a Compelling State Interest. .......... 21

          ii.   Section 717A.3B is Not Narrowly Tailored or the Least Restrictive Means Available. ........................................................................................ 22

     B.   Section 717A.3B Does Not Survive Intermediate Scrutiny. ..................................... 24

   IV.  Section 717A.3B is Unconstitutionally Overbroad. ..................................................... 25

Conclusion ......................................................................................................................... 27

## Table of Authorities

**CASES**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) ............................................................................ 10, 20

*281 Care Comm. v. Arneson*,
  766 F.3d 774 (8th Cir. 2014) .................................................................................... 20

*Animal Legal Def. Fund v. Herbert*,
  263 F. Supp. 3d 1193 (D. Utah 2017)................................................................. passim

*Animal Legal Def. Fund v. Kelly*,
  No. CV 18-2657-KHV, 2020 WL 362626 (D. Kan. Jan. 22, 2020) ................................. passim

*Animal Legal Def. Fund v. Otter*,
  118 F. Supp. 3d 1195 (D. Idaho 2015) ................................................................. 6, 8

*Animal Legal Def. Fund v. Reynolds*,
  297 F. Supp. 3d 901 (S.D. Iowa 2018) ................................................................. passim

*Animal Legal Def. Fund v. Reynolds*,
  353 F. Supp. 3d 812 (S.D. Iowa 2019) ................................................................. passim

*Animal Legal Def. Fund v. Reynolds*,
  No. 4:19-cv-124–JEG-HCA, ECF No. 41 (S.D. Iowa Dec. 2, 2019) ............................... passim

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) ............................................................................ 12, 20

*Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*,
  160 F.3d 433 (8th Cir. 1998) .................................................................................... 10

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)................................................................................................. 26

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979)............................................................................................. 9, 10

*Brown v. Enter. Merchs. Ass'n*,
  564 U.S. 786 (2011)................................................................................................. 24

*City of Houston v. Hill*,
  482 U.S. 451 (1987)................................................................................................. 26

*Condon Auto Sales & Servs. v. Crick*,
    604 N.W.2d 587 (Iowa 1999) ................................................................. 14

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) ............................................................................... 5

*Food Lion, Inc. v. Capital Cities/ABC*,
    194 F.3d 505 (4th Cir. 1999) ................................................................ 14

*Gerlich v. Leath*,
    861 F.3d 697 (8th Cir. 2017) ................................................................ 9

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) ............................................................................... 23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................... 10

*Heffron v. International Soc'y for Krishna Consciousness*,
    452 U.S. 640 (1981) ............................................................................... 8

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................... 10, 21

*Kansas Judicial Review v. Stout*,
    519 F.3d 1107 (10th Cir. 2008) ............................................................ 11

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ........................................................................... 17

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................................ 6, 25

*Myers v. Thompson*,
    192 F. Supp. 3d 1129 (D. Mont. 2016) ................................................ 20

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ............................................................................... 7

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................... 25

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ............................................................................... 17

*O'Neill v. Crawford*,
   970 N.E.2d 973 (Ohio 2012) ................................................................ 20

*PETA, Inc. v. Stein*,
   737 F. App'x 122, 130–31 (4th Cir. 2018) .............................................. 8

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ............................................................................... 12

*Reed v. Town of Gilbert, Ariz.*,
   135 S. Ct. 2218 (2015) ............................................................... 17, 18, 20

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar*,
   381 F.3d 785 (8th Cir. 2004) ................................................................... 9

*Rickert v. Pub. Disclosure Comm'n*,
   168 P.3d 826 (Wash. 2007) ................................................................... 20

*Rosemond v. Markham*,
   135 F. Supp. 3d 574 (E.D. Ky. 2015) ................................................... 20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................................... 17

*Survivors Network of Those Abused by Priests, Inc. v. Joyce*,
   779 F.3d 785 (8th Cir. 2015) ................................................................... 6

*Susan B. Anthony List v. Dreihaus*,
   573 U.S. 149 (2014) ................................................................................. 9

*Susan B. Anthony List v. Driehaus*,
   814 F.3d 466 (6th Cir. 2016) ................................................................. 20

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ............................................................... 18, 19, 21

*United States v. Alvarez*,
   567 U.S. 709 (2012) ....................................................................... passim

*United States v. DeCoster*,
   828 F.3d 626 (8th Cir. 2016) ................................................................. 22

*United States v. Eichman*,
   496 U.S. 310 (1990) ............................................................................... 18

*United States v. O'Brien*,
   391 U.S. 367 (1968) ................................................................................................ 25

*United States v. Playboy Entm't Grp.*,
   529 U.S. 803 (2000) ................................................................................................ 21

*United States v. Stevens*,
   559 U.S. 460 (2010) .......................................................................... 12, 14, 21, 26

*United States v. Virginia*,
   518 U.S. 515 (1996) .......................................................................................... 24, 25

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................ 26

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ................................................................................................ 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) .................................................................................................. 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................................................ 22

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) .................................................................................... 18, 24, 25

*Whitton v. City of Gladstone*,
   54 F.3d 1400 (8th Cir. 1995) ................................................................................. 18

*Winter v. Wolnitzek*,
   186 F. Supp. 3d 673 (E.D. Ky. 2016) ................................................................... 20

*Young v. American Mini Theatres, Inc.*,
   427 U.S. 50 (1976) .................................................................................................... 8

## STATUTES

Iowa Code § 717A.3A ................................................................................... passim

Iowa Code § 717A.3B ................................................................................... passim

Iowa Code § 88.9 ........................................................................................................ 13

## OTHER AUTHORITIES

Katie Jackson, *Fairlife Dairy still under fire over alleged animal abuse after new viral video*, TODAY (June 19, 2019, 4:42 PM; Updated June 21, 2019, 4:50 PM) ..................................... 3

Kevin Lewis, *Charges Filed in E6 Cattle Case*, PLAINVIEW DAILY HERALD (May 26, 2011, 11:30 AM) ............................................................................................................................. 3

Matthew L. Wald, *Meat Packer Admits Slaughter of Sick Cows*, N.Y. TIMES (Mar. 13, 2008) .... 3

*McDonald's Cuts Egg Supplier After Undercover Animal Cruelty Video*, L.A. TIMES (Nov. 18, 2011, 2:24 PM) ......................................................................................................................... 3

Olivia Heersink, *UPDATE: Criminal Probe Launched Into Fair Oaks Farms Employees; companies pull products*, THE TIMES (June 5, 2019) ................................................................. 3

## RULES

Fed. R. Civ. P. 56 ...................................................................................................................... 8

## Introduction

This case arises out of Iowa's enactment and threatened enforcement of Iowa Code § 717A.3B, Iowa's second Ag-Gag law.

