IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ANIMAL LEGAL DEFENSE FUND, BAILING OUT BENJI, IOWA CITIZENS FOR COMMUNITY IMPROVEMENT, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., and CENTER FOR FOOD SAFETY, | ) ) ) ) ) ) | Case No. 4:19-cv-00124-SMR-HCA |
| Plaintiffs, | ) ) ) | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | ) ) ) | |
| KIMBERLY REYNOLDS, in her official capacity as Governor of Iowa, TOM MILLER, in his official capacity as Attorney General of Iowa, and DREW B. SWANSON, in his official capacity as Montgomery County Attorney, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs are five non-profit organizations dedicated to animal protection, food safety, and other grassroots advocacy issues.  They gather evidence of animal abuse and other alleged illegal conduct by conducting undercover investigations of the day-to-day activities at facilities where they suspect wrongdoing occurs.  Unsurprisingly, they typically need to conceal their true identities and intentions to gain access to a facility, which is often gained through employment.  Plaintiffs filed this suit challenging Iowa Code § 717.3B, which they contend infringes on their constitutional rights.

Defendants are the Governor of Iowa, the Attorney General of Iowa, and the County Attorney for Montgomery County, Iowa.  They are all sued in their official capacity because they are officials with the power to enforce violations of § 717.3B.

Before the Court are Cross-Motions for Summary Judgment.  Plaintiffs move for summary judgment, arguing § 717A.3B violates the First Amendment of the United States Constitution because it discriminates based on content and viewpoint and cannot survive strict scrutiny.  [ECF No. 55].  Defendants move for summary judgment as well, arguing the law does not regulate protected speech under the First Amendment or, if it does regulate protected speech, it is content-neutral and viewpoint-neutral and passes intermediate scrutiny.  [ECF No. 62].

Both motions have been extensively briefed by the parties and the Court finds a hearing is not necessary.  *See* LR 7(c).  For the reasons described below, Plaintiffs' Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED.

## I.      BACKGROUND[1]

Plaintiffs seek to advance the interests of their organizations by engaging in advocacy, investigations, and litigation.  Among the tactics used by Plaintiffs are undercover investigations.  To gain access to the facilities in which they seek to investigate, Plaintiffs will often conceal or misrepresent their identities.  [ECF No. 55-1 ¶ 6] (Pls.' SUMF) (Walden Aff.).  They aver that their investigators never misrepresent their skills, fitness for the job, or make any other misrepresentation which could pose a danger to the facility; the misrepresentations are only limited to conceal their affiliation with the organization.  *Id.* ¶ 7.  Plaintiffs' investigators are also trained to not harm the facility, operations, property, or employees.  *Id.* ¶ 34 (Kerr Aff.).  Throughout the investigation, the investigator acts as an ordinary employee, but documents any potential violations of laws or regulations with hidden cameras.  *Id.* ¶ 7 (Walden Aff.).  The videos and photographs are then used to seek enforcement of criminal and civil laws, encourage legislation and reform,

---

[1] The facts of this case are relatively undisputed but where they are in dispute, the Court will view the fact in the light most favorable to the nonmoving party.  *See Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015)

and educate the public. *Id*. Plaintiffs have conducted investigations in Iowa previously and wish to do so again, but they allege Iowa Code § 717A.3B has a "chilling effect" on their activities. *Id*. ¶¶ 10, 32, 47, 61, 73.[2]

Iowa Code § 717A.3B is the second in a series of laws passed by the Iowa legislature aimed at criminalizing undercover investigations such as the ones conducted by Plaintiffs. The first version was Iowa Code § 717A.3A, passed in 2017. The same plaintiffs as here filed suit to enjoin that law. *See Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa) (*Reynolds I*). Senior United States District Court Judge James E. Gritzner granted the plaintiffs' motion for summary judgment and permanently enjoined the law. *Id.* Defendants appealed to the United States Court of Appeals for the Eighth Circuit.

After Judge Gritzner entered the permanent injunction, but before the Eighth Circuit ruled on the defendants' appeal, the legislature passed Iowa Code § 717A.3B, which is the subject of these Cross-Motions for Summary Judgment. The new law modified some of the language in response to Judge Gritzner's ruling but is substantially similar. Plaintiffs filed this suit to enjoin § 717A.3B. [ECF No. 1]. On December 2, 2019, Judge Gritzner preliminarily enjoined the law. [ECF No. 41]. Plaintiffs filed this Motion for Summary Judgment on March 16, 2020, and

---

[2] Plaintiffs' Statement of Undisputed Material Facts describes examples of investigations previously undertaken in Iowa. The affiant for Plaintiff Animal Legal Defense Fund ("ALDF") attests that the organization previously conducted an animal welfare investigation at Cricket Hollow Animal Park in Manchester, Iowa. [ECF No. 55-1 ¶ 5] (Walden Aff.). Plaintiff People for the Ethical Treatment of Animals ("PETA") also conducted an undercover investigation at a Hormel Foods supplier in Iowa and another investigation at a kosher slaughterhouse. *Id*. ¶ 31 (Kerr Aff.). Plaintiff Iowa Citizens for Community Improvement ("CCI") investigated a pork farm near Algona, Iowa where an investigator took photographs of the working conditions which served as the basis for an OSHA complaint. *Id*. ¶ 45 (Mason Aff.). Plaintiff Bailing Out Benji ("BOB") states that it used false pretenses to a puppy mill in 2011 to uncover the harmful conditions in which the dogs were kept. *Id*. ¶ 58 (Callison Aff.). ALDF, CCI, and BOB declare they have resumed planning and have concrete plans to resume investigations in light of Judge Gritzner's injunction of § 717A.3B. *Id*. ¶¶ 11, 49, 65.