Plaintiffs are organizations who intend to carry out the type of investigations at animal agricultural facilities that § 717A.3B criminalizes or who rely on such investigations in their advocacy. In recent years, investigations of this type have led to citations for environmental and labor violations, plant closures, and criminal convictions, and revealed systematic and horrific animal abuse. Surreptitious video recordings made by undercover investigators employed at a California slaughterhouse precipitated the largest federal recall of beef in U.S. history. Such investigations and the public conversation they ignite are an integral part of the marketplace of ideas concerning food safety, workers' rights, animal rights, and agricultural policy.

Not surprisingly, the animal agriculture industry is eager to prevent investigative whistle-blowing. To this end, animal agriculture industry groups have pushed for state legislatures to enact laws to criminalize undercover investigations in their industry. Under these laws, animal rights proponents, food safety advocates, union organizers, and investigative journalists are cast as criminals. Iowa's first foray into passing one of these laws was Iowa Code § 717A.3A, which was struck down by this Court on a challenge by these same Plaintiffs. *Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019) ("*Reynolds II*"). The Iowa legislature immediately responded by passing a revised law—Iowa Code § 717A.3B, against which the Court entered a preliminary injunction. *Animal Legal Def. Fund v. Reynolds*, No. 4:19-cv-124–JEG-HCA, ECF No. 41 (S.D. Iowa Dec. 2, 2019) ("*Reynolds III*").

Section 717A.3B violates the First Amendment to the United States Constitution because it is content- and viewpoint-discriminatory and overbroad. Plaintiffs urge this Court to grant them

summary judgment, striking down Iowa Code § 717A.3B as unconstitutional, and permanently enjoining its enforcement.

## Statement of Facts

### I.    Undercover Investigations of Animal Agriculture Expose Inhumane and Unsafe Practices That Are of Widespread Public Concern.

Undercover investigations of agricultural production facilities are typically undertaken by whistleblowers who have obtained a job through the usual channels. These individuals document activities in factory farms and slaughterhouses with a hidden camera while performing the tasks required of them as employees. Plaintiffs' Statement of Undisputed Material Fact ("SUMF") ¶¶ 6–7, 30–32. In the case of investigations into puppy mills, investigators may alternatively pose as potential purchasers in order to gain access to facilities. SUMF ¶ 56. When applying for these jobs or seeking access as a potential buyer, investigators actively or passively conceal their investigatory motive, as well as their affiliations with news-gathering or advocacy groups. SUMF ¶¶ 6–7, 29. These investigators document violations of laws and regulations, unsanitary conditions, cruelty to farmed animals and pets, dangerous work conditions and other labor violations, water pollution and other environmental violations, sexual misconduct, and other matters of public importance— all while performing the tasks assigned by the employer in the same manner as any other employee. SUMF ¶¶ 7–8, 27.

Undercover investigations of industrial agricultural facilities produce information of tremendous political and public concern. They have garnered widespread media coverage and prompted a wave of reforms. For example, in 2007, an undercover investigator at the Westland/Hallmark Meat Company in California filmed workers forcing sick cows, many unable to walk, into the "kill box" by repeatedly shocking the animals with electric prods, jabbing them

in the eyes, prodding them with a forklift, and spraying water up their noses.[1] A few years later, an undercover investigator at the E6 Cattle Company in Texas filmed workers beating cows on the head with hammers and pickaxes and leaving them to die.[2] Last year, an undercover investigation showing rampant abuse of dairy cows and calves at Fair Oaks Farm in Indiana led to animal cruelty prosecutions, civil fraud lawsuits, intense national media coverage, milk being pulled from grocery store shelves, and a major milk company altering its supply lines and changing its audit practices.[3]

As the nation's leading producer of pork and eggs, as well as a major source of other animal products, Iowa agricultural facilities have been subject to numerous investigations. In 2011, undercover investigators at Sparboe Farms documented hens with gaping, untreated wounds laying eggs in cramped conditions among decaying corpses.[4] An employment-based investigation conducted by Plaintiff PETA exposed workers at a Hormel Foods supplier beating pigs with metal rods, sticking clothespins into pigs' eyes and faces, and kicking a young pig in the face, abdomen, and genitals to make her move while telling the investigator, "You gotta beat on the bitch. Make her cry." SUMF ¶ 30.

---

[1] Matthew L. Wald, *Meat Packer Admits Slaughter of Sick Cows*, N.Y. TIMES (Mar. 13, 2008), http://www.nytimes.com/2008/03/13/business/13meat.html.

[2] Kevin Lewis, *Charges Filed in E6 Cattle Case*, PLAINVIEW DAILY HERALD (May 26, 2011, 11:30 AM), https://www.myplainview.com/news/article/Charges-filed-in-E6-Cattle-case-8414335.php.

[3] Olivia Heersink, *UPDATE: Criminal Probe Launched Into Fair Oaks Farms Employees; companies pull products*, THE TIMES (June 5, 2019), https://www.nwitimes.com/news/local/newton/update-criminal-probe-launched-into-fair-oaks-farms-employees-companies/article_1c1eb1db-4b9e-5e88-a88a-30713dae0826.html; Katie Jackson, *Fairlife Dairy Still Under Fire Over Alleged Animal Abuse After New Viral Video*, TODAY (June 19, 2019, 4:42 PM; Updated June 21, 2019, 4:50 PM), https://www.today.com/food/fairlife-dairy-still-under-fire-over-alleged-animal-abuse-t156127.

[4] *McDonald's Cuts Egg Supplier After Undercover Animal Cruelty Video*, L.A. TIMES (Nov. 18, 2011, 2:24 PM), https://latimesblogs.latimes.com/money_co/2011/11/mcdonalds-cuts-egg-supplier-after-undercover-animal-cruelty-video.html.

These and similar investigations have also documented improper food safety practices and violations of labor and environmental law. SUMF ¶¶ 8, 27. These violations endanger an economically precarious agricultural workforce. For example, when Plaintiff Iowa Citizens for Community Improvement (CCI) conducted an undercover investigation into a pork facility in Algona, Iowa, it revealed numerous poor and unsafe working conditions, which resulted in an OSHA complaint, citations, and notifications of penalty by the agency. SUMF ¶ 45. Similarly, Plaintiff Animal Legal Defense Fund (ALDF) conducted a 2015 investigation of a Texas-based Tyson chicken slaughter plant that revealed horrendous working conditions, resulting in four legal complaints. SUMF ¶ 8.

## II.     Iowa's First Attempt to Criminalize Undercover Investigation of Agricultural Facilities is Struck Down as Unconstitutional.

"While the results of [some of] these investigations were being circulated by news media, the Iowa legislature considered H.F. 589, § 2 (Iowa 2012), which would eventually become § 717A.3A"—Iowa's original Ag-Gag law. *Reynolds II*, 353 F. Supp. 3d at 817. "Lawmakers described the bill as being responsive to two primary concerns of the agricultural industry: facility security (both in terms of biosecurity and security of private property) and harms that accompany investigative reporting." *Id*.