Defendants cross-moved for summary judgment on April 27, 2020.  [ECF Nos. 55; 62].  Pursuant to the agreement of the parties, Judge Gritzner continued the case while awaiting the Eighth Circuit's ruling in *Reynolds I*.  [ECF No. 77].

On August 10, 2021, the Eighth Circuit ruled on § 717A.3A, finding one of the provisions to be constitutional but upholding Judge Gritzner's finding on the other provision.  *See Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021) ("*ALDF*"[3]).

## II.  ANALYSIS

### A.  First Amendment

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  A statute falls within the ambit of the First Amendment if it imposes a burden "based on the content of the speech and the identity of the speaker."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  A content-based restriction is a regulation based on "the topic discussed or the idea or message expressed, drawing distinctions based on the message."  *Reed*, 576 U.S. at 163.  Such content-based laws are "presumptively unconstitutional and may be justified only if the government proves that [the law is] narrowly tailored to serve compelling state interests."  *Id*.  The government bears the burden of establishing a content-based restriction is narrowly tailored to serve compelling state interests.  *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

Some categories of content-based speech are "unprotected" under the First Amendment.  *See, e.g., Miller v. California*, 413 U.S. 15, 36 (1973) (obscenity); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973) (offers for illegal transactions);

---

[3] For clarity, the appeal in *Reynolds I* will be referred to as *ALDF*.  The Eighth Circuit's holding in the case will be discussed in further detail below.

*Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (incitement); *Watts v. United States*, 394 U.S. 705, 707 (1969) (true threats); *New York Times Co. v. Sullivan*, 376 U.S. 254, 264, (1964) (defamation); *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948) (fraud); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (fighting words).  However, the United States Supreme Court has held that although certain categories of speech are unprotected, it does not mean they are "entirely invisible to the Constitution." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992).  Rather, it means such speech can "be regulated because of their constitutionally proscribable content," without violating the commands of the First Amendment.  *Id.*  The interplay of this framework on a particular category of speech is not always manifest and occasionally requires further legal analysis.

One such category is false speech.   In *United States v. Alvarez*, the Supreme Court considered the constitutionality of the Stolen Valor Act of 2005.  567 U.S. 709 (2012).  The Stolen Valor Act made it a crime for anyone to falsely represent "verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States." *Id.* at 715 (quoting 18 U.S.C. § 704(b)).  The defendant in the case, Xavier Alvarez, had been indicted and convicted of violating the law after he introduced himself as a Medal of Honor recipient at his first meeting as a new member of a local water board.  *Id.* at 714.  A six-justice majority reversed Alvarez's conviction, finding that the Stolen Valor Act did not comport with the Constitution because the First Amendment, to a certain extent, tolerates and protects false statements.  *Id.* at 730.  However, no single rationale attracted a five-justice majority.

The plurality opinion, written by Justice Kennedy, held that false speech did not run afoul of the First Amendment unless it caused legally cognizable harm.  *Id.* at 719.  "Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of

employment, it is well established that the Government may restrict speech without affronting the First Amendment." *Id.* at 723. Additionally, the Court found that false speech, at least false speech that does not cause legally cognizable harm, was not one of the "few historic and traditional categories" where "content-based restrictions on speech have been permitted." *Id*. at 717.

Concurring in the judgment was Justice Breyer joined by Justice Kagan. Justice Breyer wrote that the law was invalid under intermediate scrutiny as well as under the "exacting scrutiny" applied by the plurality. *Id*. at 732 (Breyer, J., concurring). Under intermediate scrutiny, the two justices held that the Stolen Valor Act violated the protections of the First Amendment because the law lacked "limiting features . . . rang[ing] very broadly" and could apply "in family, social, or other private contexts, where lies will often cause little harm." *Id*. at 736. Acknowledging the substantial justifications for the law, the concurrence suggested it would be constitutional if it was tailored to "focus its coverage on lies most likely to be harmful or on contexts where such lies are most likely to cause harm." *Id*. at 738.

### B. *Iowa Code Section 717A.3A and* Reynolds I

#### 1. *Reynolds I*-District Court

In 2012, the Iowa legislature passed H.F. 589, titled "Agriculture Production Facility Fraud," which was signed into law by Governor Terry Branstad and codified as Iowa Code § 717A.3A. That law provides, in part:

> A person is guilty of agricultural production facility fraud if the person willfully does any of the following:
>
> a. Obtains access to an agricultural production facility by false pretenses.
>
> b. Makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the

owner of the agricultural production facility, knowing that the act is not authorized.

Iowa Code § 717A.3A(1)(a)-(b) (2012).   A first conviction is a serious misdemeanor and subsequent convictions are punished as aggravated misdemeanors.  *Id*. § 717A.3A(2)(a)–(b).

As mentioned, Judge Gritzner granted summary judgment to Plaintiffs on their First Amendment claim.  *Id*. at 827.  Relying on *Alvarez*, he found that the false statements identified in § 717A.3A were protected speech because they did not cause "legally cognizable harm."  *Id.* at 822.  Judge Gritzner also determined that § 717A.3A was content-based because "'enforcement authorities must necessarily examine the content' of an individual's statement to determine whether the individual violates the statute."  *Id*. (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).   The content, for purposes of § 717A.3A, was the veracity of the statements made by the trespasser.