That law criminalized "obtain[ing] access to an agricultural production facility by false pretenses," Iowa Code § 717A.3A(1)(a), as well as "mak[ing] a [knowingly] false statement or representation" on an employment application "with an intent to commit an act not authorized by the owner" of the facility. Iowa Code § 717A.3A(1)(b).

The law had the effect of criminalizing undercover investigative activities targeting agricultural operations. It required journalists and investigators to disclose that they sought to engage

in an undercover investigation in order to obtain employment and comply with the law, eliminating any possibility that they would be permitted access to these facilities.

In 2017, the same Plaintiffs that bring this case filed suit challenging § 717A.3A on its face and in full as violating the First and Fourteenth Amendments. *See Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362-JEG-HCA (S.D. Iowa).

In early 2019, this Court granted summary judgment to the Plaintiffs on their First Amendment claim. *Reynolds II*, 353 F. Supp. 3d 812. The Court first ruled that the law implicated free speech, rejecting the State's argument that the statute regulated conduct. "Speech is necessarily implicated by § 717A.3A because 'one cannot violate § 717A.3A *without* engaging in speech.' The speech implicated is false statements and misrepresentations." *Id.* at 821 (quoting *Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 918 (S.D. Iowa 2018) ("*Reynolds I*")) (emphasis in original). Because "false statements will be protected by the First Amendment only if they do not cause a 'legally cognizable harm' or provide 'material gain' to the speaker," *id.* at 821–22 (quoting *United States v. Alvarez*, 567 U.S. 709, 718, 723 (2012)), and "the false statements implicated by § 717A.3A . . . d[id] not cause either," the statute implicated First Amendment protected speech. *Id.* at 822 (citing *Reynolds I*, 297 F. Supp. 3d at 920–24).

The Court next ruled that both substantive provisions "'contained within § 717A.3A [were] content-based on their face.'" *Id.* (quoting *Reynolds I*, 297 F. Supp. 3d at 919). Not only must a prosecutor "'necessarily examine the content' of an individual's statement to determine whether the individual violate[d] the statute," but he or she must also "know the content's veracity." *Id.* (citing *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

The Court then found that the statute failed both strict and intermediate scrutiny. The State's asserted interests of protecting private property and biosecurity were "not compelling in

the First Amendment sense" because "the harms targeted were 'entirely speculative.'" *Id*. at 824 (quoting *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1212 (D. Utah 2017) and citing *Animal Legal Def. Fund v. Otter*, 118 F. Supp. 3d 1195, 1207–08 (D. Idaho 2015)). But even if the interests were compelling, "§ 717A.3A's prohibitions [were] not narrowly tailored to serve either interest." *Id*. The State failed to demonstrate how biosecurity or property rights were served by the Ag-Gag law, or "'that alternative measures that burden substantially less speech would fail to achieve the government's interest.'" *Id*. at 825 (quoting *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)). The State had (and still has) numerous other laws at its disposal to protect private property and biosecurity interests without impinging on free-speech rights or singling out just one industry for protection (or its critics for prosecution). "'The existence of content neutral alternatives to' protect property rights and biosecurity, 'undercut[s] significantly' the defenses raised to the statutory content.'" *Id*. (quoting *Survivors Network of Those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785, 793–94 (8th Cir. 2015) (alteration in original)).

The Court entered judgment for Plaintiffs, declaring the statute unconstitutional and permanently enjoining the State from enforcing it. *Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362–JEG-HCA, ECF Nos. 86 (Feb. 14, 2019) (granting declaratory and injunctive relief), 87 (Feb. 15, 2019) (judgment), appeal pending, No. 19-1364 (docketed Feb. 22, 2019).

## III.   In Response to § 717A.3A Being Struck Down, Iowa Passes § 717A.3B.

The Iowa legislature wasted little time responding to this Court's ruling. Less than three weeks after the Court enjoined enforcement of Iowa Code § 717A.3A, the legislature introduced new Ag-Gag legislation. The legislation sped through subcommittees, committees, and both chambers in eleven days.

Sponsors of the bills in both the House (Rep. Klein) and the Senate (Sen. Rozenboom) were clear that the new bills were a response to this Court striking down § 717A.3A. SUMF ¶ 82.[5] Representative Klein, speaking in support of the bill he introduced, said he "will not stand by and allow [Iowa farmers] to be disparaged in the way they have been." SUMF ¶ 83.  Representative Bearinger stated that the law was necessary due to "extremism" and that it was "an important bill to protect our agricultural entities across the state of Iowa." SUMF ¶ 84.  Senator Rozenboom noted that agriculture contributes $38 billion in economic output in Iowa and that "agriculture in Iowa deserves protection from those who would intentionally use deceptive practices to distort public perception of best practices to safely and responsibly produce food." SUMF ¶ 85.

On March 14, 2019—one month after being enjoined from enforcing Iowa Code § 717A.3A and one day after the legislature sent the bill to her desk—Defendant Governor Reynolds signed into law Senate File 519, now codified at Iowa Code § 717A.3B. The bill, "deemed of immediate importance," took effect upon the Governor's signature.

## IV.    This Court Denies the State's Motion to Dismiss and Preliminarily Enjoins the Law.

Plaintiffs filed suit challenging § 717A.3B on the ground that, like § 717A.3A before it, § 717A.3B violates constitutional guarantees of freedom of speech and the press. Complaint ¶¶ 120–41. Plaintiffs also brought claims § 717A.3B was overbroad and void for vagueness. *Id*. ¶¶ 142–51. Defendants moved to dismiss each of Plaintiffs' claims. Plaintiffs moved to preliminarily enjoin the law.

---

[5] The Supreme Court has observed that in interpreting statutory language, where "no committee report discusses the provisions," contemporaneous statements made by a bill's sponsors may be "the only authoritative indications of [the legislature's] intent." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 527 (1982).

On December 2, 2019, this Court granted Defendants' motion to dismiss Plaintiffs' void-for-vagueness claim, denied the State's motion to dismiss Plaintiffs' First Amendment claims, and preliminarily enjoined enforcement of the law, finding Plaintiffs were likely to prevail because the law fails First Amendment scrutiny. *See Reynolds III.*

Plaintiffs now move for summary judgment on their First Amendment and overbreadth claims. Under the legal reasoning set forth in this Court's order denying Defendants' motion to dismiss and preliminarily enjoining enforcement of § 717A.3B, and based on the undisputed facts in the record, summary judgment for the Plaintiffs is warranted.

## Legal Standard

Summary judgment should issue when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Facial challenges to the constitutionality of statutes or regulations under the First Amendment often involve pure questions of law appropriate for resolution on summary judgment. *See, e.g.*, *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640 (1981); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976).