Judge Gritzner did not expressly determine whether strict or intermediate scrutiny applied but found that under either test, § 717A.3A failed.  *Id*. at 824.   Under strict scrutiny, the governmental interests proffered by the defendants—private property and biosecurity—were "important" but they were "not compelling in the First Amendment sense."  *Id*.  Faulting defendants for offering no record illustrating how biosecurity is compromised by a deceptive trespasser, Judge Gritzner refused to "assume that biological harm turns on a human vector making a false statement unrelated to such harm in order to gain access to the facility.   Protecting biosecurity is therefore purely speculative and cannot constitute a compelling state interest."  *Id.* at 825.   Furthermore, the prohibitions in § 717A.3A were not narrowly tailored to serve those interests.  He found that § 717A.3A was not narrowly tailored because similar prohibitions already existed in other sections of the Iowa Code.  *Id*. at 825–26 (citing Iowa Code §§ 717A.2; 716.7(2); 717A.4).  The law did not pass muster under intermediate scrutiny either because it was too "broad

in scope" and could implicate liability "where harm is unlikely and the need for prohibition is small." *Id*. at 827.

Beyond its problems with interests and tailoring, Judge Gritzner found § 717A.3A to be under- and overinclusive.  It was underinclusive because it did "nothing to deter the exact same alleged harms—trespass and biosecurity breaches—from individuals who proceed to access or enter a facility without false pretense or misrepresentation." *Id*. at 826.  The overinclusion problem arose from the lack of limitation on conduct covered by the law.  Judge Gritzner found the provision, which prohibited making "a false statement or representation as part of an application or agreement to be employed at an agricultural production facility . . . with an intent to commit an act not authorized by the owner," could sweep up innocent conduct.  *Id*.  Judge Gritzner granted the plaintiffs' summary judgment motion and entered a permanent injunction against the law on February 14, 2019.

## 2. *Reynolds I*—Eighth Circuit

On August 10, 2021, the Eighth Circuit affirmed in part and reversed in part.  The divided holding turned on the distinction between the two provisions of § 717A.3A(1).  The Eighth Circuit held the first provision, § 717A.3A(1)(a) (the "Access Provision"), did not violate the First Amendment but the second provision, § 717A.3A(1)(b) (the "Employment Provision"), did run afoul of the Free Speech Clause.  *ALDF*, 8 F.4th at 788.

In its decision, the Eighth Circuit agreed with Judge Gritzner that both provisions "constitute direct regulations of speech" because they target "false pretenses" and "false statements." *Id*. at 784.  Pretense is nonverbal expressive conduct because "pretenses" requires expression of information.  *Id*.  The court also found that both provisions were content-based

regulations because "[e]ach prohibits expression that is 'false,' and an observer must examine the content of the speech to determine whether it is prohibited." *Id*. (citing *Reed*, 576 U.S. at 163–64).

However, the panel majority disagreed with Judge Gritzner's holding on whether trespass constituted a legally cognizable harm.  Whereas Judge Gritzner found the false statements implicated by § 717A.3A did not cause "legally cognizable harm" or "material gain," the Eighth Circuit held that "harm flowing from trespass is legally cognizable." *Id*. at 786 (quoting *Nichols v. City of Evansdale*, 687 N.W.2d 562, 573 (Iowa 2004)).  In the case of trespass, the court held, nominal damages can compensate a property owner for the invasion of privacy and violation of their right to exclude, both of which are "legally cognizable harms." *Id*.  "Nominal damages are not 'purely symbolic, a mere judicial token that provides no actual benefit to the plaintiff.'" *Id*. (quoting *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021)).  In short, the Eighth Circuit held that the Access Provision was "consistent with the First Amendment" because it prohibited the utterance of false statements which result in a trespass and "in light of *Alvarez* . . . intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment." *Id*.

However, as to the Employment Provision, the *ALDF* Court held that it violated the First Amendment's guarantee of freedom of speech.  The infirmity in the Employment Provision was that it was "not limited to false claims that are made 'to secure' an offer of employment; it allows for prosecution of those who make false statements that are not capable of influencing an offer of employment." *Id*. at 787.  The court hypothesized various scenarios where a job applicant flatters themselves in immaterial ways during a job interview. *Id*.  This tailoring issue—the lack of a materiality requirement in the Employment Provision—resulted in the provision failing both strict

scrutiny (*Alvarez* plurality) and intermediate scrutiny (*Alvarez* concurrence).   Therefore, the

provision was unconstitutionally broad.  *Id.*

### C.  *Iowa Code Section 717A.3B and* Reynolds II

In response to Judge Gritzner's injunction in *Reynolds I*, the Iowa legislature passed a new

law, § 717A.3B.[4]  This second iteration bears substantial resemblance to its predecessor.  It

provides, in relevant part:

> 1. A person commits agricultural production facility trespass if the
> person does any of the following:
>
> a. Uses deception . . .  on a matter that would reasonably result in a
> denial of access to an agricultural production facility that is not open
> to the public, and, through such deception, gains access to the
> agricultural production facility, with the intent to cause physical or
> economic harm or other injury to the agricultural production
> facility's operations, agricultural animals, crop, owner, personnel,
> equipment, building, premises, business interest, or customer[; or]
> ["Access Provision"]
>
> b. Uses deception . . . on a matter that would reasonably result in a
> denial of an opportunity to be employed at an agricultural
> production facility that is not open to the public, and, through such
> deception, is so employed, with the intent to cause physical or
> economic harm or other injury to the agricultural production
> facility's operations, agricultural animals, crop, owner, personnel,
> equipment, building, premises, business interest, or customer.
> ["Employment Provision"].

Iowa Code § 717A.3B(1).  Deception includes, but is not limited to, "[c]reating or confirming

another's belief or impression as to the existence or nonexistence of a fact or condition which is

false and which the actor does not believe to be true," or "[f]ailing to correct a false belief or

impression as to the existence or nonexistence of a fact or condition which the actor previously

---

[4] The bill's sponsor said during a floor debate on the bill, "House File 649 stems from a
federal district court decision that overturned our 2012 agricultural production facility fraud law."
[ECF No. 55 ¶ 82] (Representative Jared Klein).

has created or confirmed." *Id.* § 702.9.  Section 717A.3B also provides for conspirator liability for anyone "who conspires with another . . . to commit agricultural production facility trespass." *Id*. § 717A.3B(3).  As is the case for § 717A.3A, a first conviction under § 717A.3B is a serious misdemeanor, and any subsequent convictions are aggravated misdemeanors.  *Id*. § 717A.3B(2).