## Argument

### I.   Plaintiffs Have Standing to Challenge the Constitutionality of § 717A.3B.

In the challenge to § 717A.3A, this Court found that Plaintiffs had standing to challenge the law. *Reynolds I*, 297 F. Supp. 3d at 912–17; *Reynolds II*, 353 F. Supp. 3d at 819–20.[6] Because

---

[6] In addition to this Court in the challenge to § 717A.3A, courts that have considered challenges to similar state statutes have had little difficulty finding standing on similar showings for the plaintiffs in those cases, some of whom are also Plaintiffs here. *See Herbert*, 263 F. Supp. 3d at 1200 (finding standing for ALDF and PETA to challenge similar Utah Ag-Gag statute); *Otter*, 44 F. Supp. 3d at 1017-18 (finding standing for ALDF, PETA, and CFS to challenge similar Idaho Ag-Gag statute); *PETA, Inc. v. Stein*, 737 F. App'x 122, 130–31 (4th Cir. 2018) (finding complaint alleging injury to ALDF, PETA, and CFS sufficient to establish standing to challenge civil

this case involves the same Plaintiffs with the same injuries, Plaintiffs also have standing to challenge § 717A.3B.

Plaintiffs claiming violations of their First Amendment rights establish an injury "even if the plaintiff has not engaged in the prohibited expression as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004). "[A]ctual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"). Instead, potential for enforcement is sufficient to demonstrate that "a party [can] 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Gerlich v. Leath*, 861 F.3d 697, 704 (8th Cir. 2017) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).

Under this standard, plaintiffs have standing when they have (1) "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute,'" and (2) that "'there exists a credible threat of prosecution thereunder.'" *SBA List*, 573 U.S. at 159 (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Plaintiffs here have both.

ALDF, PETA, CCI, and Bailing Out Benji have standing because they seek to engage in undercover investigations that would violate § 717A.3B but fear prosecution under the statute, chilling their speech. SUMF ¶¶ 12, 33, 35, 46–47, 63–64. Some Plaintiffs have moved forward

---

damages cause of action created by North Carolina Ag-Gag statute); *Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 362626, at *8-*12 (D. Kan. Jan. 22, 2020) (finding ALDF and CFS had standing to challenge provisions of Kansas Ag-Gag statute).

with their investigative activities now that the law is preliminarily enjoined (but would immedi-ately stop those efforts if § 717.A.3B were upheld); others have refrained from investigations un-less and until the law is permanently enjoined out of a concern for placing investigators into an uncertain legal landscape. SUMF ¶¶ 11, 36, 52, 65.

Plaintiffs face a credible threat of prosecution under § 717A.3B—the law was passed spe-cifically to criminalize the types of investigations that Plaintiffs intend to conduct. *281 Care Comm. v. Arneson*, 638 F.3d 621, 630 (8th Cir. 2011) (finding credible threat of prosecution when plaintiffs alleged a desire to use political rhetoric that they reasonably feared state officials would interpret as violating the statute (citing *Babbitt*, 442 U.S. at 302); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010).

Plaintiffs also have standing as organizations that have redirected their financial and human resources to identify and combat an alleged unlawful practice. *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434–35 (8th Cir. 1998). Each Plaintiff has a mission that is frustrated by § 717A.3B. SUMF ¶¶ 18, 39, 54, 68, 72–76. Each Plaintiff has redirected financial and human resources away from its core educational and outreach programs to focus on the social harms of the Iowa Ag-Gag law, suffering a consequent drain on its resources due to the law. SUMF ¶¶ 16–18, 38–39, 53–54, 67–68, 78–79. As a result, Plaintiffs each have less money and time to devote to activities that are central to their missions, such as animal rescues, and educating the public about the harms of industrial farming and other forms of abuse, neglect, and cruelty to animals. SUMF ¶¶ 18, 39, 54, 68, 79.

These injuries confer organizational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that the allegation that an organization had to divert resources from providing counseling and referral services to low-income home seekers to countering alleged

discriminatory housing practices constituted injury in fact, not "simply a setback to the organization's abstract social interests").

Finally, Plaintiffs Center for Food Safety (CFS) and CCI also have standing as listeners deprived of the pipeline of information that comes from other entities, such as the other Plaintiffs. "[A] plaintiff need not be subject to a speech restriction in order to have standing to advance a [First Amendment] challenge. First Amendment protections extend to both speakers and listeners, the latter having a right to receive information and ideas." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1115 (10th Cir. 2008) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976)). Plaintiffs ALDF, PETA, and CCI, would each conduct investigations and disseminate that information to willing recipients, including CCI and CFS. SUMF ¶¶ 2–14, 22–35, 37, 43–48. CFS would use information derived from those investigations in its own advocacy. SUMF ¶¶ 75, 77. CCI would also use information derived from those investigations, as well as its own investigations, in its advocacy. SUMF ¶¶ 48, 52. Because CFS and CCI are deprived of that information under § 717A.3B, they have standing to challenge the law.

## II.    Section 717A.3B Violates the First Amendment.

### A.    Section 717A.3B Criminalizes Speech, Not Conduct.

This Court has already held that § 717A.3B regulates speech "because a person can only violate § 717A.3B by engaging in deception, which requires either speech or expressive conduct— such as nodding one's head instead of saying 'yes' in response to a question." *Reynolds III* at 7. *See also Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 362626, at \*15 (D. Kan. Jan. 22, 2020) ("the prohibition on deception limits what plaintiffs may or may not say."). Because § 717A.3B restricts engaging in speech, the law implicates First Amendment interests.

11

**B.  Section 717A.3B Targets Speech Protected by the First Amendment.**

Like its predecessor § 717A.3A, and as this Court already found, § 717A.3B targets speech protected by the First Amendment. It prohibits false speech that does not cause a legally cognizable harm or provide material gain to the speaker. *Reynolds III* at 9–21. And § 717A.3B is not saved by the revised intent requirement, which requires "intent to cause physical or economic harm or other injury." *Id*. at 10 (quoting Iowa Code § 717A.3B(1)(a) & (b)).

The Supreme Court has repeatedly held that only those "few 'historic and traditional categories [of expression] long familiar to the bar,'" *Alvarez*, 567 U.S. at 717 (alteration in original) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)), are exempt from the prohibition on content-based restrictions. The First Amendment permits criminalizing only lies that cause a legally cognizable harm in the form of "'"*specific or tangible*" injuries.'" *Reynolds III* at 10 (quoting *Reynolds I*, 297 F. Supp. 3d at 921 (quoting *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194 (9th Cir. 2018))) (emphasis in *Reynolds III*). Because § 717A.3B places "no meaningful limit on the harm that would satisfy its intent element—that is, it does not require the harm to be legally cognizable, specific, tangible, actual, or material"—the law proscribes speech protected by the First Amendment. *Reynolds III* at 12.[7]

"On its face, an intent to cause *any* injury, no matter how trivial or subjective, would suffice to establish the harm element of the statute." *Id*. (emphasis in original). As such, § 717A.3B