On April 22, 2019, Plaintiffs filed a Complaint challenging § 717A.3B on the grounds that the law violates the First Amendment on its face.  [ECF No. 1 ¶¶ 120–151].  Count I contends the law is overbroad.  Count II brings a First Amendment challenge based on Plaintiffs' allegations that the law discriminates based on content and viewpoint.  In Count III, Plaintiffs maintain § 717A.3B is unconstitutionally vague.  And Count IV of the Complaint alleges the law violates Plaintiffs' Due Process rights protected by the Fourteenth Amendment by substantially burdening their First Amendment rights.  Defendants soon moved to dismiss the Complaint and Plaintiffs moved for a preliminary injunction.  [ECF Nos. 18; 25].  Judge Gritzner granted Plaintiffs' motion for a preliminary injunction and denied Defendants' motion to dismiss.  [ECF No. 41].  Plaintiffs filed a Motion for Summary Judgment, [ECF No. 55], and Defendants did so too, [ECF No. 62]. After the Eighth Circuit issued its ruling in *ALDF*, the parties provided supplemental briefing on the implications for this case.  [ECF Nos. 81; 82; 83].

### D.  Cross-Motions for Summary Judgment

#### 1.  Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City*

*of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).   But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255.   To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### 2.   Cross-Motions for Summary Judgment

Both parties move for summary judgment.   Plaintiffs argue that § 717A.3B criminalizes speech protected by the First Amendment and discriminates based on content and viewpoint.   They assert it is subject to strict scrutiny, a standard it cannot pass.   [ECF No. 58].   Defendants respond that the law does not regulate speech and, even if it does, it is content- and viewpoint neutral.   They assert the law survives strict scrutiny anyway and thus request summary judgment in their favor. [ECF No. 62].

### a.   Standing

In their Motion for Summary Judgment, Defendants write that they do not challenge Plaintiffs' standing to bring their claims but correctly point out that standing is a jurisdictional requirement. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).   The standing requirement is "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).   This means that courts have an independent obligation to confirm their jurisdiction, including standing. *Allen v. Wright*, 468 U.S. 737, 750 (1984).   Standing requires a plaintiff establish an injury in fact, a causal connection between their injury and the challenged law, and that a favorable decision will likely redress their injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).   To establish an injury in fact, a plaintiff must show an

individualized injury; that is concrete and particularized; and actual or imminent, not conjectural or hypothetical. *Id*. at 560.

When an injury has not occurred but a plaintiff alleges it is imminent, a court must assess: (1) whether plaintiffs allege an intent to engage in a course of conduct arguably affected with a constitutional interest; (2) whether the intended future conduct is arguably proscribed by the statute they are challenging; (3) whether the threat of future enforcement is substantial. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–164 (2014). The Eighth Circuit has held that this standard for a pre-enforcement First Amendment challenge is "forgiving." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Susan B. Anthony List*, 573 U.S. at 162)).

ALDF, PETA, CCI, and BOB all have standing because they have credibly alleged that they seek to engage in undercover investigations which would likely violate § 717A.3B. They face a credible threat of prosecution according to their affidavits describing their investigations, a point which Defendants do not dispute. *See* [ECF No. 55-1] (Pls.' SUMF); [ECF No. 66 at 7] (Defs.' Comb. Brief) ("Defendants, for purposes of summary judgment, do not dispute any of the facts in Plaintiffs' [SUMF]."). Plaintiffs have all offered sufficient evidence to support organizational standing on the basis of a frustrated mission and diversion of financial resources based on a credible threat of prosecution. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010). Center for Food Safety ("CFS") alleges much of their work relies on information they receive from the other Plaintiffs. [ECF No. 55-1 ¶ 75]. CFS has standing based on an "information injury" resulting from a deprivation of information they no longer receive from the other Plaintiffs. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 757 (1976) (A "right to receive" information can be a basis for a First Amendment claim).

b.   Conduct or Speech

The first inquiry is whether § 717A.3B regulates speech or expressive conduct.  Defendants insist that § 717A.3B does not regulate either because a trespass "symbolizes nothing," thus it is not an act of communication qualifying for First Amendment protections.  Non-expressive conduct is not protected by the First Amendment.  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968).  To that point, conduct does not receive First Amendment protections solely by virtue of accompanying speech.  *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006).  Only "conduct that is inherently expressive" will fall within the purview of the First Amendment.  *Id.*  A clear way to delineate the line between a law regulating conduct and a law regulating speech is that the former implicates what a person may or may not "do" whereas a law implicating the latter pertains to what a person may or may not "say."  *Id.* at 60.