---

[7] If this Court were to find that the law applies to unprotected speech, the Ag-Gag law would still be unconstitutional. A regulation is subject to strict scrutiny even when the speech at issue falls under one of the exceptions to First Amendment protection (such as true threats, obscenity, or incitement) if it discriminates based on viewpoint within that category. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–86 (1992) ("[T]he power to proscribe [speech] on the basis of one content element (e.g., obscenity) does not entail the power to proscribe it on the basis of other content elements."). *See Kelly*, 2020 WL 362626, at *18 (finding, even if speech regulated was unprotected, "defendants [could] not regulate only false speech that is intended to damage enterprises conducted at animal facilities (i.e., made with intent to damage animal facilities))".

criminalizes, among other things, a) labor organizers who seek employment with the intent to promote unionization and collective bargaining, potentially decreasing profits; b) an animal rights activist who obtains "access to a puppy mill auction by stating or implying that he or she was a breeder or pet broker" and then "surreptitiously take[s] photographs or audio or video recordings, or perhaps simply tak[es] mental notes regarding what that person observed of the animals or their conditions" to warn potential buyers of what they are purchasing; and even c) "truthful reporting on animal abuse or unsanitary conditions" at animal agricultural facilities if done with the intent to cause a business injury like reputational harm. *Id*. at 12–13.

Section 717A.3B's broad targeting of speech that causes no legally cognizable harm is confirmed by its application to both prospective and existing employees. Because "§ 717A.3B does not state that the deception must have occurred during the job application process . . . an omission by an existing employee (such as failing to inform management of an intent to whistle-blow) would constitute deception under the statute." *Id*. at 14. "A disgruntled whistleblower might very well intend to harm an agricultural production facility by truthfully reporting misconduct." *Id*. "Indeed, the fact that other Iowa statutes affirmatively provide whistleblower protections, *see*, *e.g.*, Iowa Code § 88.9(3) (whistleblower protection relating to occupational health and safety), and the absence of such a provision in § 717A.3B, suggests it would not provide such protection." *Id*.

Neither it is the case that Section 717A.3B codifies Iowa's duty of good faith and fair dealing or duty of loyalty and thus must target speech causing legally cognizable harm. *Id*. at 15–18. "The general duty of good faith and fair dealing has been limited by the Iowa Supreme Court, which has consistently rejected the theory in employment contract cases." *Id*. at 16 (cleaned up). "Iowa law does *not* recognize the implied duty of good faith and fair dealing in the employment

context." *Id.* at 16 (emphasis in original). Therefore, the existence of the duty does not establish that § 717A.3B, reaching all employees, targets a legally cognizable harm: "the duty does not demonstrate that *any* harm an employee might cause an employer is legally cognizable." *Id.*[8]

The notion that § 717A.3B simply codifies Iowa's duty of loyalty fails for the same reason it failed to save § 717A.3A—"because the 'Iowa Supreme Court has cautioned that even a civil cause of action based on the breach of the duty of loyalty must be limited in scope.'" *Id.* at 16–17 (quoting *Reynolds II*, 353 F. Supp. 3d at 826 (citing *Condon Auto Sales & Servs. v. Crick*, 604 N.W.2d 587, 600 (Iowa 1999))). In Iowa "the duty of loyalty is generally confined to instances of direct competition, misappropriation of profits, property, or business opportunities, trade secrets and other confidences, and deliberately performing acts for the benefit of one employer which are adverse to another employer." *Reynolds III* at 17 (cleaned up). So while "stealing trade secrets to pass to a competitor would breach the duty of loyalty, . . . reporting animal abuse may not," and § 717A.3B criminalizes the latter. *Id.*

Second, subsection 717A.3B(1)(b) is not excluded from First Amendment protection by the *Alvarez* plurality opinion's discussion about false statements used to obtain "offers of employment." *Id.* at 19–20 (citing *Alvarez*, 567 U.S. at 723). First, as demonstrated above, § 717A.3B(1)(b) applies not only to deceptions made to obtain employment, but also to deceptions made by existing employees to retain employment. But even if § 717A.3B(1)(b) only applied to obtaining employment, "when read in context, the *Alvarez* plurality uses 'an offer of employment'

---

[8] Even if Iowa did recognize the duty of good faith and fair dealing in the employment context, the Supreme Court has repeatedly held that only those "few 'historic and traditional categories [of expression] long familiar to the bar,'" *Alvarez*, 567 U.S. at 717 (alteration in original) (quoting *Stevens*, 559 U.S. at 468), are exempt from the prohibition on content-based restrictions. *Reynolds III* at 16. "[F]alse speech associated with an intent to violate the duty of good faith and fair dealing or any other duties an employee might owe an employer" does not fall under any of those historic categories. *Id.*

as *an example* of a material gain in stating that a fraudulent false statement, such as overstating

qualifications, would not receive First Amendment protection if it were meant to procure a material

gain, *such as* an offer of employment." *Reynolds III* at 19 (citing *Alvarez*, 567 U.S. at 723) (em-

phasis in original). "The plurality did not say that any false statement associated with an offer of

employment falls outside the protection of the First Amendment" and did not "create a blanket

First Amendment exception relating to offers of employment." *Id*. at 19–20. As this Court recog-

nized in assessing the predecessor statute, the lies Plaintiffs' "undercover investigators tell relate

to their affiliation with animal protection organizations" but not "about their job qualifications and

relevant experience." *Reynolds I*, 297 F. Supp. 3d at 924.

Finally, the assertion that undercover investigations do not receive automatic protections

against tort claims also does not change the fact that § 717A.3B burdens First Amendment-pro-

tected speech. *Reynolds III* at 20. As this Court found, the cases Defendants relied on in their

Motion to Dismiss each involve laws aimed exclusively at non-expressive conduct, which simply

captured people who were also engaged in speech; they do not involve a law that includes a con-

tent-based restriction on speech among its elements, like § 717A.3B. *Id*.

In sum, the speech prohibited by § 717A.3B does not fall outside the scope of the First

Amendment. *Id.* at 22.

### C.  Section 717A.3B is Content- and Viewpoint-Based.

#### 1.  Section 717A.3B Is Content-Based.

Section 717A.3B is a content-based restriction of protected speech. Like its predecessor

§ 717A.3A, § 717A.3B discriminates between truthful and false speech, thus imposing a limit ap-

plicable only to a specific category of speech based on its content. *See Reynolds I*, 297 F. Supp.

3d at 919 (finding § 717A.3A discriminated between true and false speech); *Herbert*, 263

F.Supp.3d at 1210 (determining that the Utah Ag-Gag law's misrepresentation prohibition was content-based because "whether someone violates the Act depends on what they say"). In addition to discriminating between categories of speech based on content, § 717A.3B is a content-based regulation because "enforcement authorities would have to evaluate the content of what a person said to determine whether they engaged in deception." *Reynolds III* at 8; *see also Kelly*, 2020 WL 362626, at *17 (noting that under the Kansas Ag-Gag statute, "defendants would have to review what the individual communicated to the animal facility owner" and statute is therefore "plainly a content-based restriction on speech.").