Judge Gritzner determined that § 717A.3B, as was the case with § 717A.3A, regulated speech and not merely conduct.  [ECF No. 41 at 7]; *see also Reynolds I*, 353 F. Supp. 3d at 821 ("Speech is necessarily implicated by § 717A.3A because one cannot violate § 717A.3A without engaging in speech.") (internal quotations and emphasis omitted); *accord ALDF*, 8 F.4th at 784 (finding both provisions of § 717A.3A "constitute direct regulations of speech.").  Consistent with Judge Gritzner's finding in this case, and the Eighth Circuit's holding in *ALDF*, the Court holds that § 717A.3B is a speech regulation.  This is because "deception" requires an expression of information in which the contents of the communication, whether verbal or nonverbal, must be examined to determine whether it was in fact deceptive.  *See ALDF*, 8 F.4th at 784.

c.   Protected or Unprotected Speech

Although the parties spill considerable ink arguing whether § 717A.3B implicates protected speech, it is clear in light of the Eighth Circuit's holding in *ALDF* that both provisions

regulate unprotected speech.  The *ALDF* Court found that deceptive trespass caused "legally cognizable harm" under *Alvarez*, therefore false speech that enables a trespass is not protected. *ALDF*, 8 F.4th at 786 ("[I]n light of *Alvarez* . . . intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment.").  The "Employment" Provision of § 717A.3B remedies the constitutional deficiency found by the *ALDF* Court in § 717A.3A by requiring any deception used to gain employment at an agricultural production facility be "on a matter that would reasonably result in a denial of an opportunity to be employed . . . ."  Iowa Code § 717A.3B(1)(b);  *see also ALDF*, 8 F.4th at 787 (finding a less restrictive means was available by "proscrib[ing] only false statements that are material to a hiring decision").  The *ALDF* Court found the Access Provision of § 717A.3A did not regulate protected speech and the Court holds that neither provision of § 717A.3B does either.

### d.   Content or Viewpoint Based Regulation

Simply because speech is unprotected does not grant a free license for the government to regulate that speech based on viewpoint.  *See R.A.V.*, 505 U.S. at 383.  The Eighth Circuit determined in *ALDF* that § 717A.3A was content based because the contents of the speech at issue needed to be examined to determine if the trespasser gained access or employment based on "false pretenses."  *ALDF*, 8 F.4th at 784.  That holding applies to § 717A.3B as well because any "deception" requires an examination of the contents of speech or expressive conduct to ascertain whether it was deceiving.

Viewpoint discrimination arises "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  Viewpoint discrimination is a particularly "egregious form of content discrimination."  *Id.*; *see also Reed*, 576 U.S. at 168 ("Government discrimination among

viewpoints—or the regulation of speech based on the specific motivating ideology or opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.").

Plaintiffs contend the law discriminates based on viewpoint because it singles out a specific industry for favoritism and seeks to silent critics of that industry. Defendants reject this argument, claiming Plaintiffs cherry-picking specific quotes from a few legislators while ignoring other statements by lawmakers about the need to protect private property and biosecurity at agricultural facilities. They further argue that the agriculture-specific scope of the law "does not equate to an intent to disfavor a subset of messages based upon their viewpoint." [ECF No. 82 at 12–13] (Defs.' Supp. Brief).

### i.   *R.A.V. v. City of St. Paul*

The seminal case on content and viewpoint discrimination within unprotected speech is *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). In *R.A.V.*, the Supreme Court considered the St. Paul Bias-Motivated Crime Ordinance, which provided: ""[w]hoever places on public or private property a symbol . . . but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor." *Id.* at 380 (quoting St. Paul Bias-Motivated Crime Ordinance, St. Paul, Minn., Legis. Code § 292.02 (1990)).

Adhering to the construction of the Minnesota Supreme Court that the ordinance regulated "fighting words," within the meaning of *Chaplinsky*, the *R.A.V.* Court reversed, holding that the law violated the First Amendment, despite reaching only unprotected speech. Justice Scalia, writing for the majority, found that speech from unprotected categories may be regulated but any content discrimination must be based on the same characteristics of the speech that makes it

proscribable. *Id*. at 384 (holding a content-based discrimination must be "*because of the*[] *constitutionally proscribable content* (obscenity, defamation, etc.)") (emphasis in original). This means that although unprotected speech categories may be regulated, they are not "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content."[5] *Id*. (emphasis in original). One example of an impermissible content-based discrimination of unprotected speech is libel but "*only* libel critical of the government." *Id*. (emphasis in original).

Content discrimination based on the same characteristics that make the speech unprotected does not give rise to the concern that the government is putting its thumb on the scale of public debate. *Id*. at 388 ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."). Such content discrimination is permissible because "[t]hese bases for distinction refute the proposition that the selectivity of the restriction is 'even arguably conditioned upon the sovereign's agreement with what a speaker may intend to say.'" *Id*. at 390 (quoting *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 555 (1981) (Stevens, J., dissenting in part)).

---

[5] Responding to Justice Stevens's accusation that it was imposing a requirement akin to underinclusiveness, the majority distilled its holding down to "the First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech." *R.A.V.* 505 U.S. at 387; *see also id.* at 419 ("Within a particular 'proscribable' category of expression, the Court holds, a government must either proscribe *all* speech or no speech at all.") (Stevens, J, dissenting) (emphasis in original).

Justice Scalia continued that the rule announced in *R.A.V.* was consistent with First Amendment doctrine because the purpose of the general prohibition "is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *Id.* at 387 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

Applying those principles, the *R.A.V.* Court held the St. Paul ordinance was facially unconstitutional because the law only applied to fighting words based on "race, color, creed, religion or gender." *Id.* at 391. This was not only a content-based discrimination but a viewpoint-based discrimination as well. *Id.* Justice Scalia emphasized that the holding was "not a prohibition of fighting words that are directed at certain persons or groups . . . but rather, a prohibition of fighting words that contain . . . messages of 'bias-motivated' hatred." *Id.* at 392. The First Amendment, the *R.A.V.* Court concluded, did not allow for such "selective limitations upon speech." *Id.*