Section 717A.3B is also content based because it is limited to the subject matter of commercial agricultural industry practices. *Reynolds III* at 23 ("Like § 717A.3A, § 717A.3B only targets the agricultural industry.") The text of the law itself makes clear that it seeks to prohibit undercover investigations of animal agricultural facilities and only agricultural facilities. *See* Iowa Code § 717A.3B(1)(a), (b). The law does not apply to any other industry that traditionally has been or might be subject to undercover investigations, including medical facilities, elder care facilities, day cares, automotive shops, or prepared food service businesses. *See id.*; *see also Kelly*, 2020 WL 362626, at *17–*18 (finding provisions of Kansas law that prohibited certain acts at animal facilities, including filming, without effective consent of the owner and with intent to damage the enterprise were content- and viewpoint-based restrictions that failed strict scrutiny). Consistent with the plain text of the statute, the contemporaneous statements by the legislators evidence this intent. SUMF ¶¶ 82–85.

As a content-based statute, Section 717A.3B is subject to heightened First Amendment scrutiny.

16

### 2. Section 717A.3B Is Viewpoint-Based Because It Singles Out Speech Critical of a Single Industry for Special, Disfavored Treatment.

Moreover, § 717A.3B is also viewpoint-based because it singles out speech critical of a single industry for special, disfavored treatment.

"Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). A statute discriminates based on viewpoint when the State "has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017). "Restrictions on speech are viewpoint-based where they distinguish between speech based on 'the specific motivating ideology or the opinion or perspective of the speaker,'" *Reynolds I*, 297 F. Supp. 3d at 925–26 (quoting *Reed*, 135 S. Ct. at 2230), or "'proscribe[] views on particular disfavored subjects and suppress[] distinctive ideas conveyed by a distinctive message,'" *id*. (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 582 (1998)).

As the District of Kansas recently explained in reviewing that State's Ag-Gag law, the statute's intent element makes it viewpoint discriminatory. Like with § 717A.3B, the Kansas law required a person to act with an "intent" to cause harm. Therefore, "[t]he law does not prohibit [the targeted] conduct if the person has the intent to benefit the enterprise conducted at the animal facility, and in this respect it impermissibly discriminates based on the speaker's views about animal facilities." *Kelly*, 2020 WL 362626, at *17. "For example, if a journalist ignored posted keep-out notices and lied to an animal facility owner to gain access and exercise control over the animal facility with the intent to write a positive article about the enterprise, he or she would not violate"

17

the law. *Id.* Accordingly, "The law plainly targets negative views about animal facilities and therefore discriminates based on viewpoint." *Id.*

Moreover, in determining whether a regulation is viewpoint- or content-based, the Court can also look beyond the face of the law to the government's purpose in enacting the regulation. *Whitton v. City of Gladstone*, 54 F.3d 1400, 1406 (8th Cir. 1995) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also United States v. Eichman*, 496 U.S. 310, 315 (1990) ("Although the Flag Protection Act contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression and concerned with the content of such expression.") (cleaned up). "[E]ven a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994); *see also Reed*, 135 S. Ct. at 2222 ("[S]trict scrutiny applies *either* when a law is content based on its face or when the purpose and justification for the law are content based . . .") (emphasis added).

Iowa legislators were candid about the viewpoint-based legislative purpose underlying both § 717A.3A and § 717A.3B. SUMF ¶¶ 78-83. They stated that they passed § 717A.3A to "make producers feel more comfortable," SUMF ¶ 80, and that animal activists "want to hurt an important part of our economy, . . . [and] don't want us to have eggs; they don't want people to eat meat." SUMF ¶ 81. They stated what § 717A.3A is "aim[ed] at is stopping these groups that go out and gin up campaigns that they use to raise money by trying to give the agriculture industry a bad name." SUMF ¶ 81.

After § 717A.3A was struck down, sponsors of the bills that became § 717A.3B admitted it was a response to that ruling. SUMF ¶ 82. In support of § 717A.3B, legislators said they "will

not stand by and allow [Iowa farmers] to be disparaged in the way they have been," that the law was necessary due to "extremism," that it was "an important bill to protect our agricultural entities across the state of Iowa," and that "agriculture in Iowa deserves protection from those who would intentionally use deceptive practices to distort public perception of best practices to safely and responsibly produce food."  SUMF ¶¶ 83–85.

These statements expose the viewpoint-based legislative purpose motivating § 717A.3B's passage.

## III.   Section 717A.3B Does Not Survive Heightened Scrutiny.

As a content- and viewpoint-based restriction on speech, § 717A.3B is subject to heightened scrutiny.

In assessing the constitutionality of § 717A.3A, and again in preliminarily enjoining § 717A.3B, this Court recognized that "the Supreme Court's fractured decision in *Alvarez* has led to some confusion regarding the appropriate level of scrutiny for false statements," *Reynolds III* at 30, but found that neither statute survived either standard of review. *Id.*; *Reynolds II*, 353 F. Supp. 3d at 823.

The same is true now. While, as explained below, Plaintiffs believe the best reading of *Alvarez* and the subsequent precedent interpreting *Alvarez* is that prohibitions on lies are subject to strict scrutiny, § 717A.3B fails both strict and intermediate scrutiny.

### A.  The Ag-Gag Law Does Not Survive Strict Scrutiny.

#### 1.  Prohibitions on False Statements Receive Strict Scrutiny.

Strict scrutiny is warranted here because, as demonstrated above, the statute discriminates based on content and viewpoint. *Turner*, 512 U.S. at 642.

Consistent with this, strict scrutiny is also the correct standard to apply to statutes that regulate false statements of fact, which, by definition, are content-based—because the Court needs to examine the speech to determine whether the law applies. The *Alvarez* plurality applied strict scrutiny to prohibitions on lies. 567 U.S. at 715. And the Eighth Circuit has applied strict scrutiny to lies that are political in nature both before *Alvarez*, *281 Care Comm.*, 638 F.3d at 636, and since, *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) ("target[ing] falsity, as opposed to the legally cognizable harms associated with a false statement, . . . is no free pass around the First Amendment"). *See also Wasden*, 878 F.3d at 1196 (subjecting Idaho Ag-Gag law's prohibition on gaining access to an animal agriculture facility by misrepresentation to strict scrutiny); *Kelly*, 2020 WL 362626, at *18 (applying strict scrutiny to Kansas's Ag-Gag law); *Herbert*, 263 F. Supp. 3d at 1210 (analyzing post-*Alvarez* precedent on level of scrutiny to apply to false statements and determining strict scrutiny applied to Utah Ag-Gag law).[9]

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231. To be narrowly tailored, the speech restriction must be the least restrictive means available to achieve the compelling interest and must not be underinclusive. *United States v. Playboy Entm't Grp.*, 529 U.S. 803,