### ii.   *Animal Legal Defense Fund v. Kelly*

Plaintiffs argue § 717A.3B is indistinguishable from a Kansas law which the Tenth Circuit recently struck down as unconstitutional on viewpoint discrimination grounds. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021). The law at issue in *Kelly* was a law passed by the Kansas legislature which prohibited "[b.] acquiring or exercising control over an animal facility . . . [c.] recording an animal facility's property . . . [or] [d.] trespassing on an animal facility," without effective consent and done with the "intent to damage the enterprise." *Id.* at 1224 (citing Kan. Stat. Ann. § 47-1827). The law provided that consent was not effective if it was "induced by force, fraud, deception, duress or threat." *Id.* at 1225. Just like the Eighth Circuit in *ALDF*, the *Kelly* Court found that the Kansas law concerned speech because deception was an element of the statute. *Id.* at 1232–33. Specifically, it found all three provisions of the law regulated speech "because they regulate what may be permissibly said to gain access to or control over an animal facility" *Id.*

The court also found the law discriminated based on viewpoint because it imposed liability for a deceptive trespass depending on the viewpoint of the individual. The *Kelly* Court commented

that the Kansas law imposed liability on an individual who deceives to enter an animal facility to expose wrongdoing, but not for someone who tells the same lie "to laud the facility or for neutral reasons." *Id.* at 1233. Therefore, the "intent to harm" element was not focused on the legally cognizable harm from a trespass but from the harm arising from specific viewpoints of the trespasser. *Id.* at 1234. This element violated the main principle from *R.A.V.*, that "a viewpoint-discriminatory regulation of unprotected speech is entitled to the same exacting scrutiny as content-based regulation of protected speech." *Id.* at 1239.

The Tenth Circuit rejected the argument that the government can regulate based on motive or intent so long as the specific speech or expressive conduct is not regulated. Free speech would be undermined if such a rule were adopted, according to *Kelly*, because a law could target a specific viewpoint by essentially including an "intent" requirement in the statute. *Id.* at 1242 ("[C]onsider . . . this hypothetical: a law prohibiting making any utterance with the *intention* to criticize an agriculture facility. Under the dissent's proposed rule, this would not offend the First Amendment's prohibition on viewpoint discrimination. After all, the content of the utterance would not be important—any utterance would do.") (emphasis added). A similar hypothetical could be used as an end around the holding in *R.A.V.*, "fighting words made with *intent to* arouse anger on the basis of race, color, creed, religion, or gender." *Id.* at 1242–43 (emphasis in original). Acknowledging *R.A.V.* discusses "the underlying message expressed" when considering content and viewpoint discrimination, *Kelly* describes the mischief from an intent-based proscription as empowering the government to exclude disfavored ideas or viewpoints from public debate. *Id.* at 1243 (quoting *R.A.V.*, 505 U.S. at 386–87).

Without deciding whether a trespass was a legally cognizable harm, the Tenth Circuit held that the legally cognizable harms envisioned by *Alvarez* are harms arising *directly* from the false

speech—such as defamation, fraud, and perjury.  *Id.* at 1234 (emphasis added).  "Damage to the enterprise" from ALDF's investigations flow from any evidence of wrongdoing and not from the lies used to gain access to the facility.  *Id.*  The harms the Kansas law purported to prevent were "not only legally non-cognizable but legally protected: that arising out of true speech on a matter of public concern."  *Id.* at 1235.  Fraud and threats are inapposite comparisons to the Kansas law because they fall within *R.A.V.*'s holding that there is "no significant danger of idea or viewpoint discrimination" when the content discrimination in the statute "consists entirely of the very reason the entire class of speech at issue is proscribable."  *Id.* at 1243–44 (quoting *R.A.V.*, 505 U.S. at 388).  This is because the Kansas law makes "deceptive trespass actionable only if made with the intent to harm the facility.  Thus, the entry onto the owner's property is not the relevant harm."  *Id.* at 1244.

Judge Hartz dissented.  He wrote that it was "at odds with common sense" to hold that a law that includes a motive element (intent to harm) violates the First Amendment.  *Id.* at 1252 (Hartz, J., dissenting).  Noting that many criminal statutes include an intent to harm as an element, such as burglary or fraud, he pointed out that no one suggests that a law violates the First Amendment by distinguishing between those who lie "with an intent to defraud" and those who do not.  *Id.* at 1253.  Judge Hartz drew a comparison between the Kansas law and the "true threats" doctrine by commenting that, "[l]imiting prohibitions [on lying to gain entry] to those who intend to harm . . . does not offend the First Amendment any more than limiting the prohibition on threats to those that are intended to frighten."  *Id.* at 1256.  The Kansas law differed from the St. Paul ordinance in *R.A.V.* because the "intent to harm the enterprise" element was an intent or motive requirement, whereas the unconstitutional provision in *R.A.V.* was directly related to the expression.  Judge Hartz concluded that the proper rule is that laws that discriminate against direct

expression (such as words spoken or expressions made) are viewpoint discriminatory, but "laws that discriminate based on intent or motive" are not. *Id*. at 1253–54.

e.   Scrutiny and Analysis

Section 717A.3B does not prohibit all deceptive trespassers, it only imposes liability based on the "intent" of the trespasser.  A trespasser intending no harm, or intending to "laud" a facility is not punished.  *See Kelly*, 9 F.4th at 1233.  But a trespasser intending "to cause physical or economic harm" can be punished.  Iowa Code § 717A.3B.  In other words, the statute considers the viewpoint of the trespasser when deciding whether to criminalize the conduct in question through its intent requirement; this is prohibited by *R.A.V.*

Defendants assert this provision targets the "intent or motivation of the speaker," not the message of the prohibited speech.  [ECF No. 82 at 15].  They urge the element is viewpoint neutral because deception for access or employment is conduct that is particularly harmful.  *Id.* (quoting *R.A.V.*, 505 U.S. at 388 ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of viewpoint discrimination exists.")).