---

[9] Accord *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 472 (6th Cir. 2016) (applying strict scrutiny to state law criminalizing false statements about political candidates); *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1139–41 (D. Mont. 2016) (applying strict scrutiny to professional rules of conduct prohibiting false statements in judicial elections); *Winter v. Wolnitzek*, 186 F. Supp. 3d 673, 696–97 (E.D. Ky. 2016) (applying strict scrutiny to false speech provision of judicial canons), *aff'd in part, vacated and rev'd in part on other grounds*, 834 F.3d 681 (6th Cir. 2018); *Rosemond v. Markham*, 135 F. Supp. 3d 574, 586 (E.D. Ky. 2015) (applying strict scrutiny to regulatory board regulation prohibiting, in part, false representations); *O'Neill v. Crawford*, 970 N.E.2d 973, 973 (Ohio 2012) ("The *Alvarez* court . . . recognized that not only must the restriction meet the 'compelling interest test,' but the restriction must be 'actually necessary' to achieve its interest."); *Rickert v. Pub. Disclosure Comm'n*, 168 P.3d 826, 828 (Wash. 2007) (applying strict scrutiny to Washington false-statement law).

813 (2000). Laws subject to strict scrutiny are "presumptively invalid, and the Government bears the burden to rebut that presumption." *Stevens*, 559 U.S. at 468 (internal quotation marks omitted); *Reynolds II*, 353 F. Supp. 3d at 824 (citing *Playboy*, 529 U.S. at 818).

Strict scrutiny is never satisfied when the interest served by the law is anything less than the most "pressing public necessity." *Turner*, 512 U.S. at 680 (O'Connor, J., concurring in part and dissenting in part).

### 2.   Section 717A.3B Does Not Survive Strict Scrutiny.

Section 717A.3B cannot withstand strict scrutiny for two equally important reasons: (1) it does not advance a compelling state interest; and (2) even if the State's interest were compelling, the law is not narrowly tailored to advance that interest.

### i.   Section 717A.3B Does Not Advance a Compelling State Interest.

In defending § 717A.3B on Plaintiffs' motion for preliminary injunction, Defendants asserted that "§ 717A.3B advances the State's interests in protecting the private property, proprietary information, and biosecurity measures of agricultural production facilities . . . specifically . . . 'where the perpetrators have obtained access or employment by deception.'" *Reynolds III* at 31 (quoting Defs.' Resist. 16, ECF No. 34).

This Court rejected Defendants' contentions that those interests saved the predecessor statute § 717A.3A, *Reynolds II*, 353 F. Supp. 3d at 824, and it also found those interests fail to justify § 717A.3B. *Reynolds III* at 31–33. This Court found that "even if it assumed that protecting the property and biosecurity of agricultural facilities from third parties were the true interests served by [the laws], they were not 'compelling in the First Amendment sense'" because "entirely speculative" harms are insufficient. *Id.* at 31 (quoting *Reynolds II*, 353 F. Supp. 3d at 824 (quoting *Herbert*, 263 F. Supp. 3d at 1211–12 and citing *Humanitarian Law Project*, 561 U.S. at 55).

Defendants cannot show that these purported interests are anything but speculative, that existing laws do not already sufficiently protect those interests, or that the agricultural industry faces greater threats to those interests than do other industries.

Even if Defendants' assertions regarding the importance of biosecurity to agricultural production were true, they cannot show that such threats come from deception used "to gain access to or employment at an agricultural production facility while intending to harm the facility." *Reynolds III* at 32 (citing *United States v. DeCoster*, 828 F.3d 626 (8th Cir. 2016)).

The disconnect between Defendants' asserted interests and the text of both § 717A.3A and § 717A.3B confirms that the actual legislative interest in passing both laws was to suppress speech from undercover investigations that puts industrial animal agriculture in a bad light. Sponsors and supporters of both the old and new law repeatedly expressed a concern for protecting the agriculture industry from the sunlight of undercover investigations. SUMF ¶¶ 80-81, 83-85. These statements reveal that the desire to protect the agricultural industry from critical speech was a "motivating factor" of the law. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Because § 717A.3B was motivated, at least in substantial part, by illegitimate motives, it cannot survive the compelling-interest test. *Id.*

### ii. Section 717A.3B is Not Narrowly Tailored or the Least Restrictive Means Available.

Even if the State's interest underlying § 717A.3B could be characterized as compelling for strict scrutiny purposes, the law still fails strict scrutiny because it is not narrowly tailored to serve that interest or the least restrictive means available to address that interest.

Strict scrutiny "entail[s] a most searching examination" and requires "the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (internal quotations omitted).

"In the prior litigation, this Court concluded that § 717A.3A was not narrowly tailored to serve the proffered interests in part because existing statutes already address the interests." *Reynolds III* at 33–34 (citing *Reynolds II*, 353 F. Supp. 3d at 825–26). At the preliminary injunction phase, the Court found that the same was true with respect to § 717A.3B because "[t]he interests presented here are the same, and the existing statutes this Court previously identified are still in effect." *Reynolds III* at 34. Because existing laws against trespass and fraud and protecting biosecurity and trade secrets already protect the interests Defendants assert that § 717A.3B protects, § 717A.3B is not narrowly tailored or the least restrictive means available to protect those interests.

The law is over-inclusive to the interests Defendants' claim it protects in other ways as well. "Like § 717A.3A, § 717A.3B 'goes far beyond what is necessary to protect the state's interests and allows for expansive prosecution.'" *Reynolds III* at 35 (quoting *Reynolds II*, 353 F. Supp. 3d at 826). The law is "overinclusive compared to Defendants' proffered interests because it applies to deception coupled with an intent to cause any type of harm, rather than merely an intent to cause the types of harm Defendants claim the statute is meant to address." *Id*. The fact that § 717A.3B would criminalize Plaintiffs' intended undercover investigations, "which do not fall under the umbrella of Defendants' proffered interests, demonstrates that the prohibition is overinclusive." *Id*.

The law is also under-inclusive. "[A]n underinclusive prohibition should raise 'serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Reynolds II*, 353 F. Supp. 3d at 826 (quoting *Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786, 802 (2011)). Like its predecessor, "Section 717A.3B . . . does nothing to deter trespass or biosecurity breaches from individuals who proceed to access or enter a facility without deception." *Reynolds III* at 35.

Unsurprisingly, "[w]hat [§ 717A.3B] appears perfectly tailored toward is preventing undercover investigators from exposing abuses at agricultural facilities." *Herbert*, 263 F. Supp. 3d at 1213. "Section 717A.3B's focus on deception is much more tailored to prohibiting undercover investigations, for which deception is vital, than for prohibiting biosecurity violations, for which deception seems peripheral." *Reynolds III* at 36. This is not a case in which the legislative motive is particularly difficult to ferret out—it is clear from the text of the law itself and the legislators' own statements.