Further, Defendants expressly defend the intent to harm requirement of § 717A.3B on the basis that not all deceptive trespassing needs to be treated the same.  Rather, they argue that Iowa is entitled to address a specific problem, which the legislature determined to be deceptive trespass by those who seek to cause harm to agricultural facilities.  But Plaintiffs point out that this is precisely the problem with the law, that it is not intended to address all trespass or resumé fraud at agricultural facilities, only that of individuals like Plaintiffs who intend to document certain

practices. [6]  Judge Grasz echoed similar concerns in his concurrence in *ALDF* where he hesitantly joined the majority in upholding the Access Provision but expressed concern about "a new category of speech which the government can punish through criminal prosecution." *Id.* at 788 (Grasz, J., concurring).  He found this was of particular concern when the speech "is tied to political or ideological messages." *Id.*

Defendants additionally rely on *United States v. Dinwiddie*, where the Eighth Circuit considered a First Amendment challenge to the Freedom of Access to Clinic Entrances Act (FACE) which imposes criminal sanctions for, among other things, intimidating or interfering with anyone attempting to obtain or provide reproductive health services.  76 F.3d 913, 917 (8th Cir. 1996) (citing 18 U.S.C. § 248(a)(1)).  The defendant in *Dinwiddie* took the position that FACE violated the First Amendment because it only punishes "abortion-related expressive conduct." *Id.* at 922–23.  The Eighth Circuit rejected this argument, finding that FACE did not discriminate against speech that "expresses an abortion-related message." *Id.* at 923.  The law applied "to anyone who blockades a clinic to prevent a woman from getting an abortion, regardless of the message expressed by the blockade." *Id.*  This element accomplished "the perfectly constitutional task of filtering out conduct that Congress believes need not be covered by a federal statute." *Id.*

*Dinwiddie*'s holding regarding FACE is distinguishable from § 717A.3B.  As the Eighth Circuit discussed, the law would apply to individuals who express viewpoints entirely unrelated

---

[6] Consider a hypothetical where an individual, tired of people giving agriculture a bad name through undercover investigations, decides to document how well a facility treats its animals and follows applicable laws and regulations.  Not wanting their video or photographs to appear staged, this individual deceives to gain access or employment but with the *intent* to help the facility. Section 717A.3B would not apply to the hypothetical individual whereas it does apply to investigations such as the ones conducted by Plaintiffs.  The law is discriminating based on a deceptive trespasser's viewpoint.

to abortion.  *Id.* (providing examples of potential violations of the law such as striking workers carrying signs that say, "We are underpaid!").  Indeed, FACE could apply to anyone intimidating or interfering with someone obtaining or providing reproductive health services without regard to any viewpoint.  Furthermore, the harm FACE sought to remedy is the very harm which makes the speech unprotected—threats and intimidation—which is an aim consistent with the admonition in *R.A.V.* that discrimination within unprotected speech must be based on the character of the speech which makes it unprotected in the first place.

Defendants also point to the Ninth Circuit's holding in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018), to support their position that § 717A.3B is viewpoint-neutral.  The *Wasden* Court found the statute there, Idaho Code § 18-7042, was viewpoint-neutral.  *Id.* at 1202.  The Court thinks *Wasden* is distinct from this case because § 717A.3B "on its face targets specific views about animal facilities."  *Kelly*, 9 F.4th at 1239.

A year after the Supreme Court handed down *R.A.V.*, it found that a law may restrict "discriminatory motive[s]" without running afoul of the First Amendment.  *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993).  The defendant in *Mitchell* received a sentencing enhancement for aggravated battery because he intentionally selected his victim based on race.  *Id.* at 479.  The Wisconsin Supreme Court had found that the sentencing enhancement violated the First Amendment by "punishing what the legislature has deemed to be offensive thought."  *Id.* at 481–82.  The United States Supreme Court reversed, upholding the Wisconsin sentencing enhancement and distinguishing *R.A.V.* because that case involved "a class of 'fighting words' deemed particularly offensive by the city," whereas "the statute in this case is aimed at conduct unprotected by the First Amendment."  *Id.* at 487.  Essentially, the intent requirement in *Mitchell* was a matter of pure conduct.

The issue with § 717A.3B, as with many laws aimed at prohibiting trespassers at agricultural facilities, is the law seeks to single out specific individuals for punishment based on their viewpoint regarding such facilities.  It is incontrovertible that the government can protect an individual's private property rights—including their right to exclude.  However, the intent element of § 717A.3B does not concern the same legally cognizable harm caused by trespass recognized by the Eighth Circuit.  *See ALDF*, 8 F.4th at 786 ("[Nominal] damages may compensate a property owner for a *diminution of privacy and a violation of the right to exclude*—legally cognizable harms." (emphasis added)).  Rather, Iowa seeks to protect private property rights by singling out for punishment, at least in part, trespassers based on their disfavored viewpoint of agriculture.  This is exactly what *R.A.V.* held to be impermissible.  *See R.A.V.*, 505 U.S. at 384 (holding that although unprotected speech may be more extensively regulated, it may not "be made the vehicle[] for content discrimination unrelated to [its] distinctively proscribable content.").  Furthermore, Section 717A.3B discriminates based on viewpoint because its "intent to harm" element proscribes speech which is "distinct from and not coterminous with any legally cognizable harm."  *Kelly*, 9 F.4th at 1239.

The pitfall of laws that purport to regulate based on an individual's "intent or motive," when the intent is closely related to speech, was illustrated in *Kelly* where the Tenth Circuit held that allowing the government to do so would "undermine[] the right to free speech by allowing the government to criminalize the inchoate desire to express a view where it cannot criminalize the expression."  *Id.* at 1242.