Defendants do not have a compelling interest in silencing whistleblowers in animal agriculture. Even if Defendants' true interests were protecting private property or biosecurity, § 717A.3B is in no way tailored to those ends, and certainly is not the least restrictive means of achieving them. The law fails strict scrutiny.

### B.   Section 717A.3B Does Not Survive Intermediate Scrutiny.

Even if this Court determines that intermediate scrutiny is the appropriate standard, § 717A.3B also fails that level of scrutiny, just like its predecessor. *See Reynolds III* at 36–37 (§ 717A.3B); *Reynolds II*, 353 F. Supp. 3d at 826–27 (§ 717A.3A).

To meet intermediate scrutiny, the State must demonstrate that the law is "narrowly tailored to serve a significant government interest" and "leave[s] open ample alternative channels for communication of the information" to be upheld. *Ward*, 491 U.S. at 791. Like strict scrutiny, intermediate scrutiny requires that the proffered interests be the "actual state purposes, not rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535–36 (1996).

For one, "Defendants' proffered interests cannot be considered 'important' in the First Amendment context because they appear entirely speculative." *Reynolds III* at 37. As demonstrated above, the State's actual interests in passing § 717A.3B were not substantial because they

were "[related] to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377

(1968). The law criminalizes speech directly and was motivated by a desire to prohibit speech that

is critical of animal agriculture.

Even under intermediate scrutiny, "the government still 'may not regulate expression in

such a manner that a substantial portion of the burden on speech does not serve to advance its

goals.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799). *See also Nat'l Inst. of Family

& Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (assuming the existence of a "substan-

tial state interest" but holding that the law was "not sufficiently drawn to achieve it"). Furthermore,

under this standard, "the government must demonstrate that alternative measures that burden sub-

stantially less speech would fail to achieve the government's interests, not simply that the chosen

route is easier." *McCullen*, 573 U.S. at 495.

Like its predecessor, § 717A.3B fails intermediate scrutiny first, because there is simply

no fit between the State's alleged interests and the means by which § 717A.3B supposedly goes

about protecting them. "[Section] 717A.3B burdens substantially more speech than necessary to

advance the proffered interests; . . . it would potentially criminalize whistleblowing, labor organ-

izing, and undercover investigating activities, even though none of those activities relate to the

stated purposes of the statute." *Reynolds III* at 37. Moreover, there is ample evidence that Iowa's

"actual state purpose[]," *Virginia*, 518 U.S. at 535, was not "unrelated to the suppression of free

expression," *O'Brien*, 391 U.S. at 377. Even under intermediate scrutiny, § 717A.3B must fall.

## IV.    Section 717A.3B is Unconstitutionally Overbroad.

The Court should also strike down § 717A.3B because it is overbroad. The overbreadth

doctrine requires that laws be invalidated when they restrict significantly more speech than the

First Amendment allows. *Stevens*, 559 U.S. at 473; *see also Ashcroft v. Free Speech Coal.*, 535

U.S. 234, 256 (2002). Criminal statutes are especially dangerous from a First Amendment perspective because of their potential to chill important expression, and must be examined particularly carefully for overbreadth. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

The first step in overbreadth analysis is to assess the breadth of the challenged statute. *Stevens*, 559 U.S. at 474. The second step is to determine whether the statute, as construed by the Court, prohibits a substantial amount of conduct or speech protected by the First Amendment. *United States v. Williams*, 553 U.S. 285, 297 (2008).

Section 717A.3B is facially overbroad because it criminalizes a substantial amount of speech protected by the First Amendment. While designed to target and chill the speech of animal-protection activists, § 717A.3B also chills and criminalizes a plethora of protected speech that is not even related to animal welfare, including that concerning worker safety, food safety, labor laws, and other types of agricultural industry misconduct. *Reynolds III* at 37. And it chills the speech of any person or group that would seek to investigate an agricultural facility in a similar manner, including journalists, union workers seeking to organize a workforce, or any person merely concerned about the conditions under which food is processed.

For example, if a reporter states that he or she wants to do a story on a manufacturing process, but actually intends to document labor violations, the reporter is violating § 717A.3B regardless of what the reporter actually does or reports on. Similarly, if that reporter fails to correct an owner or employee's understanding of why he or she was at the agricultural operation, the reporter is subject to prosecution under the law.

In addition, even journalists who forthrightly state their purpose for entry will fear prosecution under § 717A.3B. If a journalist enters a facility covered by the statute for one purpose but sees something at the facility that is even more deserving of press coverage, the journalist will be

at risk of prosecution if he or she writes the new story. Certainly, gaining entry for one explicit purpose, and then writing about another matter will oftentimes rise to the level of probable cause that one was using false pretenses to gain access.

The same reporter, like the Plaintiffs, will also fear liability for conspiracy to violate § 717A.3B by protecting a source's identity, if the source obtained material or information in violation of § 717A.3B—regardless of whether the reporter ever sets foot on the facility's property herself. In this manner, § 717A.3B also sets the publication of the information in its cross-hairs, in addition to the initial gathering of that information.

Section 717A.3B seeks to punish investigators who have no intent to cause property damages, no intent to release animals, and no intent to steal trade secrets, but who simply seek to expose animal abuse, dangerous workplaces, unsafe food production, labor misconduct, and other types of agricultural industry misdeeds. Therein lies the overbreadth.

Because § 717A.3B criminalizes a substantial amount of protected speech and conduct, it is overbroad.

### Conclusion

Section 717A.3B violates the First Amendment because it is a content-based and viewpoint-based restriction on protected speech that cannot survive strict scrutiny. Even if it is subject to intermediate scrutiny, it cannot survive that level of scrutiny either. Additionally, the law is facially overbroad, making it unconstitutional under the First Amendment. Therefore, this Court should grant summary judgment in favor of Plaintiffs and permanently enjoin § 717A.3B.

Dated this 17th day of March, 2020

/s/ *Matthew Strugar*
Matthew Strugar (*Pro Hac Vice*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010

(323) 696-2299
matthew@matthewstrugar.com

Rita Bettis Austen, AT0011558
ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 808
Des Moines, IA 50309–2317
Telephone: 515.243.3988
Fax: 515.243.8506
Email: Rita.Bettis@aclu-ia.org

Matthew Liebman (*Pro Hac Vice*)
Kelsey Eberly (*Pro Hac Vice*)
Cristina Stella (*Pro Hac Vice*)
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org
keberly@aldf.org
cstella@aldf.org

Professor Alan Chen (*Pro Hac Vice*)
University of Denver
Sturm College of Law
2255 E. Evans Avenue Denver, CO 80208
(303) 871-66283
achen@law.du.edu

Professor Justin Marceau, (*Pro Hac Vice*)
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

David S. Muraskin (*Pro Hac Vice*)
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in this case are registered CM/ECF users and will served by the CM/ECF system.

Date: March 17, 2020                    /s/_ Matthew Strugar_____
                                        Matthew Strugar