Buttressing the conclusion that the law is viewpoint discriminatory is the provision of §717A.3B which prohibits deceptive trespasser who gain access or obtain employment at an agricultural facility with the intent to cause "economic harm . . . to the agricultural production

-24-

facility's . . . business interest."  Iowa Code § 717A.3B.  This is squarely aimed at the investigations conducted by Plaintiffs.  There is no requirement that the intent to harm the business interest be predicated on falsity (such as defamation) it is only that the deceptive trespasser seeks to harm a business interest.  Section 717A.3B differs because among the harm it seeks to prohibit is "the subsequent speech" following the unprotected (false) speech.  The failure of § 717A.3B is the same as the Kansas law in *Kelly*, which is "focus[ing] not on the . . . harm from the trespass, but on the subsequent harm from the intent to harm the facility once on the property."  *Kelly*, 9 F.4th at 1233–34.

Because § 717A.3B discriminates based on viewpoint, it must satisfy strict scrutiny.  *See Reed*, 576 U.S. at 163–64.  This requires that the law be narrowly tailored to accomplish a compelling governmental interest.  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  The purpose of the strict scrutiny test "is to ensure that speech is restricted no further than necessary to achieve the [legislature's] goal," and "ensure that legitimate speech is not chilled or punished."  *ACLU*, 542 U.S. at 666.  The burden is on the government to prove that the law passes the strict scrutiny test.  *Id*. at 660.  Strict scrutiny requires that a law "must be the least restrictive means of achieving a compelling state interest."  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

Defendants offer that the law advances significant governmental interests by protecting private property, proprietary information, and biosecurity from those who seek to harm the facility.  Two of those interests—private property and biosecurity—were provided as compelling interests in *Reynolds I*, but Judge Gritzner found them to not be "compelling in the First Amendment sense."  *Reynolds I*, 353 F. Supp. 3d at 824.

Crucially, the stated purposes of the law—private property rights and biosecurity—would also be implicated for deceptive trespassers without the intent to harm the facility.  Even a

trespasser with no intent to harm a facility, but deceives to access or gain employment at the facility, is violating the property owner's right to exclude.  Defendants offer no explanation why the strict biosecurity protocols discussed by some of the legislators are not at risk by a benign or benevolent deceptive trespasser.  Section 717A.3B does not focus solely on the right to exclude, the legally cognizable harm of trespass, but only on the right to exclude those with particular viewpoints.  *See Kelly*, 9 F.4th at 1234 n.10.  Viewpoint discrimination is a "category of speech regulation that Government must avoid most assiduously."  *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 685 (1994) (Ginsburg, J., concurring).  The new interest identified by Defendants, protecting proprietary information, may be compelling and the Court will assume for purposes of this Motion that it is.[7]  This interest still suffers from the same infirmities as in *Reynolds I*, where Judge Gritzner described them as "purely speculative."  *Id*. at 825.  Furthermore, the tailoring of § 717A.3B fails strict scrutiny regardless of whether these interests are compelling.

The lack of narrow tailoring leads to transgressing important First Amendment values.  Plaintiffs and their investigators seek to shine a light on issues such as animal abuse, food safety, and agricultural working conditions, which are all fairly in the public sphere and issues of public concern.  [ECF No. 55-1 ¶¶ 45; 47; 63].  Some of the abuses uncovered during these investigations are described in their statement of undisputed material facts.

PETA investigated a supplier for Hormel Foods, in Iowa, where workers "beat[] pigs with metal rods . . . st[uck] clothespins into pigs' eyes and faces."  One employee, a supervisor, kicked a "young pig in the face, abdomen, and genitals to make her move while telling the investigator, '[y]ou gotta beat on the bitch.  Make her cry.'"  [ECF No. 55-1 ¶ 30] (Kerr Aff.).  Cows at a kosher

---

[7] The Court is very familiar with the case cited by Defendants regarding a Chinese national convicted of participating in a conspiracy to steal trade secrets for seed technology.  [ECF No. 66 at 50 n. 23]; *see United States v. Hailong*, 4:13-cr-00147-SMR-SHL-2 (S.D. Iowa).

slaughterhouse in Iowa were left "conscious for as long as three minutes after their throats had been slit." *Id.* The investigations are not limited to animal abuse in food production but also agricultural working conditions, pollution, and dog breeding facilities. *Id.* There is little debate that the issues that are subject of Plaintiffs' investigations are matters of public interest. The Supreme Court "has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)); *Roth v. United States*, 354 U.S. 476, 484 (1957) (The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."); *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

To be sure, some of the investigations may violate other laws. However, the State of Iowa may not single out individuals for special punishment based on their critical viewpoint of agricultural practices, which they have sought to do with § 717A.3B. It is the proper province of the legislature to determine whether specific facilities—such as agricultural facilities, nuclear power plants, military bases, or other sensitive buildings—are entitled to special legal protections. However, the First Amendment does not allow those protections to be based on a violator's viewpoint. If so, "the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V.*, 505 U.S. at 388.

### f.   Count IV-Due Process

Plaintiffs' fourth claim in the Complaint is a Fourteenth Amendment challenge to the law for violation of due process. They do not move for summary judgment on the claim and, in light of the Court's determination above, the claim will be dismissed without prejudice as moot.

### III.    CONCLUSION

Plaintiffs' Motion for Summary Judgment is GRANTED.  [ECF No. 55].  Defendants' Motion for Summary Judgment is DENIED.  [ECF No. 62].

Judge Gritzner issued a preliminary injunction on December 2, 2019, prohibiting enforcement of § 717A.3B, which is still in effect.  [ECF No. 41].  Plaintiffs shall have until April 1, 2022, to file a motion regarding the scope of the permanent injunction and any legal fees they may seek.  Defendants shall have until April 29, 2022, to file a response to the motion.  Plaintiffs will be permitted to file a reply to Defendants' response, if they desire, any time thereafter.

IT IS SO ORDERED.

Dated this 14th day of March, 2022.

STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